1             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2

3  Civil Action No. 11-cv-01430-PAB

4  UNITED STATES OF AMERICA,

5      Plaintiff,

6  vs.

7  KENNETH SCOTT,

8      Defendant.
_____

9

10                REPORTER'S TRANSCRIPT
        Hearing on Motion for Preliminary Injunction

11  _____

12        Proceedings before the HONORABLE JUDGE PHILIP A.

13  BRIMMER, Judge, United States District Court for the District

14  of Colorado, at commencing at  8:35 a.m., on the 26th day of

15  January, 2012, in Courtroom A-701, United States Courthouse,

16  Denver, Colorado.

17

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A-257, Denver, Colorado, 80294, (303) 893-2835

|     |     |
| --- | --- |
| 1 | APPEARANCES |
| 2 | Aaron Fleisher, Julie Abbate and Winsome Gayle, |
| 3 | U.S. Department of Justice, Civil Rights Division 950 |
| 4 | Pennsylvania Avenue, N.W., Washington, DC 20530, appearing for |
| 5 | the Plaintiff. |
| 6 | Peter Christopher Breen, Thomas More Society, |
| 7 | 29 South La Salle Street, Suite 440, Chicago, IL 60603-1548; |
| 8 | Rebecca Reynolds Messall of Hackstaff Law Group, LLC |
| 9 | 1601 Blake Street, Suite 310, Denver, CO 80202, appearing for |
| 10 | the Defendant. |
| 11 | |
| 12 | |
| 13 | *   *   *   *   * |
| 14 | PROCEEDINGS |
| 15 | THE COURT:  The matter before the Court is United |
| 16 | States of America v. Kenneth Scott.  This is Civil Case |
| 17 | 11-CR-1430.  I will take entries of appearance, please. |
| 18 | MR. FLEISHER:  Good morning, Your Honor.  Aaron |
| 19 | Fleisher for the United States. |
| 20 | MS. GAYLE:  Good morning, Your Honor.  Winsome Gayle |
| 21 | for the United States. |
| 22 | MS. ABBATE:  Good morning, Your Honor.  Julie Abbate |
| 23 | for the United States. |
| 24 | THE COURT:  Good morning to you. |
| 25 | MR. BREEN:  Good morning, Your Honor.  Peter Breen for |

1    Defendant Kenneth Scott who is present with us at counsel

2    table.

3            MS. MESSALL:  Good morning, Your Honor.  Rebecca

4    Messall for Kenneth Scott.  And also at counsel table is Monica

5    Flanagan from our office, Your Honor.

6            THE COURT:  Good morning to you.

7            We are here today for a preliminary injunction in this

8    matter.  I sent a minute order yesterday indicating how we were

9    going to divide up the time.  Just so everyone is real clear on

10   how that is going to work, once we get started in just a few

11   minutes, when you are up to bat, then I am keeping track of

12   time and we will do that with openings, too.  And then when the

13   other side gets up to cross-examine, that side is on the clock.

14           So you have a total of three hours for your

15   evidentiary presentation.  I would suggest as an overview that

16   it doesn't really seem that the facts in this case are

17   particularly contested.  So I would wonder why we would even

18   need a whole day for this, but once again, you can use your

19   time as you choose to use it.

20           Let me talk about a few of the motions in limine that

21   were filed.  First of all, I will take up in no particular

22   order Docket No. 166, United States' motion in limine to

23   exclude expert opinion testimony.  I think that I am persuaded

24   by Mr. Scott's response which is that this is not -- he is not

25   claiming necessity.  Instead, what he is claiming is this goes

1    to the public interest.  Why you would want to put on evidence

2    on the public interest thing, typically that's kind of an

3    argument, I don't know, but if Mr. Scott chooses to use his

4    time to put on Ms. Brennan, he is free to do that, although I

5    would remind Mr. Scott that his -- the proponent of an expert

6    obviously has the burden of showing that the testimony is

7    admissible, so the fact that I am denying the motion in limine,

8    it doesn't mean that 702 doesn't need to be complied with.  So

9    that motion in limine is denied.

10        The next one is the United States' motion in limine

11   for adverse inferences against Defendant Kenneth Scott.  And

12   basically these are adverse inferences that the United States

13   wishes me to draw based upon Mr. Scott's indication of the

14   Fifth Amendment in his deposition.  I will also deny this

15   motion in limine.

16        One thing is that this is a somewhat unusual statute

17   in that the liability for criminal and civil is based upon the

18   same conduct, so the invocation was not unexpected.  I am not

19   saying that for purposes of trial it doesn't in some cases seem

20   to be bafflingly overbroad, but as the *Spitzer* case, *Spitzer v.*

21   *Cain* case pointed out, when we are in a preliminary injunction

22   context, the issue is really whether the United States or the

23   plaintiff has carried its burdens.

24        And in this case we will be looking -- I will be

25   looking for what evidence they have.  And the inferences would,

1    assuming that they had any weight, not carry much weight.  So

2    the issue would in any event have gone to whether the evidence

3    of the United States brought forth supports the factors that

4    have been set out by the 10th Circuit in *RoDa Drilling* and

5    other cases.

6            The next motion in limine is Mr. Scott's motion in

7    limine, Docket No. 163.  For the reasons that I identified

8    yesterday in my order denying his motion to dismiss, I will

9    deny this motion in limine.  However, as to the admission of

10   prior convictions, Mr. Scott retains his ability to object to

11   the admission because at this point in time it's not entirely

12   clear in what context the United States may be seeking to admit

13   certain prior convictions or prior incidents that may fall

14   within 404(b), so we will see how that shakes out.

15           All right.  Anything else as a preliminary matter

16   before we commence the evidentiary portion?  On behalf of the

17   United States?

18           *MR. FLEISHER:*  Nothing on behalf of the United States.

19           *THE COURT:*  On behalf of Mr. Scott?

20           *MR. BREEN:*  Nothing here, Your Honor.

21           *THE COURT:*  Does the United States wish to make any

22   type of an opening statement?

23           *MS. GAYLE:*  Yes, Your Honor.

24           *THE COURT:*  Go ahead.  As I said, you are on the

25   clock.

1          *MS. GAYLE:*  Thank you, Your Honor.

2                      **OPENING STATEMENT**

3          *MS. GAYLE:*  This case is about respect.  It's about

4   respect for people's right to go to work without unreasonable

5   difficulty.  It is about respect for people's right to seek

6   reproductive medical care without encountering a safety hazard.

7   This case is not about freedom of expression.  Kenneth Scott

8   has a right to express his views, but he does not have the

9   right to make it unsafe for others seeking to exercise their

10  rights.

11          Today you will hear about the Planned Parenthood of

12  the Rocky Mountains, also known as PPRM, its staff and its

13  patients and about a defendant's conduct.  PPRM is a

14  reproductive healthcare center covered by the Freedom of Access

15  to Clinic Entrances Act.  The healthcare center has a range of

16  services covered by FACE, including family planning, STD

17  prevention and, yes, abortions.  It serves men and it serves

18  women.

19          The patients and staff can only access PPRM by one

20  street, Pontiac Street.  Patients and staff can only access

21  through one driveway.  You will hear from employees of the

22  healthcare center.  They will tell you how the defendant makes

23  it unsafe for them to go in and out of that driveway.  These

24  workers hold different jobs.  You will hear that PPRM employs

25  doctors, nurses, research assistants, security staff and

1   administrative staff.

2          You will hear from Kara Armstrong, a young

3   professional who worked her way up from a part-time position to

4   full-time.  She will tell you how she was unable to leave the

5   PPRM driveway because the defendant stayed in the driveway for

6   what she will say felt like a long time.  She will talk about

7   not being able to leave without hurting the defendant because

8   he stood in the driveway.

9          You will hear from Danny Cram who works security and

10  interacts regularly with the defendant.  He will tell you about

11  their security protocols.  He will tell you about the

12  defendant's intent to stop abortions.  He will tell you how the

13  defendant tries to prevent patients and workers from entering

14  and leaving the center.  Finally, he will tell you how the

15  defendant directs others to do the same.

16         You will hear before about the patients who come to

17  PPRM simply seeking medical care.  You will hear about

18  Mr. Scott's behavior.  You will hear that Mr. Scott disagrees

19  with the conduct, with the work of the healthcare center, and

20  that is his right.  You will hear that he goes there daily to

21  voice his opinion with signs and by trying to speak to people

22  as they go in and out.  That is also his right.

23         We have no concern with this speech.  However, you

24  will also hear how he makes it unsafe for patients and staff by

25  stepping into the driveway as cars approach.  This is the

1  behavior we are here to address today.  This is the behavior

2  that violates FACE.  FACE prohibits a physical obstruction done

3  intentionally to interfere with people or attempt to interfere

4  with people because they are seeking to obtain or provide

5  reproductive healthcare.

6       You will see a video of Mr. Scott going into the path

7  of approaching cars.  This creates an unreasonably dangerous

8  situation.  This is the behavior we are seeking to stop.  We

9  want an injunction to keep Ken Scott 25 feet away from the

10 driveway.  We have met the standard for preliminary injunction.

11 Our evidence will show that a preliminary injunction should be

12 entered in this matter.

13      First, there is a likelihood of success because the

14 evidence will show that Ken Scott has made it unreasonably

15 difficult for patients and staff to go to and from PPRM.  The

16 evidence will show that it is his motive and intent to

17 interfere with people because they are seeking to provide or

18 obtain reproductive healthcare.  The evidence will show that he

19 wants to do this by making it difficult for people to access

20 and leave PPRM.  We only need to show one obstruction to meet

21 the requirements of FACE.  However, we have examples of several

22 obstructions.

23      Second, irreparable harm is presumed here because we

24 are seeking to prevent violations of the FACE statute.  There

25 is also harm to patients and staff because they are not able to

1   enter and to leave PPRM as they please.  This harm cannot be

2   addressed with monetary damages.

3          Third, the balance of equities favors with the United

4   States.  Ken Scott will be able to express his objections from

5   25 feet away from the driveway.  He will be able to have his

6   signs.  He will still be able to reach his audience.  The only

7   difference is that this injunction will allow the healthcare

8   center staff to go to work without having to worry about

9   hitting Mr. Scott as they enter and leave, and patients will be

10  able to access its services without having to encounter the

11  risk of hitting Mr. Scott.

12         Finally, this relief is in the public interest to

13  allow people to access services of a reproductive healthcare

14  clinic for all kinds of medical care.  Mr. Scott has failed to

15  respect these rights.  A preliminary injunction is required

16  here because of the continued safety problem, the number of

17  incidents and the long period of time over which he has engaged

18  in this conduct.  We are simply asking Ken Scott to stay 25

19  feet away from the driveway so that everyone can exercise their

20  rights.

21         Thank you.

22         *THE COURT:*  Thank you, Ms. Gayle.

23         Any opening on behalf of Mr. Scott?

24         *MR. BREEN:*  Yes, Your Honor.

25                        **OPENING STATEMENT**

1          *MR. BREEN:*  May it please the Court, Peter Breen for

2    Defendant Ken Scott.

3          This case at its heart is about whether passing out

4    literature on a public sidewalk to willing recipients who

5    willingly stop their car, willingly roll down their windows and

6    willingly engage in conversation with the defendant, Mr. Scott,

7    is a federal offense under the Freedom of Access to Clinic

8    Entrances Act.

9          The government indicated that they believe the

10   evidence will show that Mr. Scott was stepping in front of

11   automobiles.  We respectfully contend that the video evidence

12   the government has sent to us and the testimony of the

13   witnesses will say otherwise.  I am sure that Mr. Scott is a

14   sensible man and he does not walk in front of moving vehicles.

15         Moreover, you are going to hear today testimony from

16   witnesses for the government, none of whom were actually

17   seeking reproductive health services and none of them were

18   actually engaged in conversation or any sort of interaction

19   with Mr. Scott in terms of the days and times election.  At

20   best they are going to be able to put someone in front of you

21   who is in a car, not in a car next to or behind the car of the

22   individuals who were speaking with Mr. Scott.

23         The Freedom of Access to Clinic Entrances Act was

24   created to remedy, create a federal remedy for two alleged

25   harms.  One was the mass sit-ins of the clinics of the eighties

1    and nineties and No. 2 were acts of violence directed against

2    reproductive health providers based upon their reproductive

3    healthcare.   Neither of those situations is in play today.

4          Moreover, there are First Amendment implications to

5    today's action.   Mr. Scott is speaking on an issue of public

6    importance.   He is on a public right-of-way, public sidewalk, a

7    traditional public forum, and he is pamphleteering.   He has

8    engaged in a course of activity in the public right-of-way

9    which is fully his right.   Moreover, in the FACE Act itself it

10   has an exception put there for First Amendment activity and a

11   protection thereof.

12         I also want to speak to the issue of rights and

13   competing rights.   The government has stated that there is a

14   right to be able to go to work.   And while there may be some

15   such right under state law or what have you, that is not a

16   federal constitutional right of the nature that we here today

17   would be -- that we are dealing with.

18         On the one hand, you are going to see the First

19   Amendment rights of Mr. Scott who has not been accused of

20   intentional touching any individual.   He has not been accused

21   of yelling fire in a crowded theater.   You will not hear

22   evidence, at least based upon the deposition testimony, you

23   will not hear evidence that Mr. Scott is issuing actionable

24   physical threats against anyone.   Instead, you will see a man

25   engaged in core First Amendment speech activity.

1           On the other side, you will see individuals, and again

2     not the clinic patients because not one of them is here today,

3     not one of those made a claim, you will see individuals merely

4     trying to get to work which may be a legitimate end.  It is the

5     same end that traffic signals are meant for and what have you,

6     but it is not a federal constitutional right.  A woman's right

7     to have an abortion does not include the government's promotion

8     of those who would seek to provide abortions.

9           Moreover, in this case the government is asking that

10    this Court enter a preliminary injunction that would change the

11    status quo.  Under the 10th Circuit controlling law that

12    particular action requires heightened scrutiny, particularly

13    under *Schrier v. University of Colorado*, 427 F.3d 1253 at 1258

14    as a pinpoint cite.  And from that perspective Mr. Scott's

15    activity, moving him, as it were, away from a place also serves

16    as a prior restraint on his First Amendment activity.

17          I am sure it's well-known to this Court that the

18    deprivation of First Amendment rights, no matter how minimal,

19    no matter for how short a time is an irreparable injury or held

20    to be an irreparable injury to a particular individual, and so

21    from the perspective of weighing the equities in this case, and

22    that's *Elrod v. Burns*, 427 U.S. 347, pinpoint 373, when

23    weighing the equities in this case, Your Honor would hopefully

24    take that into consideration.

25          There was another issue here.  When you look at the

13

1   actual test of the FACE Act, and counsel for the government did

2   allude to it, the interference must be done because -- there is

3   an intent requirement -- because that person was attaining or

4   providing reproductive health services.  And to analogize to

5   the instance of a fireman walking down the middle of the street

6   with a boot collecting money for a charity, if that fireman

7   should happen to by stopping one car stop the car behind that

8   car, it would not follow that the fireman's intent was to stop

9   the car behind the car that was engaged with the fireman and

10  contributing to charity.

11          Here, even more so, we are not in the middle of the

12  street.  We are on a public sidewalk.  So it is even more

13  important and more clear that what Mr. Scott is doing is not

14  prohibited under the Act and is protected under the First

15  Amendment.

16          Today we are going to present and we have listed 10

17  witnesses, the reason being the government has come in with 10

18  specific instances where they need to provide the elements of

19  the FACE Act.

20          THE COURT:  Sorry to interrupt you, Mr. Breen.

21          Just as a reminder, if you have a telephone such as we

22  can clearly hear right now, you need to make sure that it's

23  silenced so that the proceedings aren't disrupted.

24          Go ahead, Mr. Breen.

25          MR. BREEN:  Thank you, Your Honor.

1            Jackie Cromer will testify as to January 16, 2010;

2     Robert Conners, December 16 and 23rd, 2009 and December 2nd,

3     2010; Clifton Powell, September 2nd 2010; Leo Mantei will

4     testify on September 30, 2009 and December 8, 2010; Lisa Cress,

5     February 4, 2010; and Josh Augenbaugh, August 15, 2009.

6            Moreover, we have four other witnesses, two of whom

7     actually based on their interaction with Ken Scott at the

8     Planned Parenthood of Rocky Mountains had their babies, decided

9     not to go through with abortions that had previously been

10    scheduled there.

11           Moreover, we will present Jane Brennan, a trained

12    counselor with specialized knowledge in counseling for women.

13    Her testimony we offer to show abortion does hurt some women

14    and that Ken Scott by offering alternatives to abortion is

15    acting in the public interest even without the First Amendment

16    interest in his message.

17           Lynn Reid finally will testify that Ken Scott brings

18    women to her pregnancy shelter to help them with their material

19    needs.

20           As to Mr. Scott's intent, I don't think there is any

21    secret to anyone in this jurisdiction that Mr. Scott is

22    pro-life.  He is passionately so.  That is not an issue in

23    dispute.  However, in order to make out a FACE Act violation,

24    they must show that he was blocking access to that clinic in

25    order to stop people from receiving reproductive health

1    services, and the government is not going to be able to do that

2    because Mr. Scott does not do that.

3           Just as some housekeeping, Your Honor, I wanted to

4    ensure that there were certain indications made.  And we are

5    not sure if this is going to happen or not, but there were 10

6    instances pled in the complaint, so we are going to object to

7    instances that are entered outside of those 10.  There are

8    videos of the 10 alleged incidents that have been sent to us.

9    They have time stamps on them.  We are going to object to the

10   time stamps just so we will not necessarily we want to seek to

11   keep them out because we believe they show innocuous activity

12   on the sidewalk, but we want to alert the Court to that point.

13          We have Defendant's Exhibits A, B and C.  A and B are

14   offered at this time under Rule 902 as public documents that

15   are self-authenticating, they are certified; and Exhibit C, a

16   copy of the complaint so that the witnesses can confirm dates

17   in it; and Exhibit D is offered under Rules 201, 901(1) and (6)

18   which is an NPR article on the two-year collaboration between

19   the government and those on the pro abortion side of the

20   abortion issue.

21          *MR. FLEISHER:*  Objection, your Honor.  I object on the

22   grounds of relevance and hearsay.

23          *THE COURT:*  Well, this is the first time in my

24   experience that anyone has ever offered exhibits in an opening

25   statement, which by definition is not a part of the evidentiary

16

 1   part of this case, so I am going to assume that that was merely

 2   a preview of what may happen in the future.

 3            MR. BREEN:  Just as housekeeping, Your Honor.  Thank

 4   you.

 5            THE COURT:  Thank you.  Mr. Breen.

 6            The United States may call its first witness.

 7            MR. FLEISHER:  Thank you, Your Honor.  Before calling

 8   our first witness, the United States would like to invoke the

 9   rule on witnesses.

10            THE COURT:  You are asking for sequestration?

11            MR. FLEISHER:  Yes.

12            THE COURT:  Therefore, any witnesses that may exist on

13   behalf of either side that are present in the courtroom need to

14   leave.  And also it should be understood that if a witness is

15   excluded from the courtroom, that you can't have other people

16   come tell you what has been going on.  You need to make sure

17   that you are shielded from any descriptions of witness

18   testimony.  So if there are any witnesses present at this time,

19   then there are witness waiting rooms on either side through the

20   first set of doors.

21            MR. BREEN:  Your Honor, if I may, it was brought to my

22   attention there are members of media here today on this case of

23   public importance and yet there is a protective order in place

24   that is relatively restricted.  I was wondering if anything

25   presented in court today is subject to that protective order.

Michael Wagner – Direct

1          THE COURT:  It is not.  This is a public courtroom.

2    This is a public hearing and so if you choose to present

3    evidence that may be subject to the protective order, it's

4    deemed a waiver of the protective order.

5          All right.  The United States may call its first

6    witness.

7          MR. FLEISHER:  Thank you, Your Honor.

8          The United States calls Mike Wagner.

9      (**Michael Wagner** was sworn.)

10         THE WITNESS:  I do.

11         THE COURT DEPUTY:  Please state your full name and

12   spell your last name for the record.

13         THE WITNESS:  Michael Wagner, W-A-G-N-E-R.

14                       **DIRECT EXAMINATION**

15   BY MR. FLEISHER:

16   Q.  Good morning, Mr. Wagner.  Mr. Wagner, could you tell us

17   your occupation, please?

18   A.  I am the director of security for Planned Parenthood of the

19   Rocky Mountains.

20   Q.  And can you briefly describe your employment history?

21   A.  From 1973 to 1978 I was a police officer in Missouri.  From

22   '78 to about '81 I was the assistant director of the State

23   Crime Prevention Project at CBI, Colorado Crime Check.  From

24   '81 to '84 I ran a research project for the National Institute

25   of Justice through the Denver Anti-Crime Council.  Following

Michael Wagner - Direct

1   that I was employed with a hotel management company here in

2   Denver as their corporate security director for hotels in

3   Colorado, Montana and Washington state.

4          Following that I went to work for the Edwards Company

5   and Trammell Crow Company managing security of the Tabor Center

6   complex of downtown Denver.  Then I went to work for the City

7   and County of Denver Theatres and Arenas Division.  I was the

8   director for the city's entertainment venues, the Convention

9   complex, the Performing Arts complex, McNichols, the Coliseum

10  and Red Rocks.

11         Following that I went to work for Planned Parenthood

12  of the Rocky Mountains for about four years and then went to

13  work for Planned Parenthood Federation of America as their

14  associate director of security for about nine years and then

15  returned to Planned Parenthood of the Rocky Mountains as their

16  security director.

17  Q.   In your security-related jobs, can you tell us briefly what

18  type of training you received?

19  A.   I am a graduate of the Missouri State Highway Patrol Law

20  Enforcement Academy.  I have attended the National Texas and

21  California Crime Prevention Institutes, the American Society

22  for Industrial Security Protection of Assets Program, Phases I

23  and II.  I attained a professional certification as a certified

24  protection professional, certified fraud examiner, certified

25  institutional protection manager.  I have attended numerous

Michael Wagner – Direct

1   professional training seminars through the years in all phases

2   of security management.

3   Q.   In your current position as director of security for

4   Planned Parenthood of the Rocky Mountains, do you have

5   individuals who report to you?

6   A.   I do.

7   Q.   How many?

8   A.   I have approximately seven.

9   Q.   And what is their training or background?

10  A.   They are part-time security staff and all of them are

11  retired law enforcement officers with about 30 years

12  specialized experience in law enforcement.

13  Q.   When you say specialized experience, can you explain what

14  you mean by that?

15  A.   None of them were just simply patrol officers.  All of them

16  had more specialized training in terms of either being academy

17  instructors, vice and narcotics detectives, burglary

18  detectives.  One officer in another city was a supervisory

19  person with the California Department of Corrections.

20  Q.   In your current position, where physically do you work?

21  A.   I work at the administrative headquarters, 7155 E. 38th.

22  Q.   Is that the same PPRM that has been referred to before,

23  Planned Parenthood of the Rocky Mountains?

24  A.   It is.

25  Q.   Do you have a regular schedule at work?

Michael Wagner – Direct

1   A.   I do.

2   Q.   What is that schedule?

3   A.   Generally, Monday through Friday from about 9:30 or

4   10:00 until 6:00 or 6:30.  It also includes weekends, travel,

5   evening hours, so it varies a little bit.

6   Q.   Can you tell us what your job responsibilities are?

7   A.   My job responsibilities are primarily as an administrator,

8   facilitator, a trainer, as an analyst.  I oversee all aspects

9   of the security program for the affiliate.

10  Q.   And what aspects are there to the security program?

11  A.   Well, it's comprised of certainly risk assessment, dealing

12  with the design and implementation of security systems, CatCard

13  access systems, camera systems, lights, alarm systems, other

14  phases that would include the hiring and employment of our

15  security staff, periodic and recurring staff training, working

16  security for special events, interacting with law enforcement.

17  Q.   You mentioned risk assessment.  Can you explain what that

18  is?

19  A.   Risk assessment is primarily the anticipation and

20  evaluation of risk events and the initiation of acts, to

21  mitigate those events or reduce them to acceptable levels.

22  Q.   What sorts of things are you looking for when you conduct

23  risk assessment?

24  A.   When we are conducting risk assessment, we are looking at

25  really two kinds of risk:  First of all, criminal risk that is

Michael Wagner - Direct

1   largely opportunity based or for that matter community driven

2   like any business, the possibility of burglaries, armed

3   robberies, arson attacks, vandalism.

4          And then we are also in our line of work concerned

5   about the impact of opposition activity at our facilities to

6   include protest activity as it impacts patients and staff.  We

7   are concerned about the possibility of blockades, vandalism,

8   denial of service attacks against our IT infrastructure, a wide

9   range of activities and behaviors that we encounter.

10  Q.  Can you briefly describe what you mean by opposition

11  activity?

12  A.  Persons who are opposed to our mission and who proactively

13  seek to impede access to reproductive healthcare facilities or

14  who try to impact our operations negatively.

15  Q.  You refer to your mission.  What is that mission?

16  A.  Our mission is principally to provide access to

17  reproductive healthcare for men and women across the spectrum

18  in dealing with everything from STD screening to family

19  planning.  We have a neonatal program, but it also includes

20  abortion services.

21  Q.  Why does a healthcare center need security?

22  A.  In our particular case and for most surgical abortion

23  facilities, they have been literally under siege by persons

24  opposed to the mission for the last three to four decades.

25  Q.  When you say under siege, can you describe what you mean?

Michael Wagner – Direct

1    *A.*  We have protesters and picketers outside the buildings on a

2    regular recurring basis seeking to interfere with people coming

3    into the building, to harass and intimidate our employees, our

4    patients and our staff.

5    *Q.*  Mr. Wagner, I would like to briefly now turn to the layout

6    of the grounds there at the healthcare center.

7             Madam clerk, could I please have marked as Plaintiff's

8    Exhibit No. 11?

9             May I approach?

10            *THE COURT:*  It's in the exhibit book.  Do you want the

11   witness to look at it?

12            *MR. FLEISHER:*  I do.

13            *THE COURT:*  Then Mr. Wagner, if you will look at

14   Exhibit 11.

15            *MR. FLEISHER:*  May I display that, Your Honor?

16            *THE COURT:*  Well, if the witness is looking at it

17   already and if it hasn't been introduced, then you can't really

18   display it yet.

19   *BY MR. FLEISHER:*

20   *Q.*  Mr. Wagner, do you have what's been premarked as

21   Plaintiff's Exhibit 11?

22   *A.*  I do.

23   *Q.*  Do you recognize what that is?

24   *A.*  Yes.

25   *Q.*  What is it?

Michael Wagner - Direct

1   A.   It's a photograph that depicts the driveway entrance into

2   the facility.

3   Q.   When you say the facility, what do you mean?

4   A.   Into Planned Parenthood of the Rocky Mountains.

5        MS. MESSALL:   Objection, Your Honor.   There has been

6   no designation of an Exhibit 11, to my knowledge, by the

7   plaintiff, and we do not have copies of any exhibits.   We were

8   only given a designation of some videos, so I don't know what

9   exhibit you are talking about and so I have to object.

10       THE COURT:   He hasn't offered it yet.   But as the

11  witness is looking at it, obviously Mr. Scott's attorney should

12  be provided with a copy if you haven't previously provided it.

13  In fact, pursuant to the practice standards those should have

14  been exchanged already.

15       MR. FLEISHER:   Exhibit 11 was listed on our exhibit

16  list and it was provided to counsel just yesterday, Your Honor.

17       THE COURT:   Let's let Ms. Messall take a moment to see

18  if she has that.

19       MS. MESSALL:   Thank you for reminding me, counsel.

20  And I will make my objection whenever it's offered, Your Honor.

21  I did get something by e-mail yesterday and I indicated my

22  objection to them.

23       THE COURT:   You got that particular exhibit?

24       MS. MESSALL:   Last night, correct.   I do not have it

25  here.

Michael Wagner – Direct

1          THE COURT:  Go ahead, Mr. Fleisher.

2     BY MR. FLEISHER:

3     Q.  Mr. Wagner, I believe you said the picture in front of you

4     depicts the driveway entrance to the facility; is that correct?

5     A.  It does.

6     Q.  How do you know that?

7     A.  Because I took the picture.  Because I work there, I am

8     familiar with it.

9     Q.  When did you take the picture?

10    A.  Pardon?

11    Q.  When did you take the picture?

12    A.  I took the picture on the 23rd.

13    Q.  The 23rd of?

14    A.  Of January.

15    Q.  And is that a fair and accurate representation of the

16    driveway entrance to the healthcare center as it appears today?

17    A.  It is.

18         MR. FLEISHER:  Your Honor, I would now like to offer

19    Plaintiff's Exhibit 11 into evidence.

20         THE COURT:  Any objection?

21         MS. MESSALL:  Yes.  I object, Your Honor.  It's not

22    contemporaneous with any incidents in the complaint.  No. 2, it

23    contains two unidentified persons.  No. 3, it was not disclosed

24    to us until last night.

25         THE COURT:  Overruled.  It's relevant to the fact that

25

Michael Wagner – Direct

 1   the plaintiff is seeking an injunction going forward, so it

 2   will be admitted.

 3

 4          *MR. FLEISHER:*  Thank you, Your Honor.  May we now

 5   publish the exhibit?

 6          *THE COURT:*  You may.

 7          *MR. FLEISHER:*  Apologies for the delay.

 8   *BY MR. FLEISHER:*

 9   *Q.*  Mr. Wagner, looking at that picture, describe what you see.

10   *A.*  I see the entrance to the driveway and I see two

11   individuals holding poster boards who are located exactly

12   25 feet north and south of the edge of the driveway entrance.

13   *Q.*  How do you know that they are located 25 feet from the

14   driveway entrance?

15   *A.*  I measured the distance and placed the people there.

16   *Q.*  How wide is that driveway?

17   *A.*  The driveway itself is 25 feet from curb to curb.

18   *Q.*  And you said that's the entrance to the healthcare center;

19   is that right?

20   *A.*  That's correct.

21   *Q.*  Are there other entrances?

22   *A.*  There are other entrances that are closed.

23   *Q.*  And where in relation to this picture is the healthcare

24   center itself located?

25   *A.*  The healthcare would be located to the right of the edge of

Michael Wagner - Direct

1   the photograph.

2   *Q.*  Is there anything else located behind the fence depicted

3   there?

4   *A.*  Behind the fence you will see the employee parking area.

5   You will see a gravel overflow parking area and a water

6   containment attachment area on the other side.

7   *Q.*  Any other facility?

8   *A.*  No, sir, not in the perimeter of the fence.

9   *Q.*  Mr. Wagner, you mentioned protesters before.  Can you tell

10  us on this picture where protesters usually stand, if you know?

11  *A.*  The protesters usually stand right at the edge of the

12  driveway in this picture and sometimes in the driveway itself.

13  We will also have protesters alongside the fence line to the

14  right, but out of view of this particular photograph.  People

15  congregate on the ladders there.  From time to time we will

16  also have protesters across street.

17  *Q.*  Those people who congregate on ladders, do you know how far

18  they are away from that driveway?

19  *A.*  They are -- I couldn't estimate.  I would say in excess of

20  100 to 200 feet, probably.

21  *Q.*  Do you know if you are able to hear them from the driveway?

22  *A.*  Yes.

23  *Q.*  How do you know that?

24  *A.*  Because I have heard them.

25  *Q.*  Mr. Wagner, are you familiar with Ken Scott?

Michael Wagner – Direct

1  A.  I am.

2  Q.  How do you know him?

3  A.  I have known Mr. Scott as a regular protester at our Vine

4  Street facility since probably 1995.

5  Q.  When you say Vine Street facility, what do you mean by

6  that?

7  A.  It was our old surgical facility at 1st and Vine.

8  Q.  Do you see Mr. Scott in the courtroom today?

9  A.  I do.  He is at the defendant's table.

10  Q.  With you point to him, please.

11  A.  Certainly.

12      MR. FLEISHER:  Let the record reflect the witness has

13  identified the defendant, Mr. Scott.

14  BY MR. FLEISHER:

15  Q.  Mr. Wagner, do you know where Mr. Scott usually stands when

16  he is protesting at the healthcare center?

17  A.  In general, Mr. Scott will be located at the north edge of

18  the driveway.  He frequently brings a camp stool or folding

19  chair that he will set up there right at the edge of the gate

20  when there is no traffic around.  When there is traffic he is

21  usually up and moving in the vicinity of the entrance and from

22  time to time in front of the gate along the sidewalk.

23  Q.  How do you know that?

24  A.  Because I've witnessed him.

25  Q.  You said the north end of the driveway.  Just to help

Michael Wagner - Direct

1   orient us today, can you tell us which end that is on this

2   picture?

3   A.   It would be the upper end.

4   Q.   So if we are looking at the picture, left or right?

5   A.   It would be to the left, yes.

6   Q.   I would like to talk about some of the security procedures

7   that are in place at the healthcare center.  Does your job ever

8   involve contact with the police?

9   A.   It does.

10  Q.   What department?

11  A.   All the departments in the various communities that we are

12  located in.  For our purposes today, the Denver Police

13  Department.

14  Q.   When do you have contact with the police?

15  A.   Probably on a recurring basis weekly.  Generally we will

16  have a supervisor patrol officer will swing by at least once a

17  week to touch base with the security staff to see what's going

18  on and to talk to them about other issues in the neighborhood,

19  so I will frequently have a chance to talk to them.

20          When we have had an incident or complaint and the

21  police respond to the building, I will talk with them.  If we

22  have an incident that we want them to look at, we will call

23  them and talk to them.  If we have had property damage or

24  reports like that, you know, we certainly call the police and

25  make a report.

Michael Wagner – Direct

1  *Q.*  What types of incidents do you call the police about

2  generally?

3  *A.*  In general, apart from property damage incidents, we will

4  call them in a situation where, No. 1, a patient or a staff

5  member feels that they have been interfered with, stopped,

6  harassed or assaulted and they want to talk to the police.  We

7  will call the police for them and have the police officer come

8  over and talk to the complainant.

9         If we have a situation where we have observed problems

10 with traffic being blocked, impeded or people being held up, we

11 will call the police and ask them to review it to see if there

12 is any action that can be taken under those circumstances.  And

13 when we have a complaint made by the protesters against the

14 patient or against the partner, then the police respond.  We

15 will talk to the police as well.

16 *Q.*  Do you make any kind of written records for security

17 purposes?

18 *A.*  We do write incident reports on a standardized form

19 provided by our national office.

20 *Q.*  What types of things do you record on incident reports?

21 *A.*  The national office on the front of the incident report has

22 a series of incidents that they would like to capture for

23 statistical purposes.  Whenever we have an incident that falls

24 within one of those classifications, we will do an incident

25 report on it; for our purposes, largely incidents of

Michael Wagner – Direct

1  harassment, interference, trespass, vandalism, hate mail,

2  suspicious encounters, things of that nature.

3  Q.  Mr. Wagner, what is the healthcare center policy regarding

4  staff interaction with protesters?

5  A.  We have a very firm rule that all staff are directed on

6  their first day of employment through the onboarding process

7  and staff orientation and periodically through the year and

8  during employment is that our No. 1 rule is do not interact

9  with protesters except in a trespass situation.

10  Q.  Why?

11  A.  For two reasons:  No. 1, it only heightens the level of

12  tension when you interact with the protesters.  It ratchets

13  things up and it increases the probability of violence or a

14  disturbance.  No. 2, the protesters are very fond of filming

15  and recording every transaction that they have with the patient

16  or with the staff member.  They like to splice these and put

17  them on the internet or YouTube or post them to the websites.

18  And there is no upside to that from our standpoint.  It's

19  better just to avoid those types of confrontations.  We are not

20  going to change the protesters' minds.  They are not going to

21  change our minds.

22  Q.  So if an employee is driving in and out of the healthcare

23  center and a protester is in the driveway, what is that

24  employee directed to do?

25  A.  The employee is directed to yield to the protester, that

Michael Wagner – Direct

1  the operator of a motor vehicle in this state has to yield to a

2  pedestrian even if the pedestrian is in the wrong, so we

3  periodically remind staff, you know, to exercise all due

4  caution entering and exiting, to yield and to, you know, safely

5  clear the area as soon as they can.

6  Q.  And what is security staff directed to do in that situation

7  where a protester is in the driveway?

8  A.  They are directed primarily to ask or direct a protester to

9  move, which doesn't happen, and then to direct the person

10  operating the motor vehicle to enter the driveway and to park

11  in the appropriate place.  If the driver doesn't want to come

12  in or if they prefer to stop and talk to the protester, they

13  are told to direct the driver over to the parking lane on the

14  street where they can talk with the protester and not impede

15  traffic.

16  Q.  You testified that the security staff will talk to the

17  protester if the protester is in the driveway?

18  A.  Yes, they attempt to sometimes, but it's, like I said, it's

19  kind of a lost thing because protesters are not going to take

20  direction from the security staff.

21  Q.  Mr. Wagner, does the healthcare center use security

22  cameras?

23  A.  They do.

24  Q.  How are they used?

25  A.  We have three different sets of or three different really

Michael Wagner – Direct

1    independent camera systems:   One, a series of interior cameras

2    within the building.   A second is a set of fixed cameras

3    outside the building that primarily looks at the entry doors,

4    parking areas and mechanical areas with two cameras that

5    partially view the entrance gate.   And then we have a third

6    camera system mounted on the old fire house across the street

7    which is typically parked with one camera focused on the gate,

8    which is where Exhibit 11 came from, and then the second camera

9    that is focused across the front of the building on the

10   sidewalk where the ladders are.

11   Q.   How many cameras are there?

12   A.   In that system there are two cameras.

13   Q.   And in general, how many cameras?

14   A.   I would have to refer to a note, but I think the one system

15   is about 16 and the other about 20.

16   Q.   How are the cameras operated?

17   A.   The two fixed systems just run continuously and they record

18   to separate servers.   The system at the fire house is

19   controlled through the computer system.   It's accessed by the

20   front desk receptionist.   I have the capability to view them

21   from my desk.   There is another console at the front desk that

22   we have a second security officer working who could look at

23   them and those cameras have a pan, tilt, zoom capability.

24   Q.   What does that mean?

25   A.   It means that the operator can use a virtual keyboard to

33

Michael Wagner – Direct

1  turn the camera left and right, up and down and to zoom it in

2  for a tighter view.

3  Q.  And when would that be done?

4  A.  That may be done if the receptionist, for example, notices

5  something unusual or notices an incident or notices some

6  behavior that's out of the ordinary or notices a problem with

7  vehicles backing up in the driveway.  The security officer

8  working outside may see something and ask the receptionist to

9  swing the camera around and zoom it in or capture a particular

10  image, but normally they are parked in these places.

11  Q.  Speaking about this camera system you described on the old

12  fire house, these two cameras, how are they turned on and off?

13  A.  They are not turned on and off.  They run continuously.

14  Q.  And how are they viewed?

15  A.  The receptionist at the front desk has a second monitor

16  that's clipped to her computer which has the display, split

17  screen image with both cameras displayed on that.  So when she

18  is not answering the phone or dealing with visitors, filing or

19  doing other functions, she can look at that.  I also have a

20  second screen on my computer where I can look at those cameras

21  as well, but I have cameras from other sources that are

22  displayed there too.

23  Q.  When are the videos from these cameras reviewed?

24  A.  The videos are reviewed in situations when we get a

25  complaint or somebody brings an incident to our attention, then

Michael Wagner - Direct

1    we will go back and pull it up on the time line and see what we

2    have captured there on the recorder.

3    Q.   Are they reviewed routinely?

4    A.   No.

5    Q.   What's the retention system for the videos and speaking

6    specifically about the videos on the fire house?

7    A.   The videos on the fire house have an average retention of

8    about 24 days before they start to write over.

9    Q.   Can video ever be saved?

10   A.   Video can be saved if we are made aware of an incident or

11   we are looking for a particular occurrence within that 24-day

12   span, we can go back and find that period of time on a time

13   line and burn a copy to a file or to a disk if we need to.

14   Q.   How are the videos edited?

15   A.   They are not edited.  I do not even know if they can be

16   edited.  The only thing we can do is start and stop, pick a

17   start time to record from and a stop time to stop the recording

18   when we burn a copy.

19   Q.   Have you ever edited any of the videos?

20   A.   Never edited a video.  I don't know how.  I don't even know

21   if it's possible to edit them.

22   Q.   Are you aware of anyone who has ever edited any one of

23   these?

24   A.   No.

25   Q.   Mr. Wagner, I am now going to direct your attention to an

Michael Wagner – Direct

1   exhibit, it's been marked as Plaintiff's Exhibit 1.  This is a

2   video.

3            MR. FLEISHER:  Can I get the exhibits so I can play

4   it?  I guess we can show it just on the witness' screen.  Is

5   that all right?

6            THE COURT:  So I assume that Exhibit 1, is that a

7   disk?

8            MR. FLEISHER:  Yes.

9            THE COURT:  And you would like that right now?

10           MR. FLEISHER:  I would like that now, yes.

11           THE COURT:  All right.

12           MR. FLEISHER:  I apologize, if you will just bear with

13   me.  My technology skills are somewhat rudimentary.

14   BY MR. FLEISHER:

15   Q.  Mr. Wagner, I will direct your attention to the screen in

16   front of you and what has been premarked as Plaintiff's Exhibit

17   1.  Do you recognize what you see on that screen?

18   A.  Yes, I do.

19           THE COURT:  Mr. Fleisher, let me interrupt you right

20   at this time so that we might be able to save some time.  I

21   assume that what you are going to do is have Mr. Wagner

22   identify each of these various incidents which comprise

23   Exhibits 1 through 10 and then with each of them attempt to lay

24   the foundation for them?

25           MR. FLEISHER:  That's correct, Your Honor, although in

Michael Wagner – Direct

1    the interests of time, I won't be asking him to identify all of

2    the exhibits, but a handful of them.

3              THE COURT:  Is there any objection to the admission of

4    Exhibits 1 through 10?

5              MS. MESSALL:  If I could separate the testimony from

6    the exhibits, Your Honor.  It's the narration of testimony by a

7    witness who is not present and has no personal knowledge.

8              THE COURT:  We are not talking about that yet.

9              MS. MESSALL:  So we are not objecting to the exhibit

10   video, only to any foundation or lack of it for the date and

11   time stamp and then narration of it by people who are not

12   present.

13             THE COURT:  So other than the time stamp, you don't

14   have any objection to the admission of Exhibits 1 through 10?

15             MS. MESSALL:  As qualified, that's correct, Your

16   Honor.

17             MR. FLEISHER:  Thank you, Your Honor.  I would now

18   like to offer exhibits -- actually, Exhibits 1 through 6 into

19   evidence.

20             THE COURT:  All right.  Exhibits 1 through 6 will be

21   admitted with the qualification as to the accuracy of the time

22   stamp.  Go ahead.

23   BY MR. FLEISHER:

24   Q.  Mr. Wagner, still looking at Exhibit 1 on your screen, do

25   you see a date and time, a stamp on the video?

Michael Wagner – Direct

1    *A.*   I just lost Exhibit 1.  I have that, yes, I do.  It's

2    10:34:48 a.m., 12/08/2010.

3    *Q.*   Do you have any reason to believe that that date and time

4    stamp is inaccurate?

5    *A.*   No, I don't.

6    *Q.*   I would now like to direct your attention to Plaintiff's

7    Exhibit 2.

8            *MR. FLEISHER:*  Your Honor, just to clarify one point,

9    while I was fiddling with the technology I was informed that we

10   inadvertently gave one of our five exhibit binders that was

11   meant to be for defendant to the clerk, so I apologize if the

12   defendant doesn't have one of our exhibit binders.  I think we

13   provided an extra to the clerk instead.

14           *THE COURT:*  All right.

15   *BY MR. FLEISHER:*

16   *Q.*   Mr. Wagner, directing your attention to the screen and

17   Plaintiff's Exhibit 2, do you see a date and time stamp on this

18   exhibit?

19   *A.*   I do.

20   *Q.*   What does it say?

21   *A.*   It is 10:22:57 a.m., 12/02/2010.

22   *Q.*   Do you have any reason to believe that that date and time

23   stamp is inaccurate?

24   *A.*   I do not.

25   *Q.*   Mr. Wagner, I would like to play this video for you and I

Michael Wagner - Direct

1    would like to ask you to tell me what you see in this video.

2         *MS. MESSALL:*  Objection, Your Honor, no foundation

3    that this witness knows from personal knowledge.  And for the

4    narration of the video we can all see it would be improper by

5    this witness for lack of personal knowledge.

6         *THE COURT:*  Response?

7         *MR. FLEISHER:*  Mr. Wagner will testify that he has

8    viewed this video as part of his job responsibility as he

9    described as security director at the healthcare center, and I

10   am merely asking him to explain what in his view he is seeing.

11        *THE COURT:*  Well, are you trying to qualify -- is he

12   offering an expert opinion or why doesn't the video speak for

13   itself if he doesn't have any personal knowledge?

14        *MR. FLEISHER:*  He has personal knowledge of

15   individuals in the video who he can identify, particularly the

16   defendant which we will ask him to identify.

17        *THE COURT:*  All right.  Well, for the limited -- well,

18   can he identify from the still that is up right now those

19   individuals?

20        *MR. FLEISHER:*  I can certainly ask him.

21        *THE COURT:*  All right.  Why don't you ask him without

22   playing it, then.

23        *MR. FLEISHER:*  Thank you, Your Honor.

24   *BY MR. FLEISHER:*

25   *Q.*  Mr. Wagner, do you recognize the individual with the hat on

Michael Wagner - Direct

1    towards the center of that photograph?

2         THE COURT:  Mr. Wagner, let me mention to you, there

3    is a stylus that's next to the screen.  It's a touch screen

4    that you have in front of you, so if it might help.  And

5    Mr. Fleisher, you should know if it will help illustrate the

6    testimony of the witness, the witness may use the stylus to

7    indicate something on the photograph.

8         MR. FLEISHER:  Thank you, Your Honor.

9    A.  Thank you.  I recognize the defendant, Ken Scott, standing

10   in the driveway holding a poster in the one hand and wearing a

11   baseball cap and a sweater.

12   BY MR. FLEISHER:

13   Q.  How do you know that's the defendant?

14   A.  I know Ken Scott.  I have seen him dressed identically that

15   way many times.

16   Q.  Mr. Wagner, do you know who is in the vehicle that's

17   approaching to enter the driveway?

18   A.  I do not.

19        MR. FLEISHER:  I am going to now play this video of

20   Mr. Wagner, but I don't have any further questions for you at

21   this time about the video.

22        THE COURT:  And what's the purpose of playing the

23   video?

24        MR. FLEISHER:  I am sorry, Your Honor, to publish the

25   video.

Michael Wagner - Direct

1          *THE COURT:*  I have carefully reviewed all the videos.

2          *MR. FLEISHER:*  Thank you, Your Honor.

3   *BY MR. FLEISHER:*

4   *Q.*  Mr. Wagner, have you reviewed this video?

5   *A.*  I have.

6   *Q.*  Do you know if you can identify anyone else in the video?

7   *A.*  I don't believe that I can from this angle.

8   *Q.*  Thank you.  Mr. Wagner, I am now going to direct your

9   attention to what's been marked Plaintiff's Exhibit 4.  And

10  again, if you will bear with me for just a moment while I try

11  to navigate this technology.

12          Mr. Wagner, is Plaintiff's Exhibit 4 a video, a still

13  shot of the beginning of a video now on your screen?

14  *A.*  Yes.

15  *Q.*  Do you see a date and time stamp?

16  *A.*  I do.  10:20:50 a.m., 1/16/2010.

17  *Q.*  Do you have any reason to believe that date and time stamp

18  is inaccurate?

19  *A.*  I do not.

20  *Q.*  Mr. Wagner, can you identify -- can you see Ken Scott, the

21  defendant, in this picture?

22  *A.*  I do.  Ken Scott is on the left side of the picture wearing

23  a orange vest, safety vest.

24  *Q.*  If you would, can you use that stylus that the Judge

25  mentioned to point to it because there is quite a few people in

Michael Wagner – Direct

1    the picture.  I just want to make sure.

2    *A.*  Okay.

3    *Q.*  Do you recognize anyone else in this picture?

4    *A.*  I recognize our two security officers.  I can't be

5    100 percent sure of who else is out on the street right from

6    this view.

7    *Q.*  Where are the two security officers you mentioned?

8    *A.*  This appears to be Dennis Anaya and Ron Pringle.  This

9    would be on Saturday morning when we have two security officers

10   posted to the facility.

11   *Q.*  And I apologize.  I think I wasn't clear.  I meant to ask

12   where are the security officers in the picture?

13   *A.*  Where I circled them.  The one officer is inside the gate

14   near the sidewalk.  The second security officer is back just

15   outside the gate in the traffic lane interior.

16   *Q.*  Is there anyone else in the picture that you recognize?

17   *A.*  Not immediately.

18   *Q.*  And you said that you recognize the defendant, Ken Scott.

19   How do you know that's him?

20   *A.*  I have seen this video several times and I recognize Ken

21   again from just personal experience.

22   *Q.*  Are you absolutely certain that that's Ken Scott?

23   *A.*  I am.

24        *MR. FLEISHER:*  Thank you, Your Honor.  I have no

25   further questions at this time.

Michael Wagner – Direct

1          *THE COURT:*  All right.  And Mr. Wagner -- well,

2     actually we will leave it up there.

3          Okay.  Cross-examination?

4                        **CROSS-EXAMINATION**

5     *BY MS. MESSALL:*

6     *Q.*  Good morning, Mr. Wagner.

7     *A.*  Good morning.

8     *Q.*  With reference to those videos that you were just

9     testifying about, if you can go to Exhibit 1 and 4, it's true

10    that you don't personally maintain the computer system or the

11    video cameras, correct?

12    *A.*  I am not sure what you mean by maintain.

13    *Q.*  As far as the private companies who keep them running when

14    they are ongoing?

15    *A.*  That's correct, yes, we do not.  I do not.

16    *Q.*  Since you weren't personally present on those dates, you

17    don't have personal knowledge of the dates on those particular

18    videos, correct?

19    *A.*  I know that the dates that were on there were sequential

20    from the time line.  That's all I know.

21    *Q.*  Correct.  And so I think the answer, then, to my question

22    was that or my question was you don't have personal knowledge

23    to the correctness.  Even though they might have been

24    sequential, they might have been sequentially incorrect; is

25    that right?

Michael Wagner - Cross

1  *A.*  Yes.  All I know is that they were sequentially correct.  I

2  don't know if the base time was correct or not, but it seems to

3  be.

4  *Q.*  Thank you.  And then that's also true as to the time and

5  day.  Because you weren't personally present, you are not able

6  from your personal knowledge to identify the time and date of

7  those videos?

8  *A.*  That's correct, I was not there.

9  *Q.*  And in reference to your identification of Mr. Scott in

10  those videos, would you agree with me the videos are a little

11  fuzzy?

12  *A.*  Yes.

13  *Q.*  And I believe you could identify, though, because you are

14  familiar and you know Mr. Scott, you have picked him out,

15  right?

16  *A.*  That's correct.  And the original video from the server,

17  which I have on my screen at work, is a little clearer than the

18  version we see on a disk or copy.

19  *Q.*  I see.  It is a little clearer than the version given to

20  the United States that made its way to me?

21  *A.*  Yes.  Every time we copy one, we -- it gets degraded a

22  little bit.

23  *Q.*  But on the subject of clarity of these videos, the clarity

24  can be increased in real-time; isn't that correct?

25  *A.*  I don't understand the question.

Michael Wagner - Cross

1    Q.  With respect to distinguishing features on faces and people

2    in the video, they can be brought nearer in real-time to the

3    person to make their image clearer; is that correct?

4    A.  I still don't understand the question when you say in

5    real-time.

6    Q.  As opposed to after the fact.

7    A.  I think the images are roughly the same.  I don't

8    understand that.

9         MS. MESSALL:  Could we put up one of those images?

10   Pardon me for just a second, Your Honor.

11        THE COURT:  That's all right.

12   BY MS. MESSALL:

13   Q.  While he is trying to pull up the video, you did mention in

14   your direct exam that at the front desk there is a tilt, zoom,

15   pan ability from the computer at the front desk, right?

16   A.  That's correct.

17   Q.  What would be the purpose of tilt and pan on a security

18   camera?

19   A.  To focus specifically on a particular area that you want to

20   look at more closely.

21   Q.  So if you needed to see a face or a sign or a car, you do

22   have that ability to tilt, pan and zoom, correct?

23   A.  Yes, assuming somebody is operating the pan, tilt, zoom,

24   yes.

25   Q.  That's what I was trying to get at.  If at the time you

Michael Wagner - Cross

 1   want to do it, you would have to do it at the time, correct?

 2   A.  Yes.

 3   Q.  You can't do it a week later?

 4   A.  Correct.

 5            MS. MESSALL:  We are having a little trouble.

 6            THE COURT:  Also, just so we keep the record clear, if

 7   you have conversations between the tables, ask for permission

 8   to do that just so the court reporter won't be thinking that

 9   she needs to eavesdrop on your conversation.

10            MR. FLEISHER:  Thank you, Your Honor.  I apologize.

11   BY MS. MESSALL:

12   Q.  So do you, Mr. Wagner, have on your screen Exhibit 1 again?

13   A.  Yes, ma'am.

14   Q.  And would you look at the signage on the fences.

15   A.  Yes.

16   Q.  Do you see those signs?  From this video would you agree

17   with me the signage is not legible?

18   A.  I would agree.

19   Q.  And would you agree with me that in general the faces are

20   not -- let's put it this way -- discernible from what we have

21   here today, correct?

22   A.  Correct.

23   Q.  So is that the kind of correction you could make with a

24   zoom at the front desk?

25   A.  If the camera were being operated and zoomed in, yes, the

Michael Wagner – Cross

1    signs would be legible and there would be more clarity in terms

2    of the persons' features.

3    Q.  Is it true that the security guards would ask for that from

4    the front desk if they wanted a zoom?

5    A.  If they wanted to, yes.

6    Q.  And on that particular Exhibit 1 for that particular day we

7    have two security guards in the driveway, correct?

8    A.  Correct.

9    Q.  And on that particular day -- the Court has already seen

10   this video, but there has been no complaint about the security

11   guards blocking the driveway, correct?

12   A.  I am sorry?

13   Q.  The security guards that are in the driveway on this

14   Exhibit 1, I am just confirming there are no complaints about

15   them being in the driveway; is that correct?

16   A.  No, I think it appears that Officer Anaya was walking away

17   out of the driveway.

18   Q.  I have to hurry because we have a short time, so I am

19   conscious of that.  In your testimony you were referring to

20   security concerns that involve risk assessments which would be

21   normal, I am sure, like worrying about different things,

22   interference, harassment, violence, and that was in the scope

23   of your work, correct?

24   A.  Correct.

25   Q.  Now, it's true, though, that for this particular lawsuit

Michael Wagner – Cross

1    and these particular incidents there are no claims of violence

2    by my client, Ken Scott, correct?

3    *A.*  I am not a party to the claim.  I am not aware of any

4    claims of violence that were raised here.

5    *Q.*  Thank you.  And you are not aware of any threats of bodily

6    harm by my client, Ken Scott, correct?

7    *A.*  In terms of these incidents, this lawsuit, no.

8    *Q.*  And there are no written reports concerning these 10

9    incidents with respect to claims against Ken Scott, correct?

10   *A.*  To the best of my knowledge.

11   *Q.*  You have known him for 16 or 17 years, right?

12   *A.*  Yes.

13   *Q.*  If there were claims of harassment or threats or violence,

14   it would be important that those are recorded for yourself and

15   for national, correct?

16   *A.*  There have been over the years prior incidents that records

17   were made of, I am sure, but I don't have any specific to these

18   10 incidents.

19   *Q.*  And isn't it true, and I think you already said it, that

20   although employees are not directed to or they are directed not

21   to interact with protesters on their way to work and back, they

22   are directed to make police reports if they feel threatened or

23   violated, correct?

24   *A.*  Yes.

25   *Q.*  So yes, I put an objection on the record.  Your complaint

Michael Wagner – Cross

1  in this lawsuit is related to only September 30, 2009; is that

2  correct?

3           *MR. FLEISHER:*  Objection.

4           *THE COURT:*  State your objection.

5           *MR. FLEISHER:*  Mischaracterizes the witness'

6  testimony.

7           *THE COURT:*  I think that it sounds like a foundation

8  objection?

9           *MR. FLEISHER:*  Yes, Your Honor.

10          *THE COURT:*  The question is worded your complaint.

11  Sustained.

12  *BY MS. MESSALL:*

13  *Q.*  So in connection with your testimony today, were you

14  responsible for providing videotapes to the United States?

15  *A.*  I was.

16  *Q.*  And did you feel that in one of the dates represented by

17  those videos you personally had experienced a FACE violation by

18  Mr. Scott?

19  *A.*  I did.

20  *Q.*  And that was for September 30; is that correct?

21  *A.*  It was.

22  *Q.*  And there were no other complaints personally against

23  Mr. Scott related to the 10 dates in the complaint, correct?

24  *A.*  On my behalf?

25  *Q.*  Correct.

Michael Wagner – Cross

 1   *A.*  No.

 2   *Q.*  Would you agree there is a public sidewalk on the driveway

 3   that you have identified in Exhibits 1 and 4?

 4   *A.*  Yes.

 5   *Q.*  And would you agree there is a yellow boundary line painted

 6   on the driveway that cuts off the public right-of-way from the

 7   Planned Parenthood property?

 8   *A.*  Yes, there is.

 9   *Q.*  You don't know of any time when the Denver police have

10   charged Ken Scott with obstructing the PPRM driveway, correct?

11   *A.*  With obstructing the driveway?

12   *Q.*  Yes.

13   *A.*  Not that I am aware of.

14   *Q.*  With respect to Exhibits 1 and 4, in your present

15   recollection are there -- who do you believe was blocked in

16   those exhibits from your present recollection?

17   *A.*  From present recollection, I believe that employees Kara

18   Armstrong and Leslie Durgin were blocked in two of the videos

19   that have been submitted and then the rest of them, I believe

20   that they were patients.

21   *Q.*  And as to your belief about patients, there is no record of

22   any names of patients being blocked in these videos, correct?

23   *A.*  No record with me, no.

24   *Q.*  Also there was no complaint by any patients to your office;

25   is that correct?

Michael Wagner - Cross

1   A.  Not to my office.  Patients will frequently complain to the

2   medical staff at the health center, but a lot of times I never

3   hear about that.

4   Q.  So those don't pertain to these 10 incidents, correct?

5   A.  That's correct.

6   Q.  I believe you also said your duties involve acts of

7   vandalism and maybe would also be over car wrecks and that kind

8   of thing if they occur in the parking lot or driveway?

9   A.  Overall safety for the building, yes.

10  Q.  So if there were an employee fender-bender in the parking

11  lot, would there be an incident report related to that?

12  A.  Yes.

13  Q.  If there were pedestrians struck in the driveway, there

14  would be a report of that in your office too?

15  A.  Yes.

16  Q.  If there were any car accidents in the driveway, you would

17  be aware of -- made aware of that, right?

18  A.  Yes.

19  Q.  So it's true there are no traffic accidents in the

20  driveway, at least involving Ken Scott, correct?

21  A.  To date, no, that's correct.

22  Q.  So you have known Ken Scott for 16 or 17 years, so I am

23  going to ask this question.  Are you also aware that he hands

24  out literature as he conducts his protest work?

25  A.  Yes.

Michael Wagner – Cross

1   *Q.*   Have you ever seen the material that he hands out?

2   *A.*   One or two items.

3   *Q.*   Were those items security threats?

4   *A.*   No.

5   *Q.*   Of the items you remembered, were one of those offering

6   alternatives to abortion in particular?

7   *A.*   One was a list of crisis pregnancy centers, the one I

8   remember specifically.

9   *Q.*   And that's not a security threat, is it?

10  *A.*   No.

11  *Q.*   Isn't it true that Ken's materials --

12          *THE COURT:*  Also, you should refer to a witness by his

13  last name or first and last name, but the attorneys in

14  questioning witnesses should not refer to a person by just

15  their first name.  Witnesses can refer to people however they

16  refer to them.  Go ahead.

17          *MS. MESSALL:*  Thank you for that, Your Honor.  I

18  didn't realize I had done it.

19  *BY MS. MESSALL:*

20  *Q.*   But it is true that if Mr. Scott's or other protesters'

21  materials make their way past the boundary line in the

22  driveway, those materials are not permitted in the PPRM

23  building; is that correct?

24  *A.*   That's correct.

25  *Q.*   That's just the policy, right?

Michael Wagner – Cross

1    *A.*  Yes.

2    *Q.*  So you agree that handing out literature by itself is not a

3    security threat and you agree that would be First Amendment

4    protected conduct, right?

5         *MR. FLEISHER:*  Objection, compound question and calls

6    for a legal conclusion.

7         *THE COURT:*  Sustained on both grounds.

8    *BY MS. MESSALL:*

9    *Q.*  Do you -- you don't oppose the general idea of expressing

10   anti-choice views outside of PPRM on the public sidewalk,

11   correct?

12        *MR. FLEISHER:*  Objection, calls for a witness opinion

13   and irrelevant.

14        *THE COURT:*  Sustained on relevance grounds.

15   *BY MS. MESSALL:*

16   *Q.*  In the years that you have known Mr. Scott, have you heard

17   him express things that you believe caused people to become

18   upset?

19   *A.*  Yes.

20   *Q.*  And in this case that's not the basis for your own claim on

21   September 30, 2009, is it?

22   *A.*  It has nothing to do with any speaking on his part.

23   *Q.*  Thank you.  So as far as you know, none of the 10 claims in

24   this lawsuit or those videos had anything to do with anything

25   he said, correct?

Michael Wagner – Cross

1          *MR. FLEISHER:*  Objection, foundation.

2          *THE COURT:*  Sustained.

3   *BY MS. MESSALL:*

4   *Q.*  To your knowledge of -- never mind.  Strike that.  I will

5   keep going.  To your knowledge, there are no voice recordings

6   of the events in this particular complaint by the protesters

7   outside, correct?

8   *A.*  That's correct.

9   *Q.*  Does that security system have the ability to do voice

10  recording?

11  *A.*  One of the systems has the design capability, but it's

12  never been put into play, so there are no voice recordings at

13  present through the security system.

14  *Q.*  All right.  And therefore, none were provided for these

15  incidents to the United States, correct?

16  *A.*  That is correct.

17  *Q.*  For the videos that came from your department and were

18  provided for this lawsuit, your office and yourself, either

19  your office or yourself did not talk to any of the drivers who

20  had apparently stopped to talk to Mr. Scott, correct?

21  *A.*  I did not speak to them.  I don't know if the security

22  officers talked to any of them.  Normally they would ask them

23  to -- direct them to come in or they might speak to them and

24  ask them to park their car, but I don't know personally.

25  *Q.*  There were no recounts of those discussions provided to the

Michael Wagner - Cross

 1  United States if they exist, correct?

 2  A.  That is correct.

 3  Q.  With respect to September 30th, 2009 -- strike that.  So

 4  you personally have no knowledge of any drivers in those

 5  unidentified cars who told you or anybody they were harassed or

 6  threatened by Mr. Scott?

 7  A.  I have no knowledge of the identity of those drivers or any

 8  interactions that they had with other people.

 9  Q.  Your acquaintance with my client, Mr. Scott, and his

10  activities for the unborn, is it true that he hands out

11  religious materials also as part of this activity?

12          MR. FLEISHER:  Objection, relevance.

13          THE COURT:  Overruled.

14  A.  I don't know if he hands out religious materials or not.

15  As I testified earlier, one thing I am familiar with is a list

16  of crisis pregnancy centers.

17  BY MS. MESSALL:

18  Q.  He does typically preach from the bible, correct?

19  A.  Not so much in recent times.  Years ago he would preach

20  from a bible quite a bit, but I haven't seen him holding a

21  bible and preaching from it in recent memory.  He quotes quite

22  a bit spontaneously.

23  Q.  He vocalizes a lot of verses, correct?

24  A.  Yes.

25  Q.  In your work for security, police, city, hotel, long and

Michael Wagner – Cross

1    successful career in security, you were trained in the

2    importance of preserving evidence for criminal cases, correct?

3    A.  That's correct.

4    Q.  And you were trained also in the importance of preserving

5    exculpatory evidence as well, correct?

6    A.  That's correct.

7    Q.  So what was done in this case -- strike that.  Other than

8    the videos and the witnesses whose names you know, there was no

9    other attempt to corral exonerating evidence and provide it to

10   the United States, correct?

11          MR. FLEISHER:  Objection, foundation.

12          THE COURT:  Overruled.

13   A.  I was not conducting an investigation.  I was asked to

14   provide representative samples of behavior activity outside the

15   fence.  It might be indicative of a possible FACE violation, so

16   that's all I did was find representative samples or examples.

17   BY MS. MESSALL:

18   Q.  And it's correct you don't have a license to practice

19   medicine?

20   A.  That's correct.

21   Q.  And you don't personally provide medical or surgical

22   services?

23   A.  That's correct.

24   Q.  And you don't do any individual counseling, correct?

25   A.  That's correct.

Michael Wagner - Cross

1    *Q.*  And you don't do patient referrals; is that correct?

2    *A.*  That's correct.

3    *Q.*  You don't obtain reproductive health services?

4    *A.*  I am a patient at PPRM and have a medical manager number

5    there and get some services there, but ...

6    *Q.*  That wasn't the basis of your claim on September 30, 2009?

7    *A.*  No.

8    *Q.*  Your security manual here is actually developed by your

9    national office; is that correct?

10   *A.*  That's correct.

11   *Q.*  But I believe you said it's a local directive from your

12   office for police to be called if a protester or staff member

13   wants police involvement, correct?

14   *A.*  Yes, that's correct.

15   *Q.*  And there are fender-benders sometimes, right?

16   *A.*  I am sorry, could you speak up?

17   *Q.*  There are fender-benders sometimes, right?

18   *A.*  There have been, yes.

19   *Q.*  For your incident on September 30 of 2009, Mr. Wagner, it

20   was your view you were delayed for several seconds, correct?

21   *A.*  That's correct.

22   *Q.*  But you have -- you were not harmed by that delay, correct?

23   *A.*  No.  I was concerned and frightened, but I did get in

24   safely.

25   *Q.*  And therefore you were not harmed, correct?

Michael Wagner - Cross

1   *A.*   Correct.

2   *Q.*   The delay you experienced was over when the car in front of

3   you moved, correct?

4   *A.*   Correct.

5   *Q.*   And when you pulled up, that car was already stopped,

6   correct?

7   *A.*   That's correct.

8   *Q.*   And so you didn't see it come to a stop, correct?

9   *A.*   That's correct.

10  *Q.*   And so you did not see Mr. Scott step in front of a moving

11  car coming at him, correct?

12  *A.*   No, because I approached from the north.  My vision would

13  have been obscured from the fence, so I didn't see it.

14  *Q.*   In fact, on that day you were trying to enter on the wrong

15  side of the driveway, correct?

16  *A.*   Correct.

17  *Q.*   Once the car moved, you were able to pass on through,

18  right?

19  *A.*   That's right.

20  *Q.*   You never talked to the driver in front of you that day,

21  correct?

22  *A.*   No, I did not.

23  *Q.*   There was no attempt to try to get their license tag or

24  identified number, correct?

25  *A.*   No.

Michael Wagner - Cross

1    *Q.*  And if Mr. Scott had wanted to directly impede you,

2    couldn't he have just stepped in front of your car?

3            *MR. FLEISHER:*  Objection, foundation.

4            *THE COURT:*  Overruled.

5    *A.*  Could you speak up, counselor?

6    *BY MS. MESSALL:*

7    *Q.*  If Mr. Scott had wanted to directly impede you, he could

8    have just stepped in front of your car, couldn't he have?

9    *A.*  Certainly.

10   *Q.*  He did not do that, did he?

11   *A.*  Not that day, no.

12   *Q.*  And you had no reason to even know that Ken would know you

13   were driving up, right?

14           *THE COURT:*  Do you mean Mr. Scott?

15           *MS. MESSALL:*  I am sorry, Mr. Scott, thank you.

16   *A.*  I think so because that particular automobile makes a very

17   distinctive sound.  You could hear it from a block or two away.

18   I am sure he probably recognized it before I came around the

19   corner.

20   *BY MS. MESSALL:*

21   *Q.*  But even though you were testifying a minute ago that you

22   were put in fear of having to wait on getting through the

23   driveway for a few seconds, you did not make a police report

24   that day, correct?

25   *A.*  That's correct.

Michael Wagner - Cross

1    *Q.*  And you did not inform Mr. Scott that day that you had been

2    put in fear, correct?

3    *A.*  That's correct.

4    *Q.*  Do you remember in that video whether you recognized any of

5    the other protesters for September 30, 2009?

6    *A.*  I can't recall at this time.

7    *Q.*  How recently did you look at that video?

8    *A.*  Probably a week ago.

9    *Q.*  Who is Leo Mantei?

10   *A.*  I am sorry?

11   *Q.*  Who is Leo Mantei?

12   *A.*  Leo is a long-time protester such as Mr. Scott that's been

13   I guess since the Vine Street days has been around protesting.

14   *Q.*  And you recognized him in that video for September 30,

15   2009, correct?

16   *A.*  I would have to look at the video, but I am pretty sure I

17   could recognize him if I looked at it.

18   *Q.*  For that day you never talked to Leo Mantei about being in

19   fear by Mr. Scott, correct?

20   *A.*  No.

21   *Q.*  A week ago when you saw that video, you also saw a couple

22   with a baby in the video, correct?

23   *A.*  That's correct.

24   *Q.*  You did not attempt to interview them about your fear of

25   Mr. Scott that day, correct?

Michael Wagner – Cross

1    A.  No, I didn't.

2    Q.  In your training with security and your different stints

3    with Planned Parenthood, local and national, you had special

4    training on the FACE Act with that employment, correct?

5    A.  That is correct.

6    Q.  And you had that training, correct, in New York as well?

7    A.  That's correct.

8    Q.  And one of those training events was with the -- I am

9    sorry, was by the national Planned Parenthood office there,

10   correct?

11   A.  I think actually both of the trainings were conducted by

12   representatives from the Department of Justice.

13   Q.  And it's true you are not aware of any pro-life or First

14   Amendment groups who were present for that training, correct?

15   A.  That's correct.

16          MS. MESSALL:  Thank you.  Thank you, Mr. Wagner.

17          THE COURT:  And Mr. Fleisher, do you have redirect?

18          MR. FLEISHER:  No, nothing further, Your Honor.

19          THE COURT:  Then Mr. Wagner, you may step down.  Thank

20   you.

21          MR. FLEISHER:  Your Honor, may the witness be excused?

22          THE COURT:  May the witness be excused?

23          MS. MESSALL:  Yes, Your Honor.

24          THE COURT:  All right.  That means you are released

25   from your subpoena.

Michael Wagner – Cross

1          Ladies and gentlemen, why don't we take our

2   mid-morning break at this time and plan on reconvening at about

3   10:27 since we are being so careful with our time.  The Court

4   will be in recess.

5          (Recess at 10:13 a.m.)

6          (Reconvened at 10:27 a.m.)

7          THE COURT:  Back on the record in the Scott matter.

8   The United States may call its next witness.

9          MS. GAYLE:  Your Honor, the United States calls Kara

10  Armstrong.

11          THE COURT:  Ms. Armstrong, if you will please come

12  forward and stand next to Ms. Preuitt-Parks, she will

13  administer an oath to you.

14      (**Kara Armstrong** was sworn.)

15          THE WITNESS:  I do.

16          THE COURT DEPUTY:  Please state your full name and

17  spell your last name for the record.

18          THE WITNESS:  My name is Kara Marie Campbell

19  Armstrong, A-R-M-S-T-R-O-N-G.

20                    **DIRECT EXAMINATION**

21  BY MS. GAYLE:

22  Q.  Good morning Ms. Armstrong.

23  A.  Good morning.

24  Q.  Where are you employed?

25  A.  I am employed at Planned Parenthood of the Rocky Mountains.

Kara Armstrong – Direct

1   *Q.*   Do you call it PPRM?

2   *A.*   I do.

3   *Q.*   And where is PPRM located?

4   *A.*   7155 East 38th Avenue, Denver, Colorado 80207.

5   *Q.*   How long have you been employed there?

6   *A.*   I have been employed there since June of 2008.

7   *Q.*   Could you please briefly describe your education for us?

8   *A.*   Sure.  My undergrad is in psychology and sociology and my

9   master's is in public health.

10  *Q.*   Can you describe your work experience briefly.

11  *A.*   Since graduating from college, I have worked as a research

12  assistant in Houston, Texas.  I have been a nanny.  I have

13  worked for another nonprofit here in town, was a volunteer

14  coordinator.  And I have also been the research coordinator at

15  Planned Parenthood Rocky Mountains, as well as the office

16  manager of our office.

17  *Q.*   What is your position at PPRM?

18  *A.*   I have two positions.  For half of my time there I am the

19  clinical research coordinator and coordinator of clinical

20  trials and the other half of my time is spent being the

21  administrative office manager.

22  *Q.*   How long have you had the role as a clinical coordinator?

23  *A.*   Since June 2008.

24  *Q.*   What about as the administrative office manager?

25  *A.*   Since January of 2010.

Kara Armstrong – Direct

1    *Q.*  In either of your roles do you deal with patients?

2    *A.*  Yes, I can deal with patients as the clinical research

3    coordinator.

4    *Q.*  Describe how you deal with patients as the clinical

5    research coordinator?

6    *A.*  Sure.  So as the research coordinator if there is an

7    instance where the staff that conducts the research are unable

8    to do an informed consent or fill out paperwork with a patient,

9    I will do that for them.

10   *Q.*  Generally, what types of services do patients of PPRM

11   receive?

12   *A.*  There is a number of services.  The services can be

13   contraceptive family planning services, STD testing, STD

14   treatment.  We have services for men for preejaculation

15   treatment.  We also have abortion services and referral

16   services.

17   *Q.*  What does your role as administrative office manager

18   entail?

19   *A.*  As the administrative office manager, its building houses

20   approximately 100 people and I coordinate making sure all of

21   our mail is run, our contracts are in order.  I work with our

22   administration making sure all our contracts are in order.  I

23   oversee the front desk receptionist staff.  I train them,

24   coordinate their time sheets, their hours, and cover for them

25   as necessary and work with a team of facilities people to make

Kara Armstrong – Direct

1    sure that the facility is running smoothly.

2    Q.  Do you deal with patients in this role?

3    A.  If I ever deal with a patient in a role, it's simply

4    directing them into the clinic or taking a phone call and

5    directing it to the appropriate person.

6    Q.  Do you have people reporting to you in this role?

7    A.  Yes.

8    Q.  Do they deal with patients?

9    A.  They do the exact same thing, direct a client into the

10   clinic or take a phone call and direct it to the appropriate

11   place.

12   Q.  Now, does PPRM have any guidelines for dealing with

13   protesters?

14   A.  Yes, we have general guidelines.  We have a -- what's the

15   word -- a non-engagement policy, so we are not allowed to

16   engage with them.  It's one of the first things I mention in an

17   interview with a future candidate is when you come to the

18   agency, you are not allowed to engage with them.

19   Q.  Do you know Ken Scott?

20   A.  I know who he is.

21   Q.  How long have you known him?

22   A.  I have known who Ken Scott is since 2009.

23   Q.  Can you identify Mr. Scott?

24   A.  Yes, ma'am.

25   Q.  Is he in this courtroom?

1    *A.*   Yes.  He is right in front of me.

2             *MS. GAYLE:*  Let the record reflect the witness has

3    identified the defendant.

4    *BY MS. GAYLE:*

5    *Q.*   How often do you see Mr. Scott?

6    *A.*   I see Mr. Scott most days between Tuesday and Saturday, if

7    I am in the office.

8    *Q.*   Can you describe what he does?

9    *A.*   Sure.  He is outside of the gated area of our facility.  He

10   provides pamphlets to individuals.  He does a lot of showing of

11   signs, raising his voice to express his opinion and trying to

12   flag down patients so that they can be spoken to.

13   *Q.*   And where does he do this?

14   *A.*   He does this in a number of places.  Sometimes it's on the

15   street.  Sometimes it's directly next to our driveway and

16   sometimes it's in the driveway.

17   *Q.*   What does he say when he is outside of PPRM?

18   *A.*   There are a number of things that have been said.  I

19   personally have been told, "Repent.  Don't work there.  Don't

20   kill babies.  Baby killer."  Also patients are told, "Don't

21   kill your baby."  There is the occasional expression of, "We

22   can help you."  There is the times I have heard him say, "You

23   are not a man for bringing your wife here for an abortion,"

24   those types of things.

25   *Q.*   Just to clarify, are some of those statements directed

Kara Armstrong – Direct

1    towards you?

2    *A.*   Repent and don't kill babies, baby killer, those things are

3    directed towards me.

4    *Q.*   How do you know that they are directed to you?

5    *A.*   I am the only one in the parking lot walking into the

6    building.  I would assume.  It's an assumption.

7    *Q.*   Does he do anything else when you are entering PPRM?

8    *A.*   Yes.  Occasionally there will be signs being pushed right

9    in front of you in the driveway, on the side of the driveway.

10   *Q.*   What about when you are leaving?

11   *A.*   Leaving it's the exact same thing.  They are standing on

12   the side of the driveway with signs and the way you try to exit

13   the building.

14   *Q.*   When you say they, does that include Mr. Scott?

15   *A.*   It does include Mr. Scott.

16   *Q.*   And how does this activity make you feel?

17   *A.*   It makes me feel nervous, threatened.  I do not want to be

18   getting in a car accident, hurting anybody when I am trying to

19   leave the facility.

20   *Q.*   Turning to the morning of December 16, 2009, did you go to

21   work that day?

22   *A.*   I did.

23   *Q.*   And do you remember what time you arrived to work?

24   *A.*   I do not remember the time that I arrived at work.

25   *Q.*   When did you leave?

Kara Armstrong – Direct

1    A.  I do not know when I left.

2    Q.  Were you able to leave immediately?

3    A.  No, I was not.

4    Q.  Why not?

5    A.  Because there was a car stopped with Mr. Scott in the

6    driveway.

7    Q.  Describe what happened.

8    A.  To my best recollection, I was leaving the building.  And

9    as I was pulling up to leave the building, there was a car

10   stopped in the middle of the driveway with Mr. Scott on the

11   side and so I wasn't able to pass.

12   Q.  Did Mr. Scott say anything to you then?

13   A.  Not that I recall.

14   Q.  Now, why did you wait for the other car to leave?

15   A.  It was unable to get past the car.

16   Q.  Could you see around the other car?

17   A.  I could not see around the car, no.

18   Q.  Could you go around the other car?

19   A.  I could not go around the other car.

20   Q.  Was it safe to move?

21        MS. MESSALL:  Objection, form.

22        THE COURT:  Overruled.

23   A.  Can I answer the question?

24        THE COURT:  You may.

25   A.  Was it safe to move?  It was not safe to move forward, no.

Kara Armstrong – Direct

1    I would have been hitting Mr. Scott.

2    *BY MS. GAYLE:*

3    *Q.*  Have you seen a video of that incident?

4    *A.*  I have.

5         *MS. GAYLE:*  Thank you.

6         No further questions, Your Honor.

7         *THE COURT:*  Cross-examination?

8                        **CROSS-EXAMINATION**

9    *BY MS. MESSALL:*

10   *Q.*  Good afternoon, Ms. Armstrong -- morning still.  My

11   understanding is that as of more recent time you have two

12   positions that you have described as one-half the time is

13   dedicated to one thing and the other half is dedicated to the

14   other; is that right?

15   *A.*  That is correct.

16   *Q.*  When did that arrangement begin?

17   *A.*  That arrangement began January of 2010.

18   *Q.*  And therefore, that was after December of the event, the

19   encounter you had with Ken Scott that's part of this complaint,

20   right?

21   *A.*  That's correct.

22   *Q.*  So the position in December of 2009 that you held was as

23   clinical research coordinator, correct?

24   *A.*  That is correct.

25   *Q.*  And in that position you are not acting as a medical

Kara Armstrong – Cross

1  doctor, correct?

2  *A.*  I am not acting as a medical director -- doctor, sorry.

3  *Q.*  Doctor.  And not making patient referrals as a research

4  coordinator, correct?

5  *A.*  I am not making referrals for care.

6  *Q.*  And not doing patient counseling in that position, correct?

7  *A.*  I am not doing patient counseling.

8  *Q.*  And not providing pregnancy or abortion-related services in

9  that position, right?

10  *A.*  I am not, but I am providing services to test clinical

11  trial and new developments in contraceptive methods, so

12  providing those.

13  *Q.*  I believe you have testified that you didn't remember what

14  time you went to work on December 16, 2009, correct?

15  *A.*  That is correct.

16  *Q.*  And you weren't able to testify as to what time you left

17  work either, correct?

18  *A.*  That is correct.  I was unable to because my schedule

19  varied greatly at that point in time.

20  *Q.*  And also for that day it would be true that the only way

21  you know the date and time of the incident is because you have

22  looked at the video and that's the date and time on there,

23  correct?

24  *A.*  That's correct.

25      *MS. GAYLE:*  Objection, that's not in evidence.

Kara Armstrong - Cross

1          *THE COURT:* Overruled.  You can answer.

2     *A.*  That is correct.

3     *BY MS. MESSALL:*

4     *Q.*  And on that day, December 16, 2009, when you felt -- I will

5     find the word -- could you clarify for me, Ms. Armstrong,

6     what's the date of your incident in this case?

7     *A.*  I believe it is December 9, 2010 -- 2009.

8     *Q.*  When you testified that words are sometimes directed to you

9     by protesters, were there words directed to you on the day of

10    December 9, 2009?

11    *A.*  Fortunately, I do not recall.

12    *Q.*  Do you recall that your windows were rolled up that day?

13    *A.*  Yes.  My windows are always rolled up.

14    *Q.*  So your claim for that day was not because you received a

15    bodily threat to you personally, correct?

16    *A.*  I am witnessing not because of bodily threat, no.  I am

17    witnessing because they have a video showing obstruction, being

18    unable to leave.

19    *Q.*  Now, there was actually a car in the driveway as you were

20    trying to leave, correct?

21    *A.*  Correct.

22    *Q.*  And you observed the driver of that car talking to

23    Mr. Scott, correct?

24    *A.*  Correct.

25    *Q.*  So at least a large part of your inability to get out of

Kara Armstrong – Cross

 1   the driveway had to do with the car itself, correct?

 2   A.  Part of it, yes, but I probably could have gotten around

 3   the car hadn't Mr. Scott been standing on the side of the exit.

 4   Q.  But you didn't honk your horn or wave at him?

 5   A.  I have an non-engagement policy and I am not allowed to do

 6   any of those sorts of things.

 7   Q.  And you weren't waiting for them for like 20 minutes or

 8   anything, correct?

 9   A.  I don't know how long it was, but this has probably been

10   five minutes and it feels like 20.

11   Q.  That's true for both of us, and I do have to hurry.  So the

12   car that was in the driveway, Ms. Armstrong, it was already

13   there as you approached the back of it, correct?

14   A.  Correct.

15   Q.  So you did not see how it stopped, correct?

16   A.  Correct.

17   Q.  You did not talk to that driver at all, correct?

18   A.  Correct.

19   Q.  You did not make a police report after that event occurred?

20   A.  I did not make a police report.

21   Q.  You did not make a incident report with Mike Wagner's

22   office, did you?

23   A.  Not that I recall.

24   Q.  One of the things that upsets you about the protesters is

25   their posters and photographs, correct?

Kara Armstrong - Cross

1    *A.*  How they are placed is upsetting.

2    *Q.*  So if they were flower pictures placed differently you

3    would --

4    *A.*  Sorry, if there was a flower picture in the same place that

5    they are and I still couldn't see or get around, it still would

6    be an obstruction of my view.

7    *Q.*  So for the day that you had an encounter with my client

8    that's part of this lawsuit, are you complaining about posters

9    involved in that?

10   *A.*  I am not witnessing regarding any posters.  I am witnessing

11   regarding him being in the driveway.

12   *Q.*  In that encounter Mr. Scott was engaged in conversation

13   with the particular driver that was in the driveway, correct?

14   *A.*  That is correct.

15        *MS. GAYLE:*  Objection, speculation.

16        *THE COURT:*  Overruled.

17   *BY MS. MESSALL:*

18   *Q.*  Did you observe him apparently talking to the driver?

19   *A.*  He was apparently talking in the driveway.

20   *Q.*  And then that conversation concluded and Mr. Scott backed

21   out of your way, correct?

22   *A.*  That is correct.

23   *Q.*  And you were able to pass through, correct?

24   *A.*  Correct.

25   *Q.*  And there was no reason Mr. Scott had to know that you were

Kara Armstrong – Cross

1   leaving the building that day, correct?

2   *A.* You are in your car trying to exit the building.  It would

3   be assumed you are leaving.

4   *Q.* But as far as you yourself said, you didn't know when you

5   came and went as a rule because your schedule varies, right?

6   *A.* Correct.

7   *Q.* So Mr. Scott would not have known that Ms. Armstrong was

8   leaving and therefore going --

9           *MS. GAYLE:*  Objection, lack of foundation.

10          *THE COURT:*  Overruled.

11  *BY MS. MESSALL:*

12  *Q.* Is there any reason he would have known that you were --

13  *A.* I don't imagine so.

14  *Q.* So again, your only claim in this lawsuit is what is

15  contained in the video, correct?

16  *A.* I am witnessing only on that video, correct.

17          *MS. MESSALL:*  Thank you very much.

18          *THE COURT:*  All right.  Redirect?

19          *MS. GAYLE:*  Yes, Your Honor.

20                    **REDIRECT EXAMINATION**

21  *BY MS. GAYLE:*

22  *Q.* Ms. Armstrong, have you observed Mr. Scott in the driveway

23  since the incident in the video?

24  *A.* Yes.

25          *MS. GAYLE:*  Thank you, Your Honor.  No further

Kara Armstrong – Redirect

questions.

      *THE COURT:*  All right.  May Ms. Armstrong be excused?

      *MS. MESSALL:*  Yes.

      *THE COURT:*  Ms. Armstrong, you may step down.

      *MS. GAYLE:*  Your Honor, may the witness be excused for today?

      *THE COURT:*  I think I asked that and she may.

      *MS. GAYLE:*  I am sorry, Your Honor.

      *THE COURT:*  The United States may call its next witness.

      *MR. BREEN:*  Thank you, Your Honor.  The United States calls Dan Cram.

    (**Danny Cram** was sworn.)

      *THE WITNESS:*  I do.

      *THE COURT DEPUTY:*  Please state your full name and spell your last name for the record.

      *THE WITNESS:*  My name is Danny Cram, C-R-A-M.

**DIRECT EXAMINATION**

*BY MR. FLEISHER:*

*Q.*  Good morning, Mr. Cram.

*A.*  Good morning.

*Q.*  Can you please tell us your occupation?

*A.*  I am a security person at Planned Parenthood of the Rocky Mountains.

*Q.*  And where is that located?

Danny Cram – Direct

1   *A.*   7155 East 38th Avenue in Denver.

2   *Q.*   Can you briefly describe your employment history for us?

3   *A.*   I was in the United States Army for four years.  I was on

4   the Denver Police Department for 25 years.  And I worked for

5   Planned Parenthood for eight years this month.

6   *Q.*   Do you have a regular schedule at Planned Parenthood?

7   *A.*   Yes.  Currently I work Wednesdays and Thursdays and then I

8   also work when needed.

9   *Q.*   What hours do you work?

10  *A.*   7:30 in the morning until the protesters on the sidewalk

11  leave, so it could be 7:30 to 12:00 or 7:30 to 1:00 or it could

12  be 7:30 to 4:00.

13  *Q.*   What does that depend on?

14  *A.*   I am required to stay there until the protesters on the

15  sidewalk leave.

16  *Q.*   And as security, what are your job responsibilities?

17  *A.*   To ensure that vehicles can come and go in the driveway,

18  there is no interaction between patients with -- patients and

19  partners with the protesters.  By interaction I mean

20  physically.  And occasionally I am assigned cases of internal

21  theft.

22  *Q.*   When you are working there at the healthcare center, where

23  are you physically located?

24  *A.*   Normally my job, if the protesters are on the sidewalk, I

25  am required to be at or about the west driveway to the

Danny Cram – Direct

1    building.

2    *Q.*   The west driveway to the building, what street is that on?

3    *A.*   Pontiac Street.

4    *Q.*   Are there other driveways into the building?

5    *A.*   There are other driveways, but they are gated and locked.

6    *Q.*   And why are you stationed there?

7    *A.*   I am stationed -- this rule just came about in the last

8    year.  I am stationed there because of the interference with

9    protesters at the driveways trying to stop cars in the middle

10   of the driveway, and it's caused a problem with people trying

11   to come in and go out.

12   *Q.*   Where do protesters typically situate themselves?

13   *A.*   They sit out in front of the building directly in front of

14   the doors on ladders and yell at patients when they get out of

15   their car and they yell at them continuously until they go into

16   the building.  And then they are in or about the driveway.

17   That's just the recent phenomenon.

18   *Q.*   The protesters you referred to on ladders, approximately

19   how far would you say they are from the driveway itself?

20   *A.*   60 feet, 70 feet maybe.

21   *Q.*   Can you hear them when you are in the driveway?

22   *A.*   Yes.

23   *Q.*   Is there a fence around the facility?

24   *A.*   Yes, there is a fence and it has a curtain that's wire

25   tight preventing you from looking through the fence.

Danny Cram – Direct

1   *Q.*  What is in the fence?

2   *A.*  Within the fence?

3   *Q.*  Yes.

4   *A.*  I am not sure I understand the question.  You mean like the

5   building and the parking lot?

6   *Q.*  Yes, if that's what's --

7   *A.*  Our main administrative building which houses the clinic

8   and there is an employee parking lot on the north side of the

9   building, and then there is a patient parking lot on the west

10  side of the building.

11  *Q.*  Is there anything else within the fence?

12  *A.*  Shrubbery.  There is trees and shrubs between the parking

13  lot and the actual fence.

14  *Q.*  Are there any other buildings?

15  *A.*  No.

16  *Q.*  Is it important for you in your security role to know who

17  is coming in and out of the driveway?

18  *A.*  Yes.

19  *Q.*  Why?

20  *A.*  Because we don't want any protesters on the property.  They

21  have all been advised that they would be trespassing.

22  *Q.*  And in your experience, who typically drives in and out of

23  that driveway?

24  *A.*  The patients, employees and vendors and the Postal Service,

25  UPS.

Danny Cram – Direct

1    Q.  How do you know who falls into what category?

2    A.  I recognize most all of our employees or if not all

3    employees.  And if I see a person parking in the employee

4    parking lot that I don't think is an employee, then I redirect

5    them to the patient parking lot.

6    Q.  How do you know who is a patient?

7    A.  Most of them see the two signs once they are inside the

8    gate.  There is two signs directing them to patient parking and

9    they just automatically go to the patient parking lot.

10   Q.  In your role as security, do you review any video

11   surveillance tapes?

12   A.  I don't review them as a matter of course of my job.  I

13   will go look at something if there is something specifically I

14   want to look at, but normally I don't just review them.

15   Q.  Mr. Cram, are you familiar with Ken Scott?

16   A.  Yes.

17   Q.  How do you know him?

18   A.  I talked to him for almost eight years outside of different

19   clinics and at Planned Parenthood events.  I knew of him when I

20   was an active police officer prior to 1995.

21   Q.  How did you know of him?

22   A.  Because I have worked a sector that the Vine Street clinic

23   was in and Ken Scott was a protester at that clinic for years.

24   Q.  And the Vine Street clinic, was that the prior location of

25   the --

Danny Cram - Direct

1   *A.*  That's prior to, where we moved from to where we are now.

2   *Q.*  Mr. Cram, do you see Mr. Scott in the courtroom today?

3   *A.*  I do.

4   *Q.*  Can you point him out, please?

5   *A.*  He is sitting here looking at me with the gray hair and the

6   glasses.

7        *MR. FLEISHER:*  Let the record reflect the witness has

8   identified the defendant.

9   *BY MR. FLEISHER:*

10  *Q.*  Mr. Cram, I am going to direct your attention to an exhibit

11  marked Plaintiff's Exhibit 1.  If you bear with me for just a

12  moment, I have to work the technology here to pull it up.

13  Mr. Cram, is something up on the screen in front of you?

14  *A.*  Yes.

15  *Q.*  I just want to make sure the technology is working.  Thank

16  you.  Do you recognize what you see on the screen?

17  *A.*  I do.

18  *Q.*  And what is that?

19  *A.*  That's the front gate area that I have been referring to

20  that enters the parking lot to the Planned Parenthood of the

21  Rocky Mountains facility at 7155 East 38th Avenue.

22  *Q.*  Is there a -- do you know when this picture is from?

23  *A.*  It's time stamped on 12/8 of 2010 at 10:34 in the morning.

24  *Q.*  Do you have any reason to expect -- to assume that that's

25  inaccurate?

Danny Cram – Direct

1   A.  No.  I am sure that's accurate.

2   Q.  Do you recognize anyone you see in the picture that's

3   displayed on your screen?

4   A.  Yes.  I recognize Ken Scott standing at the edge of the

5   driveway in a black coat.

6   Q.  Are you absolutely sure that's Mr. Scott?

7   A.  Yes.  From the video I am looking at now, you wouldn't be

8   able to recognize him, but I made the video, so I know that

9   that's Ken Scott.

10  Q.  You have reviewed this video previously?

11  A.  Yes.

12  Q.  How do you know it's Mr. Scott?

13  A.  Because I reviewed the video and I made the video.

14  Q.  You said you reviewed the video.  Do you remember what you

15  saw on the video?

16  A.  Well, I would have to play it to remember it accurately.

17  Q.  Do you remember the incident that's depicted in the video?

18  A.  I am not sure if I understand the question.

19  Q.  Mr. Cram, I am going to play the video and we will see if

20  that refreshes your recollection.  I am going to play it now.

21          (Video was played.)

22          THE COURT:  Mr. Fleisher, I fail to see the purpose of

23  this.  This is to refresh his recollection if he had ever seen

24  it, so wouldn't his recollection have been refreshed by this

25  time?

Danny Cram - Direct

1          MR. FLEISHER:  Your Honor, I believe the witness will

2     testify that he himself is entering the video just now and so I

3     believe that's relevant.  I will stop the video at this point.

4          THE COURT:  Well, it seems to me that you could have

5     then jumped to that point in time perhaps if that's his only

6     personal knowledge of this event.

7          MR. FLEISHER:  I apologize.

8          THE COURT:  It's your time, but still.  Go ahead.

9     BY MR. FLEISHER:

10    Q.  Mr. Cram, having reviewed the video, does that refresh your

11    recollection?

12    A.  Yes, it does.

13    Q.  Do you see yourself?  Do you remember being present at the

14    time of this incident?

15    A.  Yes, I do.

16    Q.  And can you describe what happened?

17    A.  I had to come out of the building and walk over and ask the

18    car that was stopped in the middle of the driveway to please

19    move forward or back out onto the street.

20    Q.  And what happened next?

21    A.  And so the person pulled forward and entered the patient

22    parking lot.

23    Q.  And why did you come out to that scene?

24    A.  I came out because the car was stopped in the middle of the

25    driveway and it would make it difficult for people to come and

82
Danny Cram – Direct

1    go from the driveway.

2    Q.  And how did you know that that was the car?

3    A.  I was doing some work inside the building and I had the

4    cameras on at my desk, and I could see that that car got

5    stopped in the driveway.  Normally I let it go for a minute or

6    so.  And then I decided it wasn't going to move, so I had to go

7    tell them.

8    Q.  Do you have any doubt that the man in the video you

9    identified before is Mr. Scott?

10   A.  No, I have no doubt.

11   Q.  Mr. Cram, I am going to direct your attention to one other

12   exhibit and this is Plaintiff's Exhibit 5.  And again if you

13   will bear with me for just a moment.  Mr. Cram, do you

14   recognize what you see on the screen in front of you?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  That's the same gate area on a snowy day.

18   Q.  Do you know when this was recorded?

19   A.  It was recorded on 12/23/2009 at 9:24 in the morning.

20   Q.  How do you know that?

21   A.  It's time stamped in the upper right-hand corner.

22   Q.  Do you recall what happened at this time?

23   A.  I do.  I personally witnessed --

24          MS. MESSALL:  Objection, foundation.

25          THE COURT:  Overruled.

Danny Cram – Direct

1   *BY MR. FLEISHER:*

2   *Q.*  Go ahead.

3   *A.*  I witnessed this accident happen and made the video because

4   it looked like a truck was about to slide into Ken Scott.

5   *Q.*  And can you identify where Ken Scott is in this picture?

6   *A.*  He is the person to the right standing at the gate.

7   *Q.*  And Mr. Cram, there is a stylus, I believe, there.  If you

8   would not mind circling the individual that you understand to

9   be Mr. Scott.

10  *A.*  Yes.

11  *Q.*  Thank you.  How do you know that's Mr. Scott?

12  *A.*  Because I was there and I witnessed that.

13  *Q.*  Do you have any doubt that that's Mr. Scott?

14  *A.*  No.

15  *Q.*  Do you know who is in the truck in the picture?

16  *A.*  No.

17  *Q.*  Just a few more questions, Mr. Cram.  I want to talk about

18  Mr. Scott.  What interactions have you had with Mr. Scott?

19  *A.*  I have talked to Mr. Scott about -- for hours about

20  different subjects, anything from sports to abortion.

21  *Q.*  What has he said to you about abortion?

22          *MS. MESSALL:*  Objection, hearsay.

23          *THE COURT:*  Overruled.

24  *A.*  You know, it's no secret that Ken Scott is against abortion

25  of any kind, so he tries to preach to me about it.

Danny Cram – Direct

1    Occasionally we can have a conversation about something else,

2    but normally when it comes around to the abortion, he will just

3    preach to me.

4    *BY MR. FLEISHER:*

5    *Q.*  Where do you typically have these conversations?

6    *A.*  At this facility we have them out near the gate.

7    *Q.*  What's Mr. Scott's typical behavior like at that gate?

8    *A.*  Normally when he sees -- he stands there and waits until he

9    sees a car coming down the street.  If he thinks that car is

10   going to come into our facility, then if he is sitting, he will

11   jump up and approach out into the driveway and then he tries to

12   stop the car so he can talk to them.

13   *Q.*  How often does this occur?

14   *A.*  Until just recently, it occurs 10 times a day or more than

15   10 times a day when I am working.

16   *Q.*  Do cars typically stop?

17   *A.*  A lot of people have stopped because they are not sure why

18   he is out there trying to hail them down.

19   *Q.*  How do you know that?

20   *A.*  Because I have spoke to them.  And sometimes he will manage

21   to get a car stopped and they will roll down the window and

22   then he will start into his conversation with them, and the

23   driver will open the door and get out and want to fight him.

24   And sometimes they will stop and roll down the window and he

25   will start talking to them and they are not quite sure what to

Danny Cram – Direct

1   do because they don't speak English, and later I talk to them

2   and find out they don't have any clue what he was saying to

3   them.

4           And sometimes the car will stop and they will roll

5   down the window and he will talk to them for a few minutes and

6   then they will race off.  And then they will actually call me

7   to the front desk because the person wants to talk to me about

8   why was they stopped at the driveway like that.  They want the

9   police called and complain about it.

10  Q.  Mr. Cram, what do you do when Mr. Scott is in the driveway

11  with a car?

12  A.  I have done two things.  I have asked Mr. Scott if he wants

13  to talk to people and give them his message, to ask to pull out

14  onto the street and get out of the driveway.  And he has

15  responded that it's not in his interests to make them pull out

16  of the driveway because he is glad they are blocking the

17  driveway.  And I will also ask the driver if they want to talk

18  to Ken Scott, to pull out on the street.  If you want to talk

19  to him, then pull out on the street and park at the sidewalk

20  and you can talk to him there, but you can't talk to him in the

21  driveway.

22  Q.  And how often do drivers pull onto the street to talk to

23  Mr. Scott there?

24  A.  I have seen them do that one time in seven years, eight

25  years.

86

Danny Cram – Direct

1   *Q.* Mr. Cram, did Mr. Scott as you observed engage in this

2   behavior, engage in this protest activity alone?

3   *A.* No, no. There is a group of people that protest there.

4   There is actually two separate groups of people. In my mind I

5   divide them up in two separate groups of people. There is the

6   catholics to come there to mostly pray and then there is the

7   Ken Scott people that come there to protest.

8   *Q.* In your observation, what's Mr. Scott's relationship with

9   these other individuals?

10  *A.* In my observation, he is the one in charge. He tells them

11  where to stand. If they are standing in the wrong place, I can

12  hear him yelling at them, move over there. Don't stand here.

13  Here comes a car. Get ready. Stop talking to him. There is a

14  car coming. You know, I hear him yelling directions at them

15  all the time, especially recently when he was voluntarily

16  staying out of the driveway.

17  *Q.* When he was voluntarily staying out of the driveway, where

18  was he?

19  *A.* He was one of three places. He was at the north end of the

20  block. Recently he has been at the south end of the block.

21  And most of the time he would stay directly across from this

22  driveway, directly across the street.

23  *Q.* When he was directly across the street, approximately how

24  far would you say that is?

25  *A.* I actually measured it. That's 60 feet from the property

Danny Cram – Direct

1    line in the center of the driveway.

2    Q.   And when you are in the driveway, can you hear him there?

3    A.   Oh, yes, you can hear him clearly.  He has a very loud and

4    resounding voice.

5    Q.   And have you observed cars stopping to take his literature

6    across the street there?

7    A.   I don't ever recall a car stopping during my time.

8    Q.   Mr. Cram, what effects did Mr. Scott's activities have on

9    traffic safety?

10   A.   On traffic safety?  I think it has a lot to do with traffic

11   safety.  When they are on both ends of the driveway with their

12   signs and stuff, people coming out of the parking lot can't

13   really see up the street.  And if he is in the driveway, people

14   are hesitant to pull in or pull out because he has got a car

15   stopped or because he is actually standing there because they

16   are afraid to hit him.  They are not sure which way he is going

17   to go when he starts moving.  I have actually seen near

18   accidents there because he is flagging down a car or running

19   out in the street to stop a car or...

20   Q.   When you initially entered, you said they are.  Does that

21   include Mr. Scott?  I apologize.  That's not clear.  You said

22   they are near the driveway?

23   A.   They being Ken Scott or his followers.

24        MR. FLEISHER:  No further questions at this time, Your

25   Honor.

Danny Cram – Direct

1          *THE COURT:*  Thank you.

2          Cross-examination?

3          *MS. MESSALL:*  Your Honor, I would like to have this

4    removed from the screen, if I could.

5          *THE COURT:*  If you could, thank you.

6                            **CROSS—EXAMINATION**

7    *BY MS. MESSALL:*

8    *Q.*  Good morning, Mr. Cram.

9    *A.*  Good morning.

10   *Q.*  In your work for security, do you report to Mike Wagner?

11   *A.*  I do.

12   *Q.*  And is your work restricted to security work?  In other

13   words, you don't have another halftime job for Planned

14   Parenthood, correct?

15   *A.*  That's correct.

16   *Q.*  But you are part-time security, correct?

17   *A.*  Yes.

18   *Q.*  In your position have you had occasion to call the police

19   for parking lot events?

20   *A.*  I didn't hear the last part of your question.  Have I had

21   incident to call the police?

22   *Q.*  Yes.

23   *A.*  Yes.

24   *Q.*  But you haven't called any police to make charges against

25   Ken Scott, correct?

Danny Cram - Cross

1    *A.*  I didn't hear that question.

2    *Q.*  In calling the police for different things in connection

3    with your job, you haven't had to call the police for something

4    regarding Ken Scott, correct?

5    *A.*  That's not correct.

6    *Q.*  In regard to this address, in regard to the 10 incidents in

7    this complaint, you did not make a police report against Ken

8    Scott, correct?

9    *A.*  Specifically on these videos that I have just watched, is

10   that what you are --

11   *Q.*  Specifically the one that you just watched, correct?

12   *A.*  No, I did not call the police.

13   *Q.*  And then are you familiar with the other nine videos that

14   form the basis for this lawsuit?

15   *A.*  Yes.

16   *Q.*  And you did not call Ken Scott with respect to any -- you

17   did not call the police to make a charge against Ken Scott with

18   respect to any of the other nine incidents either, correct?

19   *A.*  That's correct.

20   *Q.*  As far as this lawsuit goes, you didn't make any incident

21   reports either, did you?

22   *A.*  I didn't personally make any incident reports, no.

23   *Q.*  With respect to any of the 10 incidents in this lawsuit,

24   there is no traffic accidents connected with those 10

25   incidents, correct?

Danny Cram - Cross

1    A.  That's correct.

2    Q.  You can't think of any time when the police have been

3    called for an accident at the driveway, can you?

4    A.  Not for an accident, no.

5    Q.  In this lawsuit you are not here today because you claim

6    that Ken Scott violated your rights under the FACE Act,

7    correct?

8    A.  I am not making any claim in this incident.

9    Q.  So you personally have not been irreparably harmed by Ken

10   Scott, correct?

11        MR. FLEISHER:  Objection, calls for a legal

12   conclusion.

13        THE COURT:  Sustained.

14   BY MS. MESSALL:

15   Q.  You testified that Ken Scott preaches to you sometimes.

16   You have heard him preach to the people coming and going,

17   correct?

18   A.  Yes.

19   Q.  And you are aware that he hands out literature to people

20   too, correct?

21   A.  Yes.

22   Q.  Sometimes you have heard Ken Scott say things like repent

23   and be saved, correct?

24   A.  I didn't hear your quote.

25   Q.  You have heard Ken Scott say things outside of PPRM like

Danny Cram - Cross

1  repent and be saved; isn't that right?

2  *A.*  I am sorry, your voice is real soft and I am not hearing

3  you.

4          *THE COURT:*  You have to speak up.

5  *BY MS. MESSALL:*

6  *Q.*  Isn't it true that outside of Planned Parenthood when you

7  and Ken are both out -- Mr. Scott are outside Planned

8  Parenthood, that you have heard him say the words repent and be

9  saved?

10  *A.*  Yes.

11  *Q.*  And you have heard him say god will forgive you, correct?

12  *A.*  Yes.

13  *Q.*  And you don't take those things as threats of bodily harm,

14  do you?

15  *A.*  No.

16  *Q.*  In fact, he has tried to preach to you for about as long as

17  you have known him, right?

18  *A.*  Yes.

19  *Q.*  He carries around signs with bible verses on them, right?

20  *A.*  It varies along the lines of bible verses?  Is that your

21  question?  I am a little bit hard of hearing.

22  *Q.*  I am a little bit soft so, I will get a little closer.

23  Isn't it true Ken carries around signs that have bible verses

24  on them?

25          *THE COURT:*  You mean Mr. Scott?

Danny Cram – Cross

1   *BY MS. MESSALL:*

2   *Q.*  Mr. Scott.

3   *A.*  I can't recall a particular sign that has a bible verse on

4   it, but I don't doubt that.

5   *Q.*  All right.  He certainly quotes from the bible a lot,

6   doesn't he?

7   *A.*  Yes.

8   *Q.*  And Ken Scott does all this stuff out on the public

9   sidewalk, doesn't he?

10  *A.*  Yes, he does.

11  *Q.*  Of these 10 incidents in this lawsuit, just confirming that

12  as far as -- other than the witnesses we have today, you are

13  not aware of who were in these cars that we see coming and

14  going in these videos, right?

15  *A.*  No.  I don't know their actual names.  I could say who the

16  patients are, but I can't give you the names.

17  *Q.*  Right.  But you can't say for sure because you didn't talk

18  to them, right?

19  *A.*  I did talk to some of them, yes.

20  *Q.*  For which dates are you talking about?

21  *A.*  Are you referring to the actual video?

22  *Q.*  Well, I have to refer to the 10 days that are involved in

23  this lawsuit.

24  *A.*  Yes, I have actually talked to some of the people that were

25  in some of the videos.

Danny Cram - Cross

1   *Q.*  There is no record of that, correct?

2   *A.*  No.

3   *Q.*  In the videos that we have got in this lawsuit, there is a

4   yellow line painted across the driveway that is the boundary

5   line, correct?

6   *A.*  That's the property line.

7   *Q.*  Property line?

8          *MS. MESSALL:*  That's all.  Thank you, Mr. Cram.

9          *THE COURT:*  Redirect?

10         *MR. FLEISHER:*  Nothing further for the United States,

11  Your Honor.

12         *THE COURT:*  All right.  May Mr. Cram be excused?

13         *MS. MESSALL:*  Yes, Your Honor.

14         *THE COURT:*  All right.  Mr. Cram, you may be excused.

15  Thank you.

16         All right.  The United States may call its next

17  witness.

18         *MS. GAYLE:*  Your Honor, the United States calls Leslie

19  Durgin.

20      (**Leslie Durgin** was sworn.)

21         *THE WITNESS:*  I do.

22         *THE COURT DEPUTY:*  Please state your full name and

23  spell your last name for the record.

24         *THE WITNESS:*  Leslie Durgin, D-U-R-G-I-N.

25         *THE COURT:*  Before you begin, Mr. Cram has come back

Danny Cram – Cross

1    into the courtroom.  Unless the parties have some understanding

2    that once a witness testifies they are released from the

3    sequestration order, do you have a problem given the fact he

4    has been excused?  He therefore is not subject to recall.

5          *MS. MESSALL:*  No objection.

6          *THE COURT:*  All right.  That's fine, then.  Go ahead.

7                          **DIRECT EXAMINATION**

8    *BY MS. GAYLE:*

9    *Q.*  Good morning, Ms. Durgin.

10   *A.*  Good morning.

11   *Q.*  Where are you employed?

12   *A.*  Planned Parenthood of the Rocky Mountains.

13   *Q.*  Where is that located?

14   *A.*  It's 7155 East 38th Avenue in Denver.

15   *Q.*  How long have you been employed there?

16   *A.*  Almost five years.

17   *Q.*  Can you please briefly describe your work experience for

18   us?

19   *A.*  For about 35 years I have been a nonprofit manager or

20   executive director, mostly in health and community service

21   organizations.  I worked for the Colorado state government for

22   about 10 years largely in the same field.

23   *Q.*  Have you ever held political office?

24   *A.*  I have.  I was on the city council and mayor of Boulder

25   from 1989 to 1997.

Leslie Durgin – Direct

1   Q.   Now, what kind of organization is PPRM?

2   A.   It's a private nonprofit organization that provides

3   reproductive healthcare to men and women.  We are located in

4   four states.

5   Q.   What is your position with PPRM?

6   A.   I am the senior vice-president of public policy and

7   communication.

8   Q.   Can you describe that for us?

9   A.   I oversee nine staff, two direct reports.  And in the areas

10  that I supervise we do legislative and regulatory public policy

11  work, analysis and advocacy.  And in marketing and

12  communications we do both internal and external communications

13  with the public, with our staff and traditional marketing

14  activity.

15  Q.   Is this a full-time position?

16  A.   It is.

17  Q.   Do you deal with patients in either your communications or

18  your public policy work?

19  A.   Indirectly I do, but not directly.

20  Q.   Can you describe how you deal with patients indirectly?

21  A.   Sure.  By establishing and maintaining a positive

22  environment both in terms of legislative and regulatory

23  activities, I ensure that Planned Parenthood is able to provide

24  services in an affordable and safe way.  And in communication

25  particularly in marketing we do what are traditional marketing

Leslie Durgin – Direct

1   activities to let the public know and let potential clients

2   know that we offer certain kinds of services.

3   *Q.*  How does your work assist the medical staff?

4   *A.*  Well, it provides the environment in which they can

5   practice medicine.

6   *Q.*  Now, are you familiar with the administrative staff of

7   PPRM?

8   *A.*  I am.

9   *Q.*  And is their work important to the administration of PPRM?

10  *A.*  I could not hear you.

11  *Q.*  Is their work important to the function of PPRM?

12        *MS. MESSALL:*  Objection, leading.

13        *THE COURT:*  Overruled.

14  *A.*  Yes, it is.  It also provides both the administrative

15  support and the environment I discussed previously.

16  *BY MS. GAYLE:*

17  *Q.*  Are you familiar with the security staff?

18  *A.*  I am.

19  *Q.*  And are you familiar with security guidelines?

20  *A.*  In general terms, yes.

21  *Q.*  Is the work of security important to PPRM?

22  *A.*  It's essential.

23  *Q.*  How so?

24  *A.*  Well, it too provides a safe, secure environment for our

25  patients, for our staff and for our volunteers to provide the

Leslie Durgin – Direct

1   services of Planned Parenthood.

2   Q.   Now, you said you worked full-time.  What days do you work?

3   A.   I work Monday to Friday.

4   Q.   And what time do you normally arrive to work?

5   A.   I usually get there about 9:00 o'clock.

6   Q.   And when you arrive do you -- sorry -- do you notice

7   Mr. Scott outside when you arrive?

8   A.   On many days, yes.

9   Q.   And is Mr. Scott alone?

10  A.   No.  He is generally with a group of people.

11  Q.   And can you describe the scene with those people?

12  A.   I can.  I don't count, but generally it seems like there

13  are about 12 to 15 people that are there on any given day but

14  Monday, and they are standing outside the gates of Planned

15  Parenthood with signs, with bullhorns, frequently with ladders

16  looking over the fence and demonstrating outside the gates of

17  Planned Parenthood.

18  Q.   Are there just adults out there?

19  A.   There are not.  There are frequently young children there

20  as well.

21  Q.   Now, do you know Mr. Scott?

22  A.   I know -- I recognize Mr. Scott.  I don't know him

23  personally, no.

24  Q.   How do you recognize him?

25  A.   He is sitting right in front of me.

Leslie Durgin – Direct

1        *MS. GAYLE:*  Let the record reflect the witness has

2     identified the defendant.

3     *BY MS. GAYLE:*

4     Q.   How often do you see Mr. Scott?

5     A.   I don't count, but I would guess that probably four times a

6     week.

7     Q.   Can you describe what he does when you observe him?

8     A.   Yes.  He is frequently standing right by the driveway and

9     often is yelling, calling -- in my case calling me by name,

10    calling some other staff by name and telling us that we are

11    going to go to hell.  We are going to burn in hell, that we are

12    contributing to global warming and the activist judges will not

13    save me.

14    Q.   Does he do anything else when you are entering the

15    driveway?

16    A.   He sometimes is holding a sign, but more frequently he is

17    more verbal.

18    Q.   Does he do anything when you are leaving work?

19    A.   He leaves well before I leave work.  I generally leave at

20    5:00.  The protesters usually are gone around noon.

21    Q.   Now, turning to the morning of February 4th, 2010, did you

22    go to work that day?

23    A.   I did.

24    Q.   And did you have occasion to leave work that day?

25    A.   I did.

Leslie Durgin – Direct

1    Q.  Did you leave work at your regular time?

2    A.  I was leaving the middle of the day for a meeting which is

3    when the incident occurred.  I assume I left at 5:00 o'clock as

4    usual for going home after work.

5    Q.  When you left earlier for your meeting, were you able to

6    leave immediately?

7    A.  No.  I was delayed in the driveway by Mr. Scott.

8    Q.  Can you describe what happened?

9    A.  Uh-huh.  I got in my car and was driving toward the exit.

10   In front of me there was a car that was stopped in the

11   driveway.  Mr. Scott was standing, talking to or at least

12   beside the driver's side, and I couldn't exit because the car

13   had stopped for Mr. Scott.

14   Q.  Why did you wait for the other car?

15   A.  Well, to go around -- it's a somewhat narrow driveway.  To

16   go around the other car in my judgment would have been unsafe.

17   I didn't know if another car would have tried to enter and I

18   would have been in that side of the driveway.  And it's very

19   difficult to see around the gate, so if there are protesters

20   and particularly kids standing close to the driveway, it's

21   really unsafe unless you have clear visual access.

22   Q.  Did you feel it was safe to move forward?

23   A.  No, I didn't.

24   Q.  And how did you feel when you were stopped there?

25   A.  Well, I was probably irritated a bit.  I was apprehensive.

Leslie Durgin - Direct

1   I didn't know what the situation was.  We have a very strong

2   nonengagement policy, so I was clear that I wouldn't do

3   something like honk my horn, but I didn't know what the

4   situation was ahead of me and I didn't know what Mr. Scott was

5   going to do.

6   Q.  And just to clarify, where was Mr. Scott at the time that

7   you were stopped?

8   A.  He was standing in the driveway, sort of in the middle of

9   the driveway, on the side of the driver of the car in front of

10  me.

11          MS. GAYLE:  Thank you.  No further questions.

12          THE COURT:  Cross-examination?

                        **CROSS-EXAMINATION**

14  BY MS. MESSALL:

15  Q.  Good morning, Ms. Durgin.

16  A.  Good morning.

17  Q.  With reference to your testimony concerning February 4th,

18  2010, did you make a police report in connection with that

19  event?

20  A.  I did not.

21  Q.  Was there a written incident report to Mike Wagner,

22  security at PPRM?

23  A.  No, I didn't make a written report.

24  Q.  Other than your driver's license in Colorado, you don't

25  have any medical licenses from our state, correct?

Leslie Durgin - Cross

1   A.   That's correct.

2   Q.   No counseling license, correct?

3   A.   No, I don't.

4   Q.   And you don't do either of those things for Planned

5   Parenthood, right?

6   A.   Practice medicine or counseling, no.

7   Q.   And you don't make patient referrals in your work either,

8   correct?

9   A.   No, I don't.

10   Q.   So in that you don't provide surgical services too,

11   correct?

12   A.   No.  I don't practice medicine.

13   Q.   In your job you do -- I heard you say advocacy.  Is that

14   something like lobbying?

15   A.   We have a higher lobbyist, but I do what would be called

16   advocacy as well.

17   Q.   In the nonengagement policy at Planned Parenthood, it's

18   your view that that includes not honking or waving someone on

19   if you are in a hurry?

20   A.   Yes, that's right.  Nonengagement in Planned Parenthood

21   training means not speaking to, not yelling, not answering, not

22   trying to in any fashion create more noise and chaos for our

23   patients.

24   Q.   For February 4, 2010, is part of your complaint that

25   Mr. Scott engaged in noise?

102

Leslie Durgin - Cross

 1   *A.*  Two questions there.  One is I am not part of the

 2   complaint.  I am a witness.  And the specific incident at the

 3   sidewalk, at the driveway, Mr. Scott was not at that point

 4   making loud noises, no.

 5   *Q.*  Thank you.  You don't know of any accidents involving

 6   children at the driveway, do you?

 7   *A.*  I am sorry, I couldn't hear you.

 8   *Q.*  You don't know of any accidents at the driveway involving

 9   children?

10   *A.*  No, I don't.

11   *Q.*  You were caused to wait 35 to 40 seconds; is that correct?

12   *A.*  That's correct.

13   *Q.*  You personally were not harmed by that delay, though,

14   correct?

15   *A.*  I personally was not.

16   *Q.*  You had no knowledge of who was in the car in the driveway

17   at the time you pulled up, correct?

18   *A.*  I do not know who the driver was or if there were other

19   people in the car.

20   *Q.*  And you don't -- you did not witness the car stopping,

21   correct?

22   *A.*  The car was stopped when I pulled up behind it.

23   *Q.*  You will agree that as far as Mr. Scott's conduct that day,

24   he did not step in front of your vehicle, correct?

25   *A.*  He stepped to the side of my vehicle.  I don't recall him

Leslie Durgin - Cross

1    stepping in front of the vehicle.

2    *Q.* And then you were allowed to pass by him, correct?

3    *A.* I had to wait until the car in front of me exited.  Then

4    there was a car on 30 -- on Pontiac, sorry, that passed and

5    then I was able to exit.

6    *Q.* And you observed Mr. Scott talking to the driver of the car

7    in front of you?

8    *A.* I did.

9    *Q.* Have you observed Mr. Scott handing literature out at the

10   driveway?

11   *A.* I have.

12   *Q.* That's not part of your complaint, is it?

13   *A.* I am a witness.  It's not part of this case, at least my

14   portion, my testimony.  Is that clear?  It's not part of what I

15   experienced that day, that time.

16          *MS. MESSALL:* I don't have anything further.

17          *THE COURT:* Redirect?

18          *MS. GAYLE:* No.  Thank you, Your Honor.

19          *THE COURT:* May Ms. Durgin be excused?

20          *MS. MESSALL:* Yes, Your Honor.

21          *THE COURT:* Thank you, Ms. Durgin.  You may be

22   excused.

23          The United States may call its next witness.

24          *MS. GAYLE:* We have no further witnesses.  However, we

25   would like to move into evidence two depositions that were

Leslie Durgin - Cross

1    designated prior and they have been premarked as Exhibits

2    No. 12 and No. 13.  Exhibit No. 12 is a designated deposition

3    of the defendant, Mr. Scott; and Exhibit 13 is the designated

4    deposition of Madeline Bundy.  Ms. Bundy is living in Boston as

5    a student at the moment and is not available for this hearing.

6    So we move it under F.R.C.P. 32(a)(4) for Ms. Bundy and under

7    F.R.C.P. 32(a)(3) for the defendant.

8              *THE COURT:*  Let's take up Exhibit 12 first.  Any

9    objection to the admission of Exhibit 12?

10             *MS. MESSALL:*  No objection to Ms. Bundy's deposition,

11   Your Honor.

12             *THE COURT:*  Exhibit 12 I believe is Mr. Scott's

13   deposition.

14             *MS. MESSALL:*  We did object to Mr. Scott's deposition.

15             *THE COURT:*  The question is whether you object now.

16             *MS. MESSALL:*  We do object now.  We filed a written

17   one last night and we do object now for the same grounds which

18   include the fact that we had objected to any discovery.  We

19   were ordered to do it anyway.  And then we had asserted the

20   Fifth Amendment subsequent to that for Mr. Scott.  And we

21   believe that that ruling by the magistrate supersedes this

22   entry of this testimony against him, and if I can check my

23   objection again, Your Honor.

24             *THE COURT:*  Sure.

25             *MS. MESSALL:*  In addition to the pending appeal

Leslie Durgin - Cross

1    objecting to the discovery which we did conduct, and this is

2    the fruit of that order, so we maintain that objection, Your

3    Honor, the Fifth Amendment and the order of the magistrate that

4    Mr. Scott would not have to testify himself in this case.  The

5    uniqueness of the statute makes the ordinary civil rules of

6    adverse inference and partial testifying unworkable because it

7    ends up being testimony against him for future criminal

8    prosecution under the same statute.

9           And they have asked, the United States have asked for

10   an adverse inference by virtue of this exercise of his

11   privilege.  We believe also the portions that they have

12   designated are not relevant unless they think they are, then

13   they would be protected, but there was no waiver.

14          We are compelled by the existing structure for Fifth

15   Amendment in a civil proceeding, Your Honor, so all over the

16   deposition we have objected and Your Honor can take that into

17   account.  And then Rule 403, we believe it could obviously be

18   prejudicial to have it entered.

19          THE COURT:  All right.  Ms. Gayle, I haven't looked

20   through each of the different portions of the deposition that

21   comprises Exhibit 12, but is the government's theory of

22   relevance all having to do with drawing an adverse inference

23   from his implication of the Fifth Amendment?

24          MS. GAYLE:  No, Your Honor.  We have designated

25   portions that do not implicate his invocation of the Fifth

Leslie Durgin - Cross

1    Amendment, including information about his background,

2    information about his beliefs that have -- that he willingly

3    answered and did not invoke the Fifth Amendment for.   And

4    Ms. Messall had an opportunity to question the defendant at his

5    deposition, and I would just remind the Court that the

6    deposition may be submitted for any purpose under the rule.

7         THE COURT:   The objection is overruled.   The Court

8    will admit Plaintiff's Exhibit 12, although as I have already

9    indicated in my ruling on the motion in limine regarding

10   adverse inferences, the Court will not draw any adverse

11   inferences from his implication of the Fifth Amendment.   But to

12   the extent the exhibit contains other information regarding

13   answers, then that's admissible.

14        MS. GAYLE:   Thank you, Your Honor.

15        THE COURT:   As to Exhibit 13, then, any objection to

16   its admission?

17        MR. BREEN:   Your Honor, I think Ms. Messall was

18   wondering about the counter-designations that we had made in

19   Mr. Scott's deposition, if those would be allowed as well.

20        THE COURT:   Are they in Exhibit 12?   If so, they have

21   been admitted.

22        MS. MESSALL:   They were provided to the United States

23   yesterday.

24        THE COURT:   This is the admission of evidence, so if

25   you have them contained in an exhibit and if during your case

Leslie Durgin - Cross

1   you want to move their admission, we will take them up at that

2   time.

3          MS. MESSALL:  We do.  If I could clarify with counsel.

4          THE COURT:  That's not the time.  What we are talking

5   about right now is Exhibit 13.  Any objection to Exhibit 13?

6          MR. BREEN:  Yes, Your Honor.  Insofar as we objected

7   here as well to the time stamp on the video of Ms. Bundy, she

8   had actually testified in parts of her deposition that she

9   didn't recall being there on the day of the alleged incident,

10  so we would like to continue that objection from here.  We have

11  asserted it on -- at least on Page 20 of that deposition, Page

12  19 and Page 20 of that deposition.

13         THE COURT:  Ms. Gayle, is this the entirety of her

14  deposition?

15         MS. GAYLE:  Yes, Your Honor.  We have designated

16  portions of the deposition that we believe are relevant and

17  that should be admitted.

18         THE COURT:  And how are they designated in the

19  complete transcript?

20         MS. GAYLE:  They are highlighted in yellow per the

21  Court's rule.

22         THE COURT:  Are those portions that Mr. Breen just

23  mentioned part of the designation of relevance?

24         MS. GAYLE:  I would need to review it to see the page

25  and line numbers.

Leslie Durgin - Cross

1        *THE COURT:*  Mr. Breen, it's your objection, so --

2        *MR. BREEN:*  Yes.  Actually, Your Honor, in Exhibit 13

3    I believe -- I am looking at the binder that plaintiff provided

4    us, in Exhibit 13 on Line 20 my objections are designated.  So

5    our counter-designation --

6        *THE COURT:*  You said Line 20?

7        *MR. BREEN:*  I am sorry, Page 20.  It begins on Page

8    19, Line 17, extends through Line 20 -- Page 20, Line 2,

9    repeating the objection on Line 15 of Page 20.

10       *THE COURT:*  Is there any reference by the deponent to

11   the time stamps?

12       *MR. BREEN:*  I am sorry, Your Honor.  You mean in terms

13   of --

14       *THE COURT:*  Your objection is to the time stamp.  Did

15   the deponent say anything about the time stamp in the portions

16   of the deposition that are designated by the United States?

17       *MR. BREEN:*  Well, I am trying to answer your question,

18   Your Honor.

19       *THE COURT:*  I mean, I don't see any reference to time

20   stamp on Page 20.

21       *MR. BREEN:*  We objected to foundation and

22   authenticity, so that again what we were doing today in order

23   to --

24       *THE COURT:*  But this deposition doesn't incorporate a

25   video nor is it being used to authenticate a video, at least

Leslie Durgin - Cross

1   not to my knowledge.

2         MR. BREEN:  A video was included as an exhibit in the

3   deposition.

4         THE COURT:  But this is a transcript.  Do you see a

5   videotape?  Is there a videotape that's part of Exhibit 13?

6         MR. BREEN:  No, I guess not, Your Honor.

7         THE COURT:  Objection is overruled.  Exhibit 13, those

8   portions of it that are in color, those are the ones that you

9   are tendering, correct?

10         MS. GAYLE:  Yes, Your Honor.

11         THE COURT:  Exhibit 13 will be admitted.

12         MS. GAYLE:  Thank you.

13         THE COURT:  All right.  Then we can do one of two

14   things.  So otherwise, any additional evidence, Ms. Gayle?

15         MS. GAYLE:  No, Your Honor.  The United States rests.

16         THE COURT:  Okay.  We can do one of two things and

17   that is it is now 11:47.  We could either take our lunch break

18   now, we are going to take one hour, or we can begin with

19   defendant's case if Mr. Scott chooses to present evidence and

20   go until approximately noon.

21         MR. BREEN:  Your Honor, we have two witnesses that

22   needed to go, if that's all right, if we may proceed with those

23   two.

24         THE COURT:  All right.  Mr. Scott then may call his

25   first witness.

Leslie Durgin – Cross

1          MR. BREEN:  We will first call Binette Diallo.  Your

Honor, Ms. Diallo has her daughter with her.  Can she hold her

while on the witness stand?

4          THE COURT:  No.  Is someone in the back who can take

care of her while she testifies?

6          MR. BREEN:  She is all right, yes.

7          THE COURT:  Great.  Ms. Diallo, if you can come

forward and stand next to Ms. Preuitt-Parks.

9     (**Binette Diallo** was sworn.)

10          THE WITNESS:  Yes, ma'am.

11          THE COURT DEPUTY:  State your full name and spell your

last name for the record.

13          THE WITNESS:  Binette Diallo, B-I-N-E-T-T-E,

D-I-A-L-L-O.

15                         **DIRECT EXAMINATION**

16    BY MR. BREEN:

17    Q.  Ms. Diallo, please tell us your work history.

18    A.  How I met Ken?

19    Q.  Why don't we start out with where are you working now?

20    A.  Right now I am working in DPC CCA.  I am doing billing.

21    Q.  Where were you working prior to that?

22    A.  Prior to that?  Customer service at an office in Lakewood.

23    Q.  You know the defendant, Ken Scott?

24    A.  Yes.

25    Q.  Tell us how you know him.

Binette Diallo - Direct

1   *A.*  I met him sometime when I was pregnant with my daughter.

2   That was four years ago.

3   *Q.*  Where did you meet him?

4   *A.*  In front of the Planned Parenthood downtown.  I don't know

5   the address by heart.

6   *Q.*  Would that have been at the Vine Street location?

7   *A.*  Yes, the Vine Street, yes.

8   *Q.*  At that time what was your personal situation?

9   *A.*  I was pregnant and just about to lose my house and go into

10  foreclosure, so -- and to find out that I was pregnant.

11  *Q.*  And were you employed at the time?

12  *A.*  Yes.

13  *Q.*  When you met Ken what happened?

14          *THE COURT:*  Do you mean Mr. Scott?

15          *MR. BREEN:*  I am sorry.

16  *BY MR. BREEN:*

17  *Q.*  When you met Mr. Scott, please describe that interaction.

18          *MR. FLEISHER:*  Objection, relevance.

19          *THE COURT:*  What's the relevance.

20          *MR. BREEN:*  We are going to public interest.  Again,

21  we would have presented these witnesses last, but they need to

22  get out.  In order to rebut the preliminary injunction being

23  requested, that's one of the elements, weighing the equities

24  and looking to the public interest.

25          *THE COURT:*  I will overrule the objection, but I won't

Binette Diallo - Direct

1    allow a lot of questions because I think that as I said at the

2    very beginning, some of the public interest elements may be

3    somewhat self-evident anyway, but go ahead.

4            *MR. BREEN:*  Thank you, Your Honor.

5    *BY MR. BREEN:*

6    *Q.*  Go ahead.

7    *A.*  I was driving to Planned Parenthood.  I had an appointment

8    to do my abortion that day.  I had the first appointment and I

9    missed it, and then they called me a week later and asked me if

10   I still wanted to come, so I said yes.  And there was a charge

11   for almost $400.  And I was on my way all by myself.  When I

12   drove into the parking lot, I was crying, upset, didn't want to

13   do it, but I had no choice because I was in the process of

14   losing my house.

15           When I got out of the car, I am walking to the Planned

16   Parenthood.  And, you know, and they approached me very nicely.

17   They asked me, "Can I talk to you?"  And I said, "Yes."  And

18   that's when they told me, "I can help you."  I am like, "No, I

19   don't think you can help me."  And they are like, "Yes, I can

20   help you.  Do you have a quick second?"  And I was like, "Yes."

21           So I listened to them.  I explained my situation, I am

22   about to lose my house.  This is going to be really hard and

23   everything they told me, we can help you through all this.  And

24   that's how I met them.

25   *Q.*  And then what happened?

Binette Diallo - Direct

1   *A.*  And then what happened, I went back home, went back to my

2   house.  We exchanged numbers.  They all came and gave me a

3   group hug.  I went back to my house and the same day they came

4   by, Scott and his wife came by to my house, find out we had no

5   food.  They went to King Sooper, bought me some food and got

6   some numbers for me, offered to take me to a shelter since I

7   was in the process of losing my house.

8   *Q.*  So let's go back to the activity at the Planned Parenthood

9   location at Vine Street.  What -- I guess how would you

10  characterize Ken Scott's activities on the sidewalk outside of

11  that Planned Parenthood?

12  *A.*  They was very nice.

13       *MR. FLEISHER:*  Objection, relevance.

14       *THE COURT:*  Ms. Diallo, if there is an objection, you

15  will need to wait for just a minute so I can rule on it.  I am

16  sorry, what is the objection again?

17       *MR. FLEISHER:*  Relevance.

18       *THE COURT:*  What's the relevance?  This is a different

19  place.

20       *MR. BREEN:*  We are right on the sidewalk.  From

21  Mr. Scott's early testimony, he has been doing this for 20

22  years.  This is what she witnessed on the sidewalk.  It may be

23  a different location, but it's the same sort of activity.

24       *THE COURT:*  How do we know that?

25       *MR. BREEN:*  Well, she had said folks had approached

Binette Diallo – Direct

1   her and asked her to talk with her and then offered assistance.

2          THE COURT:  As I said, I will overrule the objection,

3   but once again, since it does involve a different facility, you

4   will need to keep it moving.

5   BY MR. BREEN:

6   Q.  Please, go ahead.

7   A.  I am sorry?

8   Q.  When we were talking about what happened on the sidewalk

9   outside the Planned Parenthood, how would you characterize

10  Ken's activities?

11  A.  Very nice and helpful.

12  Q.  Tell us how you feel about those activities.

13  A.  I feel that without him my daughter's life -- and if

14  everybody in this room can just turn around, my daughter is

15  right there.  She is four years old.  She is right there and

16  very happy and healthy and it's because of Ken Scott.

17         MR. BREEN:  Ms. Diallo, per the Court's rulings, I

18  thank you for being here.  I have no further questions?

19         THE COURT:  Cross-examination?

20         MR. FLEISHER:  We have no questions, Your Honor.

21         THE COURT:  All right.  May Ms. Diallo be excused?

22         MR. FLEISHER:  She may.

23         THE COURT:  Ms. Diallo, you may be excused.  Thank

24  you.

25         THE WITNESS:  Can I say one more thing, Your Honor?

Binette Diallo – Direct

1          *THE COURT:*  No, you can't.  You can only testify

2     according to questions.  Thank you.

3          Mr. Breen, is there another witness who needs to

4     testify?

5          *MR. BREEN:*  Yes.  Oretha Zaybay.

6        (**Oretha Zaybay** was sworn.)

7          *THE WITNESS:*  Yes.

8          *THE COURT DEPUTY:*  Please state your full name and

9     spell your last name for the record.

10          *THE WITNESS:*  My name is Oretha Zaybay.  Spelling is

11     O-R-E-T-H-A, and last name is Z-A-Y-B-A-Y.

12                         **DIRECT EXAMINATION**

13     *BY MR. BREEN:*

14     *Q.*  Thank you, Ms. Zaybay.  I want to make sure the microphone

15     is close to your mouth.  Thank you.  Please tell us about your

16     work history.  Where are you working now?

17     *A.*  I am working at Cheryl Lane House (ph).  That's as a

18     nursing assistant, CNA.

19     *Q.*  You are familiar with the defendant, Ken Scott?

20     *A.*  Yeah.

21     *Q.*  Tell us how you are familiar with him.

22     *A.*  Ken Scott is a very nice person.  He is very good.  He and

23     his wife, they are very nice and they took good care of me and

24     my kid when I came to this country.

25     *Q.*  When did you meet Mr. Scott?

Oretha Zaybay – Direct

1    A.  I met him in 2003 at an abortion clinic.

2    Q.  And do you know the name?  What was the name of the

3    abortion clinic?

4    A.  Planned Parent, yeah, Planned Parent.

5    Q.  Please describe your interaction with Ken Scott when you

6    first met him.

7            MS. GAYLE:  Objection, relevance and cumulative.

8            THE COURT:  Response?

9            MR. BREEN:  Relevance and what?

10           MS. GAYLE:  It's cumulative.

11           MR. BREEN:  It's a different incident.  We have two,

12   Judge, and we are going to go for five minutes here.

13           THE COURT:  Overruled.

14   A.  What was the question again?

15   BY MR. BREEN:

16   Q.  Please describe your first interaction with Mr. Scott.

17   A.  I met him when I was going to do an abortion and he was

18   standing outside the abortion clinic, so I said, "Is this the

19   correct building?"  And he looked at me and he said, "You don't

20   have to do abortion."  So he tell me to stop and then I stopped

21   right away.

22   Q.  And what other words -- please describe your conversation

23   with him.

24           MS. GAYLE:  Objection, calls for hearsay.

25           THE COURT:  Overruled.

Oretha Zaybay – Direct

1   A.  He tell me, "Are you going to do abortion?  You don't have

2   to do abortion.  Save your baby."  And I said, "If I save my

3   baby, are you going to help me?"  I don't have no help.  And he

4   said, "Yes," and he did.  He helped me.

5   BY MR. BREEN:

6   Q.  And what was your personal situation at that time?

7   A.  I had just come from Africa.  I don't have nobody.  I don't

8   know nobody.

9   Q.  Based on your observation, what did you see Ken's

10  purpose --

11          THE COURT:  You mean Mr. Scott?

12          MR. BREEN:  I am sorry.

13  BY MR. BREEN:

14  Q.  Mr. Scott's purpose as to you?

15          MS. GAYLE:  Objection.  This calls for speculation.

16          MR. BREEN:  It's lay opinion testimony.

17          THE COURT:  Hold on.  When there is an objection, you

18  need to let me have a moment to rule on it.  Are you asking her

19  for -- I think it is speculation.  Sustained.

20  BY MR. BREEN:

21  Q.  You testified that Mr. Scott offered to help you.  Did he

22  have any other words besides words of help or did he or did he

23  not offer anything besides help?

24  A.  I don't understand what you are referring to.

25  Q.  What did Ken provide?

Oretha Zaybay – Direct

1          THE COURT:  You mean Mr. Scott?

2          MR. BREEN:  I am sorry, Your Honor.

3    BY MR. BREEN:

4    Q.  What did Mr. Scott provide in terms of help?

5    A.  He provide -- if I need money, he gave me some money for my

6    kids and took my kids out and go to the school and got in a

7    program.

8          MR. BREEN:  Ms. Zaybay, I believe that's all I need.

9    In terms of the Court's ruling, I will let you go.

10          THE COURT:  Cross-examination?

11          MS. GAYLE:  No, Your Honor, no questions.

12          THE COURT:  All right.  And may Ms. Zaybay be excused?

13          MS. GAYLE:  Yes, Your Honor.

14          THE COURT:  Thank you, Ms. Zaybay.  You may be

15    excused.

16          Mr. Breen, any other witnesses that need to be called

17    at this point?

18          MR. BREEN:  No, Your Honor.  I will wait until after

19    lunch.

20          THE COURT:  So it's 12:01 now.  We will plan on

21    reconvening, then, at 1:00 p.m., so please plan on beginning at

22    that time.  The Court will be in recess.  Thank you.

23          Let me give you your running totals.  The government

24    has used 107 minutes at this point and Mr. Scott has used 78

25    minutes at this point.

119

Oretha Zaybay – Direct

1    (Recess at 12:02 p.m.)

2    (Reconvened at 1:04 p.m.)

3    We are back on the record in the Scott matter.  Mr. Scott

4  may call his next witness.

5        MR. BREEN:  Thank you, Your Honor.  The defense calls

6  Clifton Powell.

7    (**Clifton Powell** was sworn.)

8        THE WITNESS:  I do.

9        THE COURT DEPUTY:  Please state your full name and

10  spell your last name for the record.

11        THE WITNESS:  Clifton Powell, P-O-W-E-L-L.

12                    **DIRECT EXAMINATION**

13  BY MR. BREEN:

14  Q.  Good afternoon, Mr. Powell.  Would you please provide the

15  Court with your recent work history starting about five years

16  back.

17  A.  I was an electrician up until approximately '08, 2008, got

18  laid off and was on unemployment for a while, a couple years

19  doing odd jobs and handyman-type work.  Also I was doing

20  lobbyist work on the side as a volunteer.

21  Q.  And are you familiar with the defendant, Ken Scott?

22  A.  Yes.

23  Q.  And how are you familiar with the defendant?

24  A.  In 1992 I attended a rally at a church and they were

25  speaking on abortion.  It was organized by Pat Mahoney and some

Clifton Powell - Direct

1    other christian activists at the time, and they asked for

2    volunteers to take a Planned Parenthood affiliate at 80th and

3    Wadsworth in Arvada.  I signed up for that and at the same time

4    Kenneth Scott signed up to do that picket and that's when we

5    first started protesting together.

6    Q.  You indicated that you have been picketing abortion for an

7    extended period of time.  Are you familiar with the Planned

8    Parenthood Rocky Mountains?

9    A.  Yes, I am.

10   Q.  Would you please describe the driveway area of the Planned

11   Parenthood of the Rocky Mountains to us.

12   A.  There is one roadway that goes in front of Planned

13   Parenthood on the -- it would be the west side of the main

14   building.  There is one driveway there and it has one entrance

15   and one exit at the same driveway.

16   Q.  Are there any other identifying features of that driveway

17   area?

18   A.  It's a large yellow line that's across the front of the

19   driveway there.

20   Q.  To your knowledge, what does the yellow line indicate?

21   A.  It's the property line of Planned Parenthood.

22   Q.  Do you ever cross that property line?

23   A.  No, never.

24   Q.  In your personal -- in connection with this lawsuit, there

25   was a video provided and I want to ask you about that.  Let's

Clifton Powell - Direct

1    just step back.  What do you know about this lawsuit?

2    A.  This particular with freedom of access to clinics?  I know

3    Mr. Scott is being accused of obstruction, impeding and

4    blocking entry to Planned Parenthood.

5    Q.  And there had been a video provided in which you were

6    designated as an individual able to testify on that.  Do you

7    recall reviewing a video in connection with one of the alleged

8    incidents in this lawsuit?

9    A.  Yes.

10   Q.  How did you identify yourself in that video?

11   A.  It's the clothing I usually wear at the protests, the hat

12   that I usually wear, gloves, jacket.  I am sitting in one of

13   the chairs there and that's a day that would probably be a

14   normal day for me to protest out there.

15   Q.  Now, in your recollection you recognized yourself on the

16   video.  And tell us, do you remember or do you not -- do you or

17   do you not remember the particular date that you were present

18   in front of the Planned Parenthood Clinic in connection with

19   that alleged incident?

20   A.  Yes, I recall that date.

21   Q.  I would like to show you that video, Mr. Powell, of that

22   date.  It has been previously marked as Plaintiff's Exhibit.

23           MR. FLEISHER:  Counsel, which exhibit is this?

24           MR. BREEN:  We were looking at -- it was designated

25   December 2nd, 2010, which is Exhibit 2, Plaintiff's Exhibit 2.

Clifton Powell - Direct

1          THE COURT:  That's been admitted already.

2          MR. BREEN:  Yes, Your Honor.

3          THE COURT:  What's the purpose of showing it to him?

4          MR. BREEN:  Well, I would like to have -- the witness

5    was actually there, so he observed -- I believe he is going to

6    testify exactly what Ken was doing and what he was engaged in.

7          THE COURT:  So why does he need the video to do that?

8          MR. BREEN:  Well, we can just do it without the video,

9    then.

10         THE COURT:  I was just wondering what the purpose of

11   showing him the video was.  If he was present, it sounds like

12   he will testify about the incident.

13         MR. BREEN:  So I think it was a minute and 15 and

14   there were cars moving and things and it might certainly help

15   in terms of who was doing what at what time.

16         THE COURT:  So is what you are asking that the video

17   be played to illustrate his testimony?

18         MR. BREEN:  That would be what we would be asking,

19   Your Honor.

20         THE COURT:  Any objection?

21         MR. FLEISHER:  No objection.

22         THE COURT:  Go ahead.  I am sorry, Your Honor.  That's

23   my screen saver.  I guess we will have to go without for right

24   now.  This worked before the hearing.  I am sorry, Your Honor.

25   BY MR. BREEN:

Clifton Powell - Direct

1   *Q.* Mr. Powell, if you would describe for me your recollection

2   of the events indicated on the video. There was a time stamp.

3   Do you recall the time stamp on the video?

4   *A.* Yes.

5   *Q.* And what was that time stamp, date stamp?

6   *A.* It was December 2nd, 2010.

7   *Q.* What did you observe Mr. Scott -- walk us through that.

8   What do you recall Mr. Scott doing in relation to that video,

9   in relation to the events depicted on that video?

10  *A.* Well, normally what we do is we stand at the side of the

11  driveway and one person or more will either ask the person to

12  stop to get literature, like we will say free information, free

13  help, free ultrasound, free pregnancy test, pro-life doctor to

14  help you out, trying to get them to stop just for a few minutes

15  to take the literature and/or talk to us about further help.

16  We might end up engaging in further conversation across the

17  street or just next to us on the roadway out of the way.

18  *Q.* And on that day in question, what did you see Ken Scott do?

19  *A.* Well, a vehicle approached, was about ready to drive into

20  Planned Parenthood and Mr. Scott usually will say something to

21  the effect, Can we get you some free help? And then he engaged

22  in person after they voluntarily stopped in a conversation.

23  The person took information and then Ken proceeded to tell them

24  about the many options and alternatives to abortion.

25  *Q.* You talked about the individual stopped. How did Mr. Scott

Clifton Powell - Direct

1    accomplish the car stopping?

2    A.  Well, it's sort of like hailing a cab.  Would you stop,

3    please, like hold up a hand or literature or just to get their

4    attention, and they will voluntarily stop.  And then if they

5    roll down their window, you engage in a conversation.  If they

6    don't, then you don't.

7    Q.  And in this particular instance, you have testified that

8    the individual stopped.  Did Mr. Scott -- where was he

9    positioned during this interchange?

10   A.  He was right next to me, which we were off to the side on

11   the sidewalk where we usually are and it's just inside the exit

12   site, so the person had to stop voluntarily in the exit site of

13   the driveway and they pulled over to us.  And we were standing

14   off to the side.

15   Q.  Just to clarify, you were on the north side of the

16   driveway; is that correct?

17   A.  Yes, that would be the north side of the driveway.

18   Q.  Now, you said as well that there was certain interaction

19   that information was being conveyed.  What sort of information?

20   You mentioned audible and you also mentioned there was

21   literature often waved or what have you.  In your recollection,

22   was there literature offered on that day?

23   A.  Yes.  We usually have an information sheet that has a

24   compilation of crisis pregnancy centers, adoption agencies.  We

25   might list a couple of websites that can get the person help

Clifton Powell - Direct

1   listed on there as well.

2   Q.   What sorts of -- to your recollection, what did Ken say to

3   those individuals in that car?

4          MR. FLEISHER:  Objection, calls for hearsay.

5          THE COURT:  Overruled.

6   A.   Can we get you the help.  And if the person changes their

7   mind, usually you will get further help for them and on that

8   day.  Just the standard took the information and then about a

9   minute and 30 seconds was about all it was and then the person

10  drove on into Planned Parenthood.

11  BY MR. BREEN:

12  Q.   And do you recall anything out of the ordinary or do you or

13  do you not recall anything out of the ordinary on that day?

14  A.   Just the usual stop, greet, try to get them to change their

15  mind within that few minutes or less that you have.  Sometimes

16  it's only 10 seconds, 15 seconds depending upon the person.

17  Q.   And would you characterize this interaction as usual or

18  unusual?

19         MR. FLEISHER:  Objection, leading.

20         THE COURT:  Overruled.

21  A.   It was a typical interaction with the people at the

22  driveway.  They voluntarily stopped, voluntarily offered

23  information.

24  BY MR. BREEN:

25  Q.   Let's move more generally to the conduct of Ken Scott's

Clifton Powell – Direct

1   that you observed over the years.  When you are generally

2   reviewing his conduct, what sorts of words does he use in

3   reaching out to individuals at the abortion facility?

4   A.  Abortion is murder.  We don't want you to go through the

5   pain of this abortion.  Sometimes he will preach the gospel,

6   Jesus Christ is Lord.  If you accept Christ as your Lord and

7   savior, then you are going to go to heaven.

8           Conversely, if you don't accept Christ as your Lord

9   and savior, then you are in danger of going to hell.  We can

10  get you free help for the abortion or maybe change your mind

11  about birth control even because sometimes there is a

12  controversy over whether it's an abortifacient, RU 486, for

13  example, or if it's the EC, emergency contraceptive, the Yaz or

14  any other birth control thing that they are going to do, the

15  IUD, for example.

16  Q.  In your experience with being there at the abortion

17  facility with Mr. Scott, have you viewed him move about?  I

18  believe we will step back.  How does Ken Scott normally

19  approach a car in your experience?

20  A.  Well, like I said, it's sort of like hailing a cab.  First

21  you have to wait until the person slows down enough to get

22  their attention, basically wave, stop.  Some people hold up

23  their hands, so usually Ken will do something like that or have

24  the literature in his hand.  Please stop.  We have free

25  information for you.  And they either voluntarily stop or they

Clifton Powell – Direct

1   keep going.

2   Q.  In terms of the way Ken conducts himself, is there anything

3   else he does at the clinic besides the literature waving and

4   the talking to folks at their cars?

5   A.  Well, if he is not doing that, usually he will try to

6   witness to the staff people going into Planned Parenthood, just

7   warn them about what's going on in there.  There might be a

8   poster, word only posters that he might hold or graphic poster.

9   They may hold like Baby David or we call him Malachi that

10  witnesses to the people, say it's a witness to the people.

11  Q.  When you say those baby posters, those are posters of what

12  sort of babies?

13          MR. FLEISHER:  Objection, relevance.

14          THE COURT:  Overruled.

15  A.  Malachi is like a 22-week-old in the wound and it's -- they

16  found it in a dumpster in Houston, Texas, and they usually

17  enlarge the picture.

18  BY MR. BREEN:

19  Q.  You say in the wound?

20  A.  In the wound, yes, 22 weeks in the wound.

21          MR. FLEISHER:  Objection, foundation.

22          MR. BREEN:  I am trying to clarify the witness'

23  testimony as to what type of sign.

24  BY MR. BREEN:

25  Q.  If you could describe those signs.  You mentioned they are

Clifton Powell - Direct                                                128

1   babies.  What sort of babies are they?

2   *A.*  They were abortions that they found in a dumpster somewhere

3   or a facility of some sort like a freezer or refrigerator.

4   *Q.*  Roughly how large are these signs?

5   *A.*  It depends.  It varies from 18 inches by 2 feet up to 3

6   foot by 5 foot and sometimes they can be larger, but it varies.

7   *Q.*  Now, if Mr. Scott is carrying the smaller sign, what else

8   does he carry?  Tell us about -- actually, let me back up.

9   When Mr. Scott is there at the side of the driveway, what size

10  signs does he normally carry?

11  *A.*  The smaller ones that are easier to handle, I would say

12  roughly a foot and a half by 2 foot and ones that are easier to

13  handle so you can have literature in one hand and the poster in

14  the other hand.

15  *Q.*  And when does he normally hold the larger signs?

16  *A.*  They are usually posted to a fixed location like a

17  telephone pole or a vehicle.  They are easy to just put on the

18  fence.  We can put those on the fence, tape them to the fence,

19  whatever.  Normally you can -- sometimes they are being held,

20  but usually that's unusual.  The circumstance might be a

21  temporary location to go to or something like that.

22  *Q.*  There are times, at least in this lawsuit it's been alleged

23  and it's being requested as relief today that Mr. Scott remain

24  25 feet away from the Planned Parenthood facility.

25          *MR. FLEISHER:*  Objection.  Counsel is testifying.

Clifton Powell - Direct                                               129

1          THE COURT:  He hasn't asked a question yet.

2     BY MR. BREEN:

3     Q.  Can you tell us about the various times or the various

4     locations, can you tell us where Ken stands other than in that

5     driveway area?

6     A.  There has been the location at Planned Parenthood directly

7     across the driveway, would be the west side of the road.  It

8     either cornered like 38th Avenue or 39th Avenue, and then

9     anywhere in between like on the ladder locations.

10    Q.  When you observed Mr. Scott at the location across the

11    street, what types of activities does he engage in when he is

12    across the street?

13    A.  It's pretty much the same.  He will try to witness people,

14    say something to them, try to wave them down with a flag -- not

15    a flag, a poster and literature and tell them to repent or show

16    a word only poster or a graphic poster.

17    Q.  And in your experience, are cars more likely or less likely

18    to pull over and speak to Mr. Scott when he is across the

19    street or when he is in the driveway?

20    A.  Less likely.

21    Q.  Can you give us a rough estimate of how much less likely?

22    A.  I would say at least half, at least 50 percent less.

23    Q.  You yourself also, I believe you testified you also

24    picketed at the abortion facilities.  Do you do any of the same

25    sorts of activities that Ken does at the Planned Parenthood of

Clifton Powell – Direct

1  the Rocky Mountains?

2  *A.*  Yes.

3  *Q.*  Do you reach out with resources?  Let me ask you more

4  generally.  What sorts of things do you do that are the same as

5  Ken?

6  *A.*  I have literature packets with me.  I offer that with the

7  information sheet and various other booklets and pamphlets that

8  are with the packet.  I hold posters of David, Malachi, word

9  only like abortion kills children.  I have held the large ones

10 in different locations, different sizes.  In addition to what

11 Ken does, I use a bullhorn to preach to the people there as

12 well and I use my voice as a –– to preach as well.

13 *Q.*  Going back to the issue between being at the driveway and

14 being across the street, is it your opinion that Mr. Scott is

15 more effective or less effective across the street than he is

16 at the driveway?

17       *MR. FLEISHER:*  Objection, calling for the witness'

18 opinion.

19       *THE COURT:*  Overruled.

20 *A.*  I would say less effective.

21       *MR. BREEN:*  Those are all the questions that I have

22 for you, Mr. Powell.

23       *THE COURT:*  Cross-examination?

24       *MR. FLEISHER:*  Thank you, Your Honor.

25                      **CROSS–EXAMINATION**

Clifton Powell - Cross

1  *BY MR. FLEISHER:*

2  *Q.*  Good afternoon, Mr. Powell.  Mr. Powell, you testified

3  about an incident on December 2nd, 2010, correct?

4  *A.*  Yes.

5  *Q.*  You couldn't hear what the driver in that car was saying,

6  could you?

7  *A.*  I was close enough I could hear.

8  *Q.*  You said that the person in the car eventually drove into

9  the PPRM parking lot, correct?

10  *A.*  After they voluntarily stopped for about a minute and 30

11  seconds.

12  *Q.*  So that person was a patient?

13  *A.*  I am not sure what they were doing there.

14  *Q.*  You have talked about Mr. Scott's method of reaching out to

15  people.  You said it was like hailing a cab in terms of how he

16  tries to get someone's attention, correct?

17  *A.*  Yes.

18  *Q.*  Mr. Scott could easily do that same thing before the car

19  enters the driveway, right?

20  *A.*  Yes.

21  *Q.*  Mr. Powell, you consider Ken Scott a close friend, correct?

22  *A.*  Yes.

23  *Q.*  And you consider yourself a pro-life activist, right?

24  *A.*  Yes.

25  *Q.*  Your goal is to persuade people not to get abortions, yes?

Clifton Powell – Cross

1   A.  Yes.

2   Q.  And you said you try to reach out to the PPRM staff too; is

3   that correct?

4   A.  Yes.

5   Q.  So you want PPRM to stop performing abortions, don't you?

6   A.  Yes.

7   Q.  And Ken Scott wants that as well, correct?

8   A.  Yes.

9        MR. FLEISHER:  No further questions.

10       THE COURT:  Any redirect?

11       MR. BREEN:  No, Your Honor.

12       THE COURT:  May Mr. Powell be excused?

13       MR. FLEISHER:  Yes, Your Honor.

14       THE COURT:  Thank you, Mr. Powell.  You may be

15   excused.

16       MR. BREEN:  Defense would call Josh Augenbaugh.

17     (**Joshua Aughenbaugh** was sworn.)

18       THE WITNESS:  I do.

19       THE COURT DEPUTY:  Please state your full name and

20   spell your last name for the record.

21       THE WITNESS:  It's Joshua Augenbaugh,

22   A-U-G-H-E-N-B-A-U-G-H.

23                    **DIRECT EXAMINATION**

24   BY MR. BREEN:

25   Q.  Good afternoon, Mr. Augenbaugh.  Would you please provide

Joshua Aughenbaugh – Direct

1    the Court your work history the last few years.

2    A.  My work history of the last few years?

3    Q.  Start the last three years, how about that?

4    A.  Three years, okay.  Sorry, I am thinking about what years

5    those were.  In 2008 to 2009, I delivered pizzas in the evening

6    and in the mornings five days a week I sidewalk counseled

7    outside of Planned Parenthood.  In 2010 I believe I lived in

8    Estes Park and worked at a restaurant.  And then in 2011 I

9    spent six months in South Africa working at a children's home

10   for orphans.  And the end of 2011 to present I have been at

11   home just doing odd jobs here and there.

12   Q.  And then where are you about to continue your work?

13   A.  And I should be leaving to go back to South Africa soon, in

14   the next couple weeks.  I had to delay a trip to South Africa.

15   Q.  You testified that you had been sidewalk counseling five

16   days a week at the Planned Parenthood of the Rocky Mountains.

17   Roughly how many times were you at the Planned Parenthood of

18   the Rocky Mountains over the last three-year period if you had

19   to estimate?  How about this:  Have you been sidewalk

20   counseling at the Planned Parenthood lately?  How about that?

21   A.  Not -- I have not been there for a while, maybe three times

22   in the last year.

23   Q.  During the time period of the incidents in the complaint,

24   how would you characterize your frequency at the Planned

25   Parenthood of the Rocky Mountains?

Joshua Aughenbaugh - Direct

1   A.   I believe that's when I was there four to five days a week.

2   Q.   And you are familiar with the defendant, Ken Scott?

3   A.   Yes.

4   Q.   How are you familiar with Ken?

5   A.   I have known Ken since I was a boy and I -- from sidewalk

6   counseling outside of Planned Parenthood at 20th and Vine and

7   also at the Pontiac Street location.

8   Q.   When you speak of Ken's sidewalk counseling, let's restrict

9   ourselves to the current location of Planned Parenthood.   When

10  you speak of him sidewalk counseling, where does he normally

11  position himself when he sidewalk counsels?

12  A.   He stands next to the driveway.

13  Q.   Would you please walk us through, say, an average day of

14  sidewalk counseling.   What are the general steps to sidewalk

15  counseling to someone driving into the Planned Parenthood of

16  the Rocky Mountains?

17  A.   As the cars drive down the street, we have signs set up and

18  we try to get people's attention, tell them that we will offer

19  them help.   And then when they get to the driveway, someone

20  usually approaches the vehicle from the side to try to hand

21  literature to them.   They roll their window down.   We can maybe

22  speak with them for a short period of time and then as they

23  proceed through, if they do, then we speak to them from ladders

24  over the fence as they go from their -- from the parking lot

25  from their cars into the building.

Joshua Aughenbaugh - Direct

1   *Q.*  If I could ask, how effective -- actually, let me back up.

2   How do you judge success in your sidewalk counseling?

3   *A.*  It's -- that's complicated.  There is a satisfaction in

4   knowing that you are offering help to women and to their

5   children and knowing that you are doing something right, but it

6   is I would say much more satisfying when a woman changes her

7   mind and comes and actually receives the help that you are

8   offering.

9   *Q.*  And how frequently have you seen that occur?

10  *A.*  In the year that I was there, I believe we had 72 women

11  change their minds.

12  *Q.*  And describe how that normally occurs when they change

13  their mind, when you say that.

14  *A.*  Some stop and talk to us before and don't even drive into

15  the parking lot and we are able to direct them to a crisis

16  pregnancy center or some other facility.  Some actually go in

17  and then change their mind and come back out and talk to us.

18  And some, you know, some we have a greater degree of follow-up

19  with.  Others don't really care to get much help, but they let

20  us know that they have changed their mind.

21  *Q.*  And when you describe those 72, how many of those occurred

22  around -- when Ken Scott was present roughly?

23  *A.*  I would think at least half the time he was there.

24  *Q.*  And who would have been the main sidewalk counselor for

25  those women who decided to change their mind?

Joshua Aughenbaugh - Direct

1    *A.*  I would say Ken and his wife Jo.

2    *Q.*  Paint a picture of the entranceway for us.  Start from the

3    north and to the south and just paint for us what that site

4    looks like.

5    *A.*  Okay.  On coming from the north, Planned Parenthood owns

6    the entire block on the east side of Pontiac and so they have

7    it fenced off, but you come down probably about halfway down

8    the block and then there is their driveway and there is a

9    parking lot.  And then the building stands to the south of the

10   block, and there is a parking lot between Pontiac and the

11   actual building.

12   *Q.*  Are there any -- give us some of the identifying features

13   of the driveway area itself.

14   *A.*  Oh, on the driveway, the public sidewalk goes through the

15   driveway.  There is a yellow line painted across the driveway

16   that indicates the Planned Parenthood property line.

17   *Q.*  Let's talk about that property line for a little bit.  When

18   you are engaged -- well, let's talk about you first.  When you

19   are engaged in sidewalk counseling, where are you are in

20   relation to that property line?

21   *A.*  We are on the public sidewalk, yeah, not on the Planned

22   Parenthood side of the property line.

23   *Q.*  And when you say we, who are you including in we?

24   *A.*  The sidewalk counselors in general, so Ken and Jo and I

25   definitely and other people who would join us.

137

Joshua Aughenbaugh – Direct

1   Q.  Is there ever any discussion about -- well, tell me, how is

2   the information conveyed that that is the Planned Parenthood

3   property line?

4   A.  The first time I was at the Pontiac site someone explained

5   to me that that is what that line indicated and that we needed

6   to stay on the public side of it.

7   Q.  Who else have you observed giving a similar instruction?

8   A.  I think Ken and Jo would be the main people that have given

9   that kind of instruction.  I have given it to other people that

10  are there for the first time or who ask.

11  Q.  It's been alleged and there are -- it's been alleged and

12  claimed here by the United States that they would like to see

13  Ken moved 25 feet away from the facility.  First off, have you

14  observed Ken in other locations besides outside of the driveway

15  area?

16  A.  Briefly, but it would be to set up a sign or to help

17  somebody with something.  He always moves back to that area.

18  Q.  In your opinion, would you consider Ken to be more

19  effective or less effective across the street as opposed to on

20  the driveway?

21  A.  I think he would be less effective.

22  Q.  Why?

23  A.  As people go pull through the driveway, it is an

24  opportunity to be closer to them and to hand literature to them

25  without walking into the street.  And it's a time where

138

Joshua Aughenbaugh - Direct

1  vehicles naturally slow down when they pull into a driveway as

2  opposed to in the street which is a 25-per-hour speed limit.

3            MR. BREEN:  Mr. Augenbaugh, those are all the

4  questions I have for you.

5            THE COURT:  Cross-examination?

6            MS. GAYLE:  Yes, Your Honor.

**CROSS-EXAMINATION**

7

8  BY MS. GAYLE:

9  Q.  Mr. Augenbaugh, you protested at PPRM often; is that

10  correct?

11  A.  That's correct.

12  Q.  And you went there at least once a month?

13  A.  Yes.

14  Q.  And in 2009 you protested there consistently from Tuesday

15  to Friday; is that accurate?

16  A.  Yes, Tuesday to Friday and sometimes on Saturday.

17  Q.  And you also protested there in the year after that; is

18  that accurate?

19  A.  I don't believe that I was there much during the year 2010.

20  I am sure I would have been there a couple times, but ...

21  Q.  And you have known Mr. Scott for a long time?

22  A.  Yes, I have.

23  Q.  In fact, you have known him for more than 10 years?

24  A.  Yes.

25  Q.  And you met him while protesting in front of PPRM?

Joshua Aughenbaugh - Cross

1    A.   That's correct.

2    Q.   When you first started protesting at PPRM, Mr. Scott was

     the person who instructed you on what to do; is that right?

3

4         MR. BREEN:   Objection, I think that misstates his

5    prior testimony.

6         THE COURT:   Overruled.

7    A.   I could not say that, no.   My father originally took me

8    down there and being that I was young, I stayed close with my

9    father and he explained to me what to do and where to be.

10   BY MS. GAYLE:

11   Q.   Mr. Augenbaugh, do you remember providing deposition

12   testimony in this matter?

13   A.   Not in this particularly.

14   Q.   Do you remember providing testimony on January 10, 2012 of

15   this year?

16   A.   Yes.

17   Q.   And in that deposition you were under oath?

18   A.   Yes.

19   Q.   And in that deposition you were asked several questions

20   about your protest activities in front of PPRM?

21   A.   Okay.

22   Q.   I am going to read some testimony from that deposition.

23   Your Honor, is it okay if I publish that deposition testimony

24   using the Elmo?

25        THE COURT:   Any objection?

Joshua Aughenbaugh – Cross

1          MR. BREEN:  No, Your Honor.

2          THE COURT:  You may.  It might be hard for you to see.

3          Ms. Gayle, I think you need to rotate it, but you can

4     also adjust lights on the side and see if it makes it easier to

5     read and also you can zoom in.

6     BY MS. GAYLE:

7     Q.  Can you see the screen in front of you?

8     A.  Yes.

9     Q.  Can you read what's marked as -- I am going to move this

10    for a second, Page 16, Lines 5 through 15?

11    A.  Yes.

12    Q.  And I am just going to read it and please read along just

13    silently with me.  There is a question:

14          Do you hand out information at the direction of

15    anyone?  Does anyone tell you to hand out information?

16          Answer:  I was initially instructed that this is a

17    reasonable manner of communicating with people when I began

18    protesting.

19          Okay.

20          Answer:  So that yes, there was an initial instruction

21    to do that.

22          Question:  And who gave you that initial instruction?

23          Answer:  My father and Ken and Jo Scott.

24          Is that an accurate representation of your testimony?

25    A.  Yes.

Joshua Aughenbaugh - Cross

1    *Q.*  Thank you.  Mr. Augenbaugh, you testified that you were

2    present for one of the incidents in this matter; is that

3    accurate?

4    *A.*  Yes.

5    *Q.*  And the incident you were referring to is the August 19,

6    2009 incident?

7    *A.*  I believe so.

8    *Q.*  And you didn't remember anything about this incident before

9    watching the video of it, did you?

10   *A.*  No.

11   *Q.*  And after watching the video you don't remember anything

12   about the incident; is that accurate?

13   *A.*  Not particularly.

14   *Q.*  And you don't recall that particular event; is that

15   accurate?

16   *A.*  Yes, that's correct.

17        *MS. GAYLE:*  Thank you.  No further questions.

18        *THE COURT:*  Thank you.

19        Redirect?

20                   **REDIRECT EXAMINATION**

21   *BY MR. BREEN:*

22   *Q.*  Just briefly.  Mr. Augenbaugh, I believe -- do you recall

23   the actual date for which you were designated?

24   *A.*  I don't, no.

25   *Q.*  Because counsel mentioned an August 19 date.  Do you know

142

Joshua Aughenbaugh – Redirect

1   whether or not that is the true --

2          MS. GAYLE:  Objection.

3          MR. BREEN:  Counsel, August 19 is not the date.

4          THE COURT:  Mr. Breen, you can't have a side

5   conversation.  You need to address the Court.

6          MR. BREEN:  I am sorry, Your Honor.  I am just trying

7   to clarify.

8          THE COURT:  Why don't you ask the question again.

9   BY MR. BREEN:

10  Q.  You stated you don't remember the day.  Do you remember or

11  not remember whether it was August 19 of 2009?

12  A.  I don't remember.

13  Q.  Why don't you remember the incident in the video?

14  A.  It -- it was a normal day at Planned Parenthood for me from

15  what I could tell, yeah.

16         MR. BREEN:  No further questions.

17         THE COURT:  All right.  May Mr. Augenbaugh be excused?

18         MS. GAYLE:  Yes, Your Honor.

19         THE COURT:  Mr. Augenbaugh, you may be excused.  Thank

20  you.

21         Mr. Scott may call his next witness.

22         MR. BREEN:  Your Honor, we call Jackie Cromer.

23     (**Jackie Cromer** was sworn.)

24         THE WITNESS:  I do.

25         THE COURT DEPUTY:  Please state your full name and

Joshua Aughenbaugh – Redirect

1    spell your last name for the record.

2              THE WITNESS:  Jackie Diane Cromer, C-R-O-M-E-R.

3                          **DIRECT EXAMINATION**

4    BY MR. BREEN:

5    Q.  Good afternoon, Ms. Cromer.

6    A.  Good afternoon, Peter.

7    Q.  Please tell the Court where you currently work.

8    A.  I work for State Farm Insurance.

9    Q.  How long have you held that position?

10   A.  I have been with the company a little over 10 years.

11   Q.  Are you familiar with the defendant, Ken Scott?

12   A.  Yes, I am.

13   Q.  How are you familiar with him?

14   A.  I met him through my dad at Planned Parenthood.

15   Q.  And how frequently have you been to Planned Parenthood?

16   A.  In the past probably three years, around a dozen times.

17   Q.  And you had been designated as testifying to a particular

18   day on an incident in question in this case.  I would ask you,

19   have you reviewed any videos of what happened that day?

20   A.  Yes, I have.

21   Q.  Tell us about your recollection of that day depicted in the

22   video.

23   A.  Okay.  Well, it was January 16 of 2010.  It was a Saturday

24   morning and there were three or four -- three gentlemen

25   standing in the middle of the driveway at PPRM.  And you could

Jackie Cromer - Direct

1   see Ken Scott was standing to the left of the driveway as you

2   are facing the clinic, and he saw a car approach from the

3   right.  And Ken walked over to the gentleman, waved at them,

4   and I am assuming he told them to move out of the driveway.

5   And those folks ended up moving out of the driveway to the

6   right side.  And as the car that was approaching the clinic was

7   turning into the clinic, Ken just approached their driver's

8   side window and tried to hand them some literature and then

9   they continued to drive straight into the clinic.

10  Q.  Tell me about the interaction insofar as you could

11  ascertain it between Ken and the driver of the automobile.

12  A.  Well, there wasn't really any interaction.  He was just,

13  you know, trying to see if they would take a moment to roll

14  down their window so he could talk to them to hand them that

15  literature and try to get them to change their mind, tell them

16  that there is other options, that they didn't have to be at the

17  clinic that day for what they were going there for.  There were

18  people there that could help them.

19  Q.  Based on your dozen times at the Planned Parenthood clinic,

20  have you -- does this interchange reflect a usual day or an

21  unusual day at the Planned Parenthood?

22  A.  It's a usual day.  It was just a typical day at Planned

23  Parenthood.

24  Q.  What sorts of words have you heard Ken use when he is

25  attempting to reach folks driving into or out of the Planned

Jackie Cromer - Direct

1   Parenthood facility?

2   *A.*  Well, he will say, you know, free help.  Free ultrasounds.

3   You don't have to do this.  We can help you.  Please talk to

4   us.  Please let us help you.  And he says pretty much the same

5   thing to every person coming or going.

6   *Q.*  Now, other than the individuals who are on public

7   right-of-way, so not on the Planned Parenthood property, are

8   there others who are regularly at the facility when you are

9   there?

10  *A.*  Yes, there are.

11  *Q.*  Who are they?

12  *A.*  Well, there is -- well, as far as people from our group,

13  there is other -- I don't know if you want to call us sidewalk

14  counselors or --

15  *Q.*  Folks that are not with the pro-life side?

16  *A.*  Oh, yes.  Well, on the Planned Parenthood side of the

17  property the people that are mainly there are the two security

18  guards, Ron and Dennis, they are out there.  And then there is

19  a few escorts that we see that once the people that are going

20  to the clinic park, they actually go to their car door and

21  escort them into the doors.  And then there is employees that

22  go in there and stuff like that, too.

23  *Q.*  On the day in question do you recall any of those

24  individuals coming out to confront Ken or anyone else about

25  this incident?

Jackie Cromer - Direct

1   A.   No.

2   Q.   During your times when you are at Planned Parenthood, you

3   have indicated there are Planned Parenthood folks.  You

4   indicated there are folks from the pro-life side.  Is there

5   anyone else there?

6   A.   There is a few people, like the first Saturday of the month

7   a bunch of catholic people come from various churches and they

8   just -- they either stay on the other side of the street or

9   they will walk around the Planned Parenthood property and, you

10  know, pray the rosary, but they don't really talk to us at all.

11  Then there is just a few other groups of people that have come

12  there in the past just to kind of check out what's going on.

13  Q.   Let's go back to the day in question.  You indicated both

14  date and your familiarity with the incident.  Why are you

15  familiar with this incident?  Why are you indicating

16  familiarity with this incident so firmly?

17  A.   Well, I saw a video of it and I actually saw myself in that

18  video.

19  Q.   Now, let's talk about have you seen Ken -- tell me where

20  you have seen Ken stand outside of the driveway area.

21  A.   Well, he is on the left side of the driveway.  If he is not

22  there -- he is there 95 percent of the time.  The only other

23  time he will be, you know, across the street or down the block

24  is when he is setting up signs first thing in the morning or

25  taking those signs when we are done in the afternoon.  And then

Jackie Cromer – Direct

1   there was one time that I saw that he was down the block when

2   they were doing some construction and people could only come in

3   from that one way, so he was trying to catch people down there

4   to see if he could talk to them down there before they even got

5   close to the clinic.  But other than that, he is always on the

6   left side of the driveway.

7   Q.  When folks approach the clinic, how do they approach?  How

8   do they approach that Planned Parenthood entrance?

9   A.  Most of the time a few people walk in, but most of them are

10  driving in.  They are either driving in, you know, coming in to

11  make a right-hand turn into the clinic or coming the other way

12  to make a left-hand turn.

13  Q.  Would you estimate there are more people coming from the

14  south, if you will, or the north?

15  A.  Probably more people coming from the south.

16  Q.  Just to be clear, that side, that coming south to north

17  toward the clinic is further away from the other side of the

18  street than it is from the driveway?

19  A.  Yes.

20  Q.  In all of your experience there at the Planned Parenthood,

21  have you observed any -- tell us about your observations of

22  legal versus illegal activity.

23          MS. GAYLE:  Objection, calls for legal conclusions.

24          THE COURT:  Sustained.

25  BY MR. BREEN:

Jackie Cromer - Direct

1   Q.  You had testified that this was a normal day.  Can you tell

2   us about any abnormal days at the Planned Parenthood?

3   A.  No, not really.  I mean, everything, you know, pretty much

4   happens the same.  We get every once in a while, you know, when

5   Ken or someone tries to, you know, give people literature, some

6   people get angry, flip him off, but that's the only thing I

7   would consider to be abnormal.

8   Q.  In your observation, have you -- what have you observed the

9   reaction generally?  Describe for me the various reactions to

10  Ken's advocacy in your observation.

11  A.  Reactions from who, the people that are going in for

12  abortions and whatever they are there for?

13  Q.  The folks driving in and out of the clinic.

14  A.  Well, the people that, you know, do stop and do, you know,

15  take literature, most of the people are quiet.  Most of them

16  don't stop.  Some of them are angry.  But the ones that do stop

17  it seems to me from what I observed that they are just confused

18  on, you know, why they are there.  And sometimes they don't

19  believe us, I guess.  It seems they are apprehensive to stop

20  and talk to us because they don't know.  They are just confused

21  about why they are there.

22          Some people will, you know, be thankful to us for

23  trying to give them information and then most people also deny

24  that they are even there for an abortion.  I am not getting an

25  abortion.  I am not here for that.  I am here for a blood test

Jackie Cromer – Direct

1   or birth control or I am here for something else, but the

2   people that do admit that they are there for that, we have a

3   mixture of reactions from people.

4   *Q.* On the good side, let's say, let's characterize the

5   reactions you have talked about from flipping Ken off all the

6   way from being more receptive.  Would you describe some of the

7   interactions that were more on the receptive side.

8   *A.* Yeah.  There were two people that I do remember very

9   clearly.  One couple, a Hispanic couple in a black truck, we

10  actually got them to change their mind.  They had pulled into

11  the clinic, and I can't remember for sure if they actually took

12  any literature that Ken was trying to hand them, but after they

13  pulled in we have folks that are along the side of the property

14  at Planned Parenthood up on ladders talking to people over the

15  fence line.  And those folks that were counseling them, telling

16  them, don't do this.  We can help you.  Please, please don't

17  kill your baby.  We actually got them to change their mind and

18  they left.  They pulled out.  They pulled over and they told us

19  that we changed our mind.  We are going to keep our baby.

20        And immediately and Jo ran over there, gave them the

21  literature with Ken's number on it, Jo's number on it, and a

22  baby blanket and a silver dollar they give to people that save

23  their babies.  And then they continued on, you know, on their

24  way.

25        And then there was another one where Ken was up the

Jackie Cromer - Direct

1    block, which they were doing that construction when they had

2    the road closed, and I can't remember if they left and came

3    back or not, but Ken did let us know from up the block that

4    they did change their mind as well.  They were going to keep

5    their baby, too.

6    Q.  You testified you were there about 12 times over three

7    years.  Why were you there only 12 times?

8    A.  Well, I usually only went -- my husband worked at a

9    motorcycle shop and he worked on Saturdays, so I went because

10   he was working.  And then he changed jobs and he doesn't work

11   Saturdays anymore except for every once in a while, so I pretty

12   much just went when my husband was working.

13            MR. BREEN:  Ms. Cromer, those are all the questions I

14   have.

15            THE COURT:  Cross-examination?

16            MS. GAYLE:  Yes, Your Honor.  Thank you.

17                         **CROSS-EXAMINATION**

18   BY MS. GAYLE:

19   Q.  Good afternoon, Ms. Cromer.

20   A.  Good afternoon.

21   Q.  You testified to watching a video of the January 16

22   incident; is that accurate?

23   A.  Yes, it is.

24   Q.  You didn't remember anything about the incident before

25   watching the video; is that true?

Jackie Cromer - Cross

1   A.  No, I did not.

2   Q.  And you couldn't hear what was being said to the driver in

3   the car that was stopped?

4   A.  No.

5   Q.  You couldn't hear what the driver was saying to Mr. Scott?

6   A.  No.

7   Q.  You don't know why they stopped; is that accurate?

8   A.  Well, they stopped because -- well, they actually didn't

9   stop.

10  Q.  The car that you saw in the video was not stopped?

11  A.  No, the car didn't stop.  It was turning in and Ken

12  approached the car to try to, you know, hand them literature,

13  have them roll down their window and hand them literature.

14  They just drove by.  They didn't stop.

15  Q.  In the video you saw Mr. Scott depicted in, you saw

16  Mr. Scott enter the driveway after three men left the driveway;

17  is that accurate?

18  A.  Yes.

19  Q.  As the car turned in, Mr. Scott was walking towards the

20  driver's door of the car; is that accurate?

21  A.  Uh-huh.

22  Q.  And he reached out his hand and he tried to get them to

23  stop to take some information; is that right?

24  A.  Yeah.  He would have liked them to, you know, at least stop

25  for a second to grab some literature, yes.

Jackie Cromer - Cross

1   Q.  But other men left the driveway as the car was approaching;

2   is that right?

3   A.  Yes.

4   Q.  And you testified that you observed Mr. Scott stopping

5   vehicles in the driveway on other occasions?

6   A.  Well, he is not stopping the vehicles.  He is trying to get

7   the drivers of the vehicles to stop.

8   Q.  And to do so he walks into the middle of the driveway; is

9   that accurate?

10  A.  Yes, but he does not walk in front of any vehicles.

11  Q.  But he walks into the middle of the driveway; is that

12  accurate?

13  A.  Yes, it is.

14  Q.  As the cars are approaching?

15  A.  Yes.  Well, they are like -- the driveway is here and they

16  are turning in.  Yeah, I guess as they are approaching, that

17  would be accurate.

18  Q.  Now, you go to PPRM with your father?

19  A.  Yes.

20  Q.  And you have done this at least a dozen times?

21  A.  Yes.

22  Q.  And you spend your Saturday mornings there?

23  A.  Yes.

24  Q.  And that's where you met Mr. Scott?

25  A.  Yes.

Jackie Cromer - Cross

1    *Q.*  And you have known Mr. Scott for about three years?

2    *A.*  Yes.

3    *Q.*  And he is a friend of your father's?

4    *A.*  Yes, he is.

5              *MS. GAYLE:*  Thank you.  No further questions.

6              *THE COURT:*  Thank you.

7              Redirect?

8              *MR. BREEN:*  Thank you, Your Honor.

9                      **REDIRECT EXAMINATION**

10   *BY MR. BREEN:*

11   *Q.*  Counsel had asked you the question whether you remembered

12   anything before you viewed the video.  Would you like to --

13   would you please explain your -- what the video did to your

14   recollection of the event.

15   *A.*  Yeah.  Well, I guess I could say I didn't really remember

16   it because it didn't really stand out in my mind because it was

17   just a normal day at Planned Parenthood.  And I remembered

18   being there when I saw the yellow vest that Ken used to wear.

19   And when I saw the yellow vest, I said, oh, yes, I do remember

20   being there.

21             *MR. BREEN:*  No further questions.

22             *THE COURT:*  All right.

23             May Ms. Cromer be excused?

24             *MS. GAYLE:*  Yes, Your Honor.

25             *THE COURT:*  Thank you, Ms. Cromer.  You may be

Jackie Cromer - Redirect

 1   excused.

 2           MR. BREEN:  The defense will next call Leo Mantei.

 3   Your Honor, do we have a time?

 4           THE COURT:  You have 55 minutes left.

 5       (**Leo Mantei** was sworn.)

 6           THE WITNESS:  I do.

 7           THE COURT DEPUTY:  Please state your full name and

 8   spell your last name for the record.

 9           THE WITNESS:  My name is Leo Mantei, Jr.  My last name

10   is spelled M-A-N-T-E-I.

11                        **DIRECT EXAMINATION**

12   BY MR. BREEN:

13   Q.  Good afternoon, Mr. Mantei.  Would you please begin by

14   giving the Court a little bit of your work history from, say,

15   earlier on until now.

16   A.  My work history?

17   Q.  Uh-huh.

18   A.  I spent most of my career as a civil engineer with the

19   Bureau of Reclamation here in Denver -- in Colorado, I should

20   say.

21   Q.  And how are you employed or unemployed today?

22   A.  I am retired.

23   Q.  You are familiar with Mr. Scott, the defendant in this

24   case?

25   A.  Yes.

Leo Mantei – Direct

1    Q.   How are you familiar with him?

2    A.   Mostly through the pro-life movement.

3    Q.   And for how long have you been familiar with Mr. Scott?

4    A.   Over 10 years, probably closer to 15 years or more.

5    Q.   And you mentioned the pro-life movement.  What sorts of

6    ways are you involved in the pro-life movement?

7    A.   I am involved -- the ways that I am involved?  In addition

8    to protesting at the places where babies are killed, I go to

9    high schools and hand out leaflets with another group.  I

10   promote the pro-life efforts of my church.

11   Q.   And then you mentioned being at the places where babies are

12   killed.  Is there a particular -- what particular place are you

13   at more frequently than others?

14   A.   Planned Parenthood of the Rocky Mountains.

15   Q.   And for how long have you been going to Planned Parenthood

16   of the Rocky Mountains?

17   A.   Since 1991.

18   Q.   You have been designated for two separate dates based on

19   incidents alleged in the complaint.  I want to bring you to

20   those dates, first to a particular date, September 30th of

21   2009.  I would like to ask you your present recollection of the

22   events of September 30, 2009.

23   A.   Well, it was a normal day there, some cars stopping to

24   talk, most of them not, but ...

25   Q.   Have you refreshed your recollection of September 30th at

Leo Mantei – Direct

1    any time since that day?

2    A.  When I was asked to testify, I looked at the videos and saw

3    that that was one of the days when I was present.

4    Q.  And on the date in question, could you describe the conduct

5    of Ken Scott?  Maybe I should step back.  The incident alleged,

6    so on September 30th, the incident alleged in the video, could

7    you describe the conduct of Mr. Scott?

8    A.  He was standing on the sidewalk by the driveway and

9    offering literature to anybody that would stop and take it,

10   mostly cars driving in.

11   Q.  And tell us about how did Mr. Scott approach the cars on

12   September 30 of 2009?

13   A.  Well, when they would drive up to the driveway, he would

14   call out and wave some literature and say free help, free help

15   for you.

16   Q.  And how would he position himself in relation to the cars

17   as they would approach?

18   A.  So that he would be by the side of the car, usually the

19   driver's side.

20   Q.  You mentioned free help and the like.  What sort of

21   information does Ken convey in that context of attempting to

22   reach folks either going into or out of the Planned Parenthood

23   facility?

24   A.  Well, in addition to pamphlets of the development of the

25   baby from the moment of conception on, also a list of health

Leo Mantei - Direct

1    sources available.  Among those are crisis pregnancy centers

2    and homes where young women can stay when they need help, a

3    place to live.

4    Q.  Tell me more about the words Ken uses.  Describe some of

5    the words he uses when reaching out to folks who are either

6    going into or coming out of the abortion facility.

7    A.  Well, usually it's -- if he can get them to stop, he talks

8    to them about the humanity of the baby and that there is help

9    available.  And he also, if he has time, talks about his

10   experience with having been involved in abortion that he

11   regrets the rest of his life and how it served him and broke up

12   his marriage.  And he doesn't want to see them make the same

13   mistakes that he made.

14   Q.  Now, you yourself, you said you have been outside of

15   Planned Parenthood since roughly 1991.

16   A.  Yes.

17   Q.  Would you please describe your own activities outside the

18   Planned Parenthood facility.  Let's restrict it to the current

19   Planned Parenthood facility, to your own activities there.

20   A.  Most of the time I am there with a sign that says please

21   stop and talk.  We will help you.  And I have literature in my

22   hands all the time so if they do stop, I can offer them

23   something, the same type of literature that Ken offers.

24   Q.  Now, have you observed Ken in locations or tell us about

25   the locations where you have observed Ken at the current

Leo Mantei – Direct

1     Planned Parenthood facility other than the driveway area.

2     A.  Well, in recent months he has been stationed more about

3     half a block away in either direction hoping that he can still

4     talk to people that are coming there.  And he is generally kind

5     with them.  He doesn't -- no point in harassing.

6     Q.  When he is away from the driveway, has that increased the

7     number of people he can reach or decreased the number of people

8     he can reach going into and out of the clinic?

9     A.  Well, on some days -- I am not there every day so I don't

10    know, but I have heard him say at some days he has reached more

11    people that way.

12    Q.  Let's focus on the folks going into or out of the clinic.

13    Do you have an opinion based on your own observation and

14    experience as to whether he has been able to reach more people

15    or fewer people being away from the entrance than next to the

16    entrance?

17    A.  Having the chance to reach more people is less because

18    people come from both directions.

19    Q.  When you say both directions, would you elaborate on that.

20    A.  People approach that place from the north and from the

21    south.  And he can only be one way -- at one place or the other

22    unless he is able to be at the driveway.

23    Q.  Now, you were also designated for a different day,

24    December 8 of 2010.  And I am wondering if you have a

25    recollection, if you could give us your recollection of what

Leo Mantei – Direct

1   occurred that day.

2   *A.*  It was again a normal day of activity.  As I recall, one

3   car stopped and talked with Ken for quite a while.  The people

4   at least in the driver's side were talking to him.  I was

5   across the street.  And I think that day he didn't have

6   literature in his hand.  And when I saw that, and I think he

7   signaled to one of us that he needed some literature, and I

8   went back to my vehicle and got some literature and took it

9   over, handed it to the driver.

10  *Q.*  And what sort of literature was this?

11  *A.*  The same type of literature that I just described, the list

12  of help available and the educational leaflets with the

13  development of a baby from the time of conception until birth.

14  *Q.*  And do you recall how that interaction ended between Ken

15  and the driver on the date in question?  It's okay if you

16  don't, but I just want to ask.

17  *A.*  It was -- I can't remember.  I think the car probably drove

18  on in, the people drove in.  And there was maybe one other car

19  that stopped briefly and then went and drove around and went on

20  in before the other one did.

21  *Q.*  I want to refresh your recollection, if that's okay, with

22  the brief video there.  We do have this working now or should.

23          *THE COURT:*  For the record, this is Exhibit No. 1?

24          *MR. BREEN:*  It's Plaintiff's Exhibit -- I am sorry,

25  Your Honor.  You are right, No. 1.  This was the five-minute

Leo Mantei – Direct

1    video.

2    *BY MR. BREEN:*

3    *Q.* And Mr. Mantei, would you identify yourself in this video?

4    There is a little stylus there.  You could circle yourself, if

5    you like.

6    *A.* I am the person on the far left.

7    *Q.* Can you make a little circle around yourself?  He did that.

8    Pardon me.  Okay.  Do you recall what occurred at the end of

9    this particular interchange?

10   *A.* Well, the security guard, as he often does, comes up and

11   tells the cars to move on.

12   *Q.* How frequently does this occur?

13   *A.* I am not there every day.  It may happen once a day, but

14   not even that often.

15   *Q.* When looking at your purpose for being at the clinic and

16   seeing and remembering what you remember, how does having the

17   security guard move someone along who is engaged in

18   conversation with Ken Scott make you feel?

19   *A.* That he doesn't care whether that baby lives or dies.

20        *MR. BREEN:*  Mr. Mantei, those are all the questions I

21   have for you today.

22        *THE COURT:*  Cross-examination?

23                    **CROSS-EXAMINATION**

24   *BY MR. FLEISHER:*

25   *Q.* Good afternoon, Mr. Mantei.  Just a few quick questions for

Leo Mantei - Cross

1  you.  You talked about an incident on September 30, 2009.

2  Before viewing the video of that incident, you didn't have any

3  independent recollection of it, did you?

4  A.  I think that's -- there was a woman with a baby there

5  standing with us and that made my recollection pretty quick.

6  Q.  But you only recall it after you saw the video; is that

7  correct?

8  A.  Pretty much.

9  Q.  You also talked about an incident on December 8, 2010.  You

10  didn't have any independent recollection of that incident until

11  you saw the video; is that correct?

12  A.  Right.

13  Q.  Mr. Mantei, you consider Mr. Scott a close friend, don't

14  you?

15  A.  Yes, somebody I trust.

16  Q.  I am sorry?

17  A.  Somebody that I trust.

18  Q.  Mr. Mantei, you want to stop people from getting abortions,

19  don't you?

20  A.  Yes.

21  Q.  And you want to stop people from performing abortions,

22  correct?

23  A.  Yes.

24  Q.  And Mr. Scott wants the same things?

25  A.  I would say so.

Leo Mantei – Cross

1          MR. FLEISHER:  Thank you.  No further questions.

2          THE COURT:  Thank you.

3          Any redirect?

**REDIRECT EXAMINATION**

BY MR. BREEN:

Q.  Just to be clear, counsel asked you about wanting to stop

abortions.  What means do you consider acceptable means to stop

abortions?

A.  Any peaceful means and prayer.

Q.  You said peaceful means and prayer.  Counsel also asked you

about your independent recollection of the two dates in

question and particularly as to September 30th.  I believe you

were answering as to why you remembered specifically the

September 30th video in particular.  Would you please elaborate

on that answer.

A.  Well, it wasn't a lot elaborated on except I was happy to

see someone with a baby there standing with us because then the

visual message is important for young mothers going in there.

Q.  And after you have seen these videos, how would you

describe your recollection of the days in question,

September 30th and December 8th?

A.  Could you repeat that?

Q.  I will split it into two.  After seeing the video, how

would you describe your recollection of the events of

September 30th?

163

Leo Mantei - Redirect

1    *A.*  It was that was just a normal day of activity.

2    *Q.*  But you yourself -- let's just -- I will back up.  Why do

3    you remember the --

4             *MR. BREEN:*  Well, I will just withdraw the question

5    and stand on that.

6             *THE COURT:*  May Mr. Mantei be excused?

7             *MR. FLEISHER:*  Yes, Your Honor.

8             *THE COURT:*  Thank you, Mr. Mantei.  You may be

9    excused.

10            Mr. Scott may call his next witness.

11            *MR. BREEN:*  The defense calls Lisa Cress.

12       (**Lisa Cress** was sworn.)

13            *THE WITNESS:*  I do.

14            *THE COURT DEPUTY:*  Please state your full name and

15   spell your last name for the record.

16            *THE WITNESS:*  My name is Lisa Cress, last name

17   C-R-E-S-S.

18                    **DIRECT EXAMINATION**

19   *BY MR. BREEN:*

20   *Q.*  Good afternoon, Ms. Cress.

21   *A.*  Good afternoon.

22   *Q.*  Would you please describe for the Court your current

23   employment.

24   *A.*  I am a receptionist at an optometrist office.

25   *Q.*  For how long have you held that position?

Lisa Cress – Direct

 1   *A.*   A little over 10 years.

 2   *Q.*   You are familiar with the defendant, Ken Scott?

 3   *A.*   I am.

 4   *Q.*   How are you familiar with him?

 5   *A.*   I met him sidewalk counseling about four or five years ago.

 6   *Q.*   When you say you met him sidewalk counseling, where were

 7   you sidewalk counseling?

 8   *A.*   At that point when I met him, outside of the Planned

 9   Parenthood facility at 20th and Vine in Denver.

10   *Q.*   Where do you sidewalk counsel today?

11   *A.*   At the Planned Parenthood facility at 38th and Pontiac in

12   Denver.

13   *Q.*   How frequently do you engage in that activity?

14   *A.*   On an average about twice a week.

15   *Q.*   When you are there, are there others -- who else is there

16   sidewalk counseling?

17   *A.*   Ken's wife, Jo, is usually there and Cliff Powell is

18   usually there; other regulars, Leo Mantei, Terry Sullivan.

19   *Q.*   I tried to ask, who else is there -- who else is sidewalk

20   counseling when you are there?

21   *A.*   Okay.  All of those people are sidewalk counselors.

22   *Q.*   Do you have -- are you familiar with Ken Scott sidewalk

23   counseling?

24   *A.*   Yes.

25   *Q.*   But you didn't list him on the individuals when you are

Lisa Cress - Direct

1   normally there.  Would you like to supplement your list?

2   A.  Ken Scott is usually there as well, yes.

3   Q.  In your viewing of Ken's sidewalk counseling method, would

4   you please describe an average incident of him sidewalk

5   counseling to a car going into or out of the abortion facility.

6   A.  Sure.  He stands near the driveway of the Planned

7   Parenthood facility with a packet of literature that as the car

8   is driving in or out of the facility, he will extend his hand

9   and offer that literature to them.  And then usually he says

10  something as well like free help, free help.  Yeah, that's his

11  main thing.

12  Q.  Now, where does he stand when he is approaching individuals

13  driving into or where does Mr. Scott stand when he approaches

14  cars that are going into the abortion facility?

15  A.  Usually he stands on the north side of the driveway, and

16  then if a car is willing to stop and take literature, he will

17  walk up to the open window and hand it to them.

18  Q.  And for cars that are driving out of the facility, where

19  does Mr. Scott normally stand?

20  A.  The same place.

21  Q.  Does he -- which window does he normally approach, then,

22  for folks that are driving out of the facility?

23  A.  Whatever window is on the north is usually -- I mean,

24  sometimes he is up and down the sidewalk, so whatever is

25  available.

Lisa Cress – Direct

1    Q.   Now, you testified that his method is to approach after the

2    car stops or as the car is stopping.  Is there any other way he

3    sidewalk counsels to these cars driving into or out of the

4    clinic?

5    A.   He holds up a sign sometimes with a picture of an aborted

6    baby on it.  If a car is coming from a direction where he is,

7    he will be extending the literature to them as they are

8    approaching.  It's not always when they are pulling into the

9    driveway or coming out of it.  Once they are on it he will talk

10   to them more about offering alternatives to the abortion that

11   we have.

12   Q.   What is -- you have testified as to some of the words he

13   uses.  What is his primary message to those entering or exiting

14   the clinic?

15   A.   The first thing he tries to get across to every car coming

16   in that seems to be a patient is free help, free help.  He will

17   say it twice.

18   Q.   And you -- describe a little more about the layout at the

19   driveway.  Would you describe the features of that area.

20   A.   Sure.  The Planned Parenthood facility takes up a whole

21   block.  The building is on the south end of the block and there

22   is a parking lot and some open space on the north end.  The

23   driveway is just at the north end of the building.  And the

24   whole side of the sidewalk is where we -- that's on the east

25   side of the road of 38th is where we do the sidewalk counseling

167

Lisa Cress - Direct

1   most of the time with signs and literature and things like that

2   trying to talk to people going in.

3   Q.  And then the actual driveway itself, could you describe the

4   physical layout of that area?

5   A.  There is a fence all the way along the facility and it

6   opens up at the driveway.  It's a very wide driveway, enough

7   for two cars plus to get through.  Typically I would assume

8   that way it's an in lane and then an out lane and there is a

9   sidewalk going along that full side.  And it seems to continue

10  through the driveway.  There is a yellow line that marks the

11  property boundary of Planned Parenthood we assume.

12  Q.  When you observe Ken Scott sidewalk counseling, where is he

13  in relation to that yellow line?

14  A.  He is -- when he is sidewalk counseling, he is on the

15  public sidewalk side of the yellow line.

16  Q.  In your experience, what are the various ways people will

17  respond to his sidewalk counseling?

18  A.  Most people just drive on in and ignore him.  Some people

19  will stop and kind of look and see what he is offering, and a

20  lot of those people will then roll down their window and take

21  the literature and drive on in.  Few people will stop and

22  actually talk to him about why are we out there and what are

23  the alternatives that we are offering.  A few times those women

24  have chosen to take up the help that we are offering and keep

25  their children.

Lisa Cress - Direct

1   Q.  How frequently would you estimate women have taken the help

2   you are offering and decided to keep their children?

3   A.  We keep track of women that we confirm have decided to keep

4   their children.  I know this last 12 months have been about 50,

5   so about one a week.

6   Q.  When you talk about the help you are offering, what sort of

7   help is being offered?

8   A.  We offer help of adoption options, alternative -- like

9   there is a facility called Alternatives and a facility called

10  Riverside.  Both of those do free ultrasounds for women.  They

11  also offer things for them for keeping their babies.  We have

12  access to parenting classes, diapers, maternity clothes, baby

13  clothes, things like that, housing.

14  Q.  You noted -- I want to take you back to the entryway.  You

15  noted when people are coming out of the clinic, Ken will try to

16  reach them.  Why will he try to reach those folks driving out

17  of the clinic?

18  A.  Most of the time we don't know what a woman has gone in for

19  at the facility.  We don't know if she went in for a pregnancy

20  test and now she has gotten a positive and she is trying to

21  decide what to do and might need our help.  We don't know if

22  she was in there and chose to keep her baby while she was

23  inside and is now looking for the help that we were offering on

24  the way in.  We would like to know those things and be able to

25  help the women as they are leaving.

Lisa Cress – Direct

1    *Q.*  When you look at your sidewalk counseling, why are you out

2    there sidewalk counseling?

3    *A.*  I am out there to offer women a last minute alternative to

4    abortion and to save the lives of their children.

5    *Q.*  The relief sought by the United States here is to move Ken

6    25 feet away from the Planned Parenthood property.  I guess

7    first I should ask, where else have you seen Ken positioned

8    besides the driveway?  Let me start there.

9    *A.*  This summer there was some sort of court rule or agreement

10   or something that had him standing across the street.  He set

11   up a tent across the street and mostly he would just stand

12   there and talk across the street to security guards.  When he

13   got the chance, he would offer literature from across the

14   street, but people are driving in.  Mostly the customers drive

15   in on the other side of the street from where he was standing

16   at that point.  He has also stood at the corner at the

17   northwest corner.

18   *Q.*  When you say folks are driving in on the opposite side of

19   the street, I want to situate us.  The facility itself is on

20   the east side of Pontiac.

21   *A.*  Right.

22   *Q.*  He was standing on the west side of Pontiac.

23   *A.*  Correct.

24   *Q.*  And the customers you are referring to are driving in from

25   the south?

Lisa Cress - Direct

1   *A.*  From the south, yes.

2   *Q.*  Now, why does that make him less able to present literature

3   to them?

4   *A.*  A couple things.  If you are offering literature, then you

5   are extending your hand with a packet of information.  If

6   someone sees that and you are -- and they stop to take it, you

7   would normally just hand it to them because you are right there

8   on the same side of the road that they are driving on.  If you

9   were across the street and you are not allowed to come any

10  closer, once they stop you are holding out this literature to

11  them that you will bring to them, they would have to do a

12  U-turn to get to them or something like that.

13          The other thing is we don't only offer literature to

14  people going in.  We try to speak to women as they are entering

15  the facility.  We are trying to keep a conversational tone so

16  that we are just talking to them calmly.  If we are farther

17  away from the facility, we have to raise our voices to be heard

18  at all.

19  *Q.*  When you talk about raising your voices, you indicate you

20  prefer to keep a conversational tone.  Why would you prefer to

21  keep a conversational tone instead of raising their voice?

22  *A.*  We don't want the women to feel threatened.  We want them

23  to know we are there to care about them and care about their

24  children.  We are just there to offer free help.  So yeah, Ken

25  from across the street that has a voice that can project, but

Lisa Cress – Direct

1   it would be better if he could just talk to people like I am

2   talking to you now.

3           MR. BREEN:  Ms. Cress, I believe that is all the

4   questions I have for you today.

5           THE WITNESS:  Okay.  Thank you.

6           THE COURT:  Cross-examination?

7           MS. GAYLE:  No questions, Your Honor.

8           THE COURT:  Ms. Cress, you may be excused.  Thank you.

9           Mr. Scott may call his next witness.

10          MR. BREEN:  The defense would call Lynn Reid.

11      (**Paula Lynn Reid** was sworn.)

12          THE WITNESS:  I do.

13          THE COURT DEPUTY:  Please state your full name and

14   spell your last name for the record.

15          THE WITNESS:  Paula Lynn Reid, R-E-I-D.

16                        **DIRECT EXAMINATION**

17   BY MR. BREEN:

18   Q.  Good afternoon, Ms. Reid.

19   A.  Good afternoon.

20   Q.  Would you please let us know, let the Court know your work

21   history, recent work history.

22   A.  My recent work history?

23   Q.  Yes, sir.

24   A.  I am director for Mary Maternity of Motherhood Home in the

25   Arvada area.  We provide a home for women in pregnancy crisis.

Paula Lynn Reid - Direct

1   *Q.*  And you are familiar with the defendant, Ken Scott?

2   *A.*  I am.

3   *Q.*  How are you familiar with him?

4   *A.*  I met Ken approximately 14 years ago as I was at that time

5   going to a abortion clinic praying at 20th and Vine and Ken was

6   a sidewalk counselor.  And he and I have got to know each

7   other.  Through his work he has brought women into our home

8   that gave birth to their babies.

9   *Q.*  When you say our home, is that your current home.

10  *A.*  Our current home, yeah.  So I have known Ken for I would

11  say about 14 years in that capacity.  And he and his wife have

12  been over to our home on a social level as well, so yeah, I

13  know Ken.

14  *Q.*  How does Ken bring women to your home as you have described

15  it?

16          *MR. FLEISHER:*  Objection, relevance.

17          *THE COURT:*  I will allow it.  Overruled.

18  *A.*  Usually through a phone call.  We have a lady that has

19  decided that she wants to keep her child.  She doesn't want to

20  kill her child, so can she come over and talk to you.  So she

21  comes over and does an interview and goes through our process.

22  *BY MR. BREEN:*

23  *Q.*  So the woman that -- if you will help me, then, where are

24  they calling from?

25  *A.*  Usually from the abortion clinic.

Paula Lynn Reid - Direct

1   *Q.*  When you say the abortion clinic, what specific location

2   are you referring to?

3   *A.*  Originally it was 20th and Vine and now it's the one over

4   on East 38th and Pontiac, I believe, Rocky Mountains Planned

5   Parenthood.

6   *Q.*  Roughly how frequent are these phone calls?

7   *A.*  Let me think.  I would say probably I get phone calls maybe

8   a couple times a year, two, three times a year.

9   *Q.*  And for those folks that you speak with, is there any -- do

10  they indicate any general sense of their feelings towards Ken

11  Scott?

12          *MR. FLEISHER:*  Objection.

13  *A.*  They are thankful to him.  They are thankful for him.

14          *MR. BREEN:*  That's all the questions I have.

15          *THE COURT:*  Cross-examination?

16          *MR. FLEISHER:*  No questions, Your Honor.  Thank you.

17          *THE COURT:*  Ms. Reid, you may step down.  Thank you.

18          *THE WITNESS:*  Thank you.

19          *THE COURT:*  Mr. Scott may call his next witness.

20          *MR. BREEN:*  The defense would call Jane Brennan.

21      (**Jane Brennan** was sworn.)

22          *THE WITNESS:*  I do.

23          *THE COURT DEPUTY:*  Please state your full name and

24  spell your last name for the record.

25          *THE WITNESS:*  Jane Brennan, B-R-E-N-N-A-N.

Jane Brennan – Direct

1          **DIRECT EXAMINATION**

2    *BY MR. BREEN:*

3    *Q.*  Good afternoon, Ms. Brennan.

4    *A.*  Good afternoon.

5    *Q.*  Would you please tell the Court your work address.

6    *A.*  7286 South Chapparal Circle East, Centennial, Colorado

7    80016.

8    *Q.*  And what is your current work?

9    *A.*  A counselor.

10   *Q.*  What kind of counselor?

11   *A.*  Community counseling.

12   *Q.*  And in your community counseling, what sorts of patients do

13   you see?

14   *A.*  I specialize in pregnancy loss which is abortion,

15   miscarriage and infertility.

16   *Q.*  How frequently do you see these clients?

17   *A.*  You mean each individual patient how frequently do I see?

18   *Q.*  Yes.

19   *A.*  No more than six sessions usually.

20   *Q.*  And roughly how many patients would you have seen in the

21   last year?

22   *A.*  About 50 possibly.

23   *Q.*  And how long have you been engaged in community counseling?

24   *A.*  I would say about the past six years.

25   *Q.*  Now, where did you -- tell me about your educational

Jane Brennan – Direct

 1   background starting with your undergraduate and proceed on.

 2   A.  I got a BS degree in elementary education from Boston

 3   University and I have an MS degree in counseling from the

 4   University of Phoenix.

 5   Q.  Any other educational background?

 6   A.  I am a graduate of the Catholic Biblical School.

 7   Q.  Tell us, you said you have been in community counseling for

 8   six years.  Prior to that what were you working in?

 9   A.  I was a stay-at-home mom for a while and then I was a

10   teacher.

11   Q.  In your courses in community counseling, what sorts of

12   coursework did you undertake in order to receive that degree in

13   community counseling?

14   A.  Well, we had ethics.  We had counseling methods.  We had to

15   do a practicum.  We had to do an internship.  Diagnosing, there

16   was two courses on that.  Psychology.

17   Q.  Do you have a license in community counseling?

18   A.  No.

19   Q.  And why not?

20   A.  The State of Colorado doesn't require therapists or

21   counselors to be licensed.  You can if you want.  I am working

22   towards it.

23   Q.  Do you give lectures at all?

24   A.  Lectures?

25   Q.  Talks.

176

Jane Brennan – Direct

1   A.   Talks, yes.

2   Q.   Describe some of those talks.

3   A.   I give my testimony and I talk about the harm caused to

4   women by abortion.

5   Q.   Now, when you talk about your testimony, I want you to hold

6   on that thought.   Roughly how many talks have you given in the

7   last six years?

8   A.   Oh, 50.

9   Q.   When did you start giving talks?

10   A.   About four years ago.

11   Q.   As well, you talked about your testimony.   Could you give

12   us a little more insight as to what you mean when you say your

13   testimony.

14   A.   I used to be a pro-abortion militant feminist and I was a

15   volunteer at NOW, the National Organization for Women, and also

16   at Planned Parenthood.   And I had two abortions.   And I

17   underwent a conversion and became -- and I saw the harm caused

18   to women by abortion, and that is what I talk about.

19   Q.   Have you received any awards for your work?

20   A.   I received a Pro-Vita award from the Archdiocese of Denver

21   and a Magis award from Regis Jesuit High School.

22   Q.   And do you have a relationship with the Archdiocese of

23   Denver currently?

24   A.   I am a parishioner.

25   Q.   Do you have any other affiliations with other organizations

Jane Brennan – Direct

1   on this that are generally in this field?

2   A.  I used to be the Colorado coordinator for the Silent No

3   More Awareness campaign.

4   Q.  And what is that?

5   A.  That is a advocacy group for women and men who have been

6   harmed by abortion.

7   Q.  And have you had media appearances?

8   A.  Yes.

9   Q.  Describe some of those.

10  A.  I have been on numerous radio programs.  I have been on

11  EWTN.

12  Q.  What is EWTN?

13  A.  The Eternal World Television Network.  It's a catholic

14  station.

15  Q.  What is the scope of EWTN in terms of its reach in terms of

16  an audience?

17  A.  It's worldwide.  And Fr. Frank Pavone's Gospel of Life Show

18  and several protestant stations also.

19  Q.  When you make these appearances, what are you discussing

20  generally?

21  A.  How abortion hurts women.

22  Q.  As well, can you give us some of your publications?

23  Generally, can you describe your publications on this topic.

24  A.  I put together a book of women's abortion stories,

25  including my own.  It's called Motherhood Interrupted.  I had

Jane Brennan - Direct                                                    178

1    an article published in Envoy Magazine and other articles on

2    other on-line sites I have had published.

3    *Q.*  As well, can you describe your study just briefly on this

4    issue outside of your master's degree?

5    *A.*  I have studied studies done by various people,

6    organizations.  They are all collated and collected at a site

7    called The Elliot Institute all about the harms done to women

8    by abortion.  They are statistical or studies.

9    *Q.*  And do you recall various journals in which the studies you

10   reviewed?

11   *A.*  I am sorry, I don't.

12   *Q.*  Do you have in front of you Plaintiff's Exhibit J –– or

13   Defendant's Exhibit J?  I am sorry.

14   *A.*  I have to get my glasses.

15   *Q.*  That would be plaintiff's exhibit, so don't look at that

16   one.  Probably the smaller one.  If you turn to tab J.

17   *A.*  Yes, I have it.

18   *Q.*  Do you recall some of the journals in which you have

19   reviewed studies on this topic?

20   *A.*  Yes.

21   *Q.*  Could you give us a few of them?

22   *A.*  The European Journal of ––

23        *MS. GAYLE:*  Objection, Your Honor.  This calls for

24   hearsay.  Also the witness is reading from material that's not

25   in evidence that hasn't been admitted.

179

Jane Brennan – Direct

1      THE COURT:  If this is -- I think you asked the

2  question for her to refresh her recollection.  If that's true,

3  she can't look at the exhibit while testifying.  Objection

4  sustained.

5  BY MR. BREEN:

6  Q.  If you mind just refreshing your recollection and closing

7  the exhibit.  Make sure your recollection is refreshed and then

8  now would you please proceed.

9  A.  The European Journal of Medical Research, I think it was

10  called, the Psychiatric Journal, and I don't recall the rest of

11  them.

12  Q.  Ms. Brennan, you mentioned your personal experience.  You

13  discussed that.  Is there any other experience you would like

14  to share with us that gives you an expertise in this particular

15  field?

16  A.  I have counseled numerous women who have undergone

17  abortions.  I have interviewed many women who have undergone

18  abortions for my research for my book and for articles that I

19  have written.  And I have met many women and men after my talks

20  that shared with me their abortion stories.

21  Q.  Now, you mentioned as well that you were familiar with

22  Mr. Scott, the defendant in the case.  I believe I asked you

23  that.

24  A.  Yes.

25  Q.  Have you observed Mr. Scott engaged in activity that is

Jane Brennan - Direct

1   related to your field?

2   A.  Yes.

3   Q.  Please describe that, your viewing of that activity.

4   A.  Mr. Scott would approach women and offer them counsel or

5   information about abortion and the harms it causes.

6   Q.  And where is this?

7   A.  Outside of Planned Parenthood in Denver.

8   Q.  And how do you come to be outside of the Planned Parenthood

9   in Denver?

10  A.  I go there frequently to do the same thing, sidewalk

11  counseling and to pray.  I am involved in three or four

12  regularly scheduled prayer vigils.

13          THE COURT:  Mr. Breen, sorry to interrupt, but you

14  have eight minutes left.

15          MR. BREEN:  Okay.

16  BY MR. BREEN:

17  Q.  So you knew Mr. Scott.  You have got background in this

18  field.  What is your opinion about what abortion does --

19          MS. GAYLE:  Objection, Your Honor.

20          THE COURT:  Let's hear the question.

21  BY MR. BREEN:

22  Q.  What is your opinion based upon your expertise of what

23  abortion does to someone?

24          MS. GAYLE:  Objection, Your Honor.

25          THE COURT:  Grounds?

Jane Brennan – Direct

1        *MS. GAYLE:*  As to expert testimony, opinion testimony,

2    I would like to voir dire the witness.

3        *THE COURT:*  You may.

4                        VOIR DIRE EXAMINATION

5    *BY MS. GAYLE:*

6    *Q.*  Good afternoon, Ms. Brennan.

7    *A.*  Good afternoon.

8    *Q.*  You testified that you are not licensed as a therapist in

9    the state of Colorado; is that accurate?

10   *A.*  Yes.

11   *Q.*  That means you are not licensed as a social worker?

12   *A.*  No.

13   *Q.*  And you don't have a psychology degree; is that accurate?

14   *A.*  That is accurate.

15   *Q.*  And you don't have a psychiatry degree?

16   *A.*  Right.

17   *Q.*  And you don't have a degree in any medical field.

18   *A.*  Right.

19   *Q.*  What is your field?

20   *A.*  Community counseling.

21   *Q.*  And your opinions are published in several magazines?

22   *A.*  Yes.

23   *Q.*  And in your book?

24   *A.*  Yes.

25   *Q.*  And your book was published by a company by the name of

Jane Brennan – Voir Dire

1   Xlibris Publishing; is that accurate?

2   *A.*   Yes.

3   *Q.*   And Xlibris Publishing provides for self-publishing

4   services?

5   *A.*   Yes.

6   *Q.*   Your book didn't have to be accepted for publication, did

7   it?

8   *A.*   No.

9   *Q.*   How much editing did Xlibris require?

10   *A.*   Well, you couldn't publish books that didn't make any

11   sense, I suppose is how I would put it.  It had to be edited.

12   *Q.*   Did you have to pay them to publish your book?

13   *A.*   Yes.

14   *Q.*   And the magazines that your articles are published in, they

15   are not psychological journals, are they?

16   *A.*   No.

17   *Q.*   They are not medical journals?

18   *A.*   No.

19   *Q.*   They are magazines about religion?

20   *A.*   Yes.

21   *Q.*   Is that accurate?

22   *A.*   Yes.

23   *Q.*   You published an article in an Envoy magazine?

24   *A.*   Yes.

25   *Q.*   And Envoy deals with evangelization and conversion?

Jane Brennan – Voir Dire

1    *A.*   Yes.

2    *Q.*   That's not a scientific journal, is it?

3    *A.*   No.

4    *Q.*   And it's not a medical journal?

5    *A.*   No.

6    *Q.*   And you published articles in the Catholic Exchange?

7    *A.*   Yes.

8    *Q.*   The Catholic Exchange is a catholic on-line site?

9    *A.*   Yes.

10   *Q.*   And that's not a journal for psychologists, is it?

11   *A.*   No.

12   *Q.*   Your articles are not peer reviewed?

13   *A.*   No.

14   *Q.*   And your articles are about your personal experience?

15   *A.*   Mainly.

16   *Q.*   You published two articles in Catholic Online; is that

17   accurate?

18   *A.*   Yes.

19   *Q.*   And Catholic Online is similar to Catholic Exchange?

20   *A.*   Yeah.

21   *Q.*   In that it's not a scientific journal?

22   *A.*   Correct.

23   *Q.*   It's an online catholic magazine?

24   *A.*   Yes.

25   *Q.*   Now, the articles that you rely on that you were asked

Jane Brennan – Voir Dire

1   about by Mr. Breen, those articles are available on a website;

2   is that accurate?

3   *A.*   That is one place they are available, yes.

4   *Q.*   You obtained them from a website; is that accurate?

5   *A.*   Yes.

6   *Q.*   And that website is named afterabortion.org?

7   *A.*   Yes.

8   *Q.*   Afterabortion.org compiles these articles?

9   *A.*   Yes.

10  *Q.*   They don't conduct these studies, do they?

11  *A.*   No.

12  *Q.*   So you have just reviewed articles compiled by

13  afterabortion.org?

14  *A.*   Yes.

15  *Q.*   And afterabortion.org offers books for sale; is that right?

16  *A.*   I believe so.

17  *Q.*   But your book is not offered for sale there, is it?

18  *A.*   No.

19  *Q.*   Now, you talked about your talks and these talks are hosted

20  by organizations opposed to abortion?

21  *A.*   Yes.

22  *Q.*   They are pro-life organizations, some of them?

23  *A.*   Yes.

24  *Q.*   And some of them are religious organizations?

25  *A.*   Yes.

Jane Brennan – Voir Dire

1   *Q.*  They are not posted by a psychology organization?

2   *A.*  No.

3   *Q.*  Your book is based on the personal accounts of yourself and

4   of other women?

5   *A.*  Yes.

6   *Q.*  And you met these women at coffee shops, some of them?

7   *A.*  To interview them.  That's not where I initially met them.

8   *Q.*  You interviewed them at coffee shops?

9   *A.*  Some of them, yes.

10  *Q.*  And you interviewed some of them over the phone?

11  *A.*  Yes.

12         *MS. GAYLE:*  Your Honor, we object to this witness as

13  an expert to provide opinions that have to do with the

14  psychological impact of abortion, as well as the medical impact

15  of abortion.  We don't believe that the defendant has shown

16  that she is indeed qualified to be an expert under the rules,

17  702.  We don't believe that the basis for her opinion is

18  reliable.

19         *THE COURT:*  Response?

20         *MR. BREEN:*  Your Honor, the witness is offering

21  specialized testimony, specialized knowledge in a field that is

22  a unique field.  In terms of whether the witness was speaking

23  in front of pro-life organizations, if the plaintiff were to

24  bring an expert to testify to the alternative of our expert who

25  would say aren't they speaking in front of Planned Parenthood,

Jane Brennan – Voir Dire

1    so that should not impact the recognized expertise of this

2    witness in a limited field.

3              Moreover, community counseling has been testified to

4    as a legitimate area of counsel.  It is a short-term counseling

5    that was testified to by our witness.  Yes, it's not

6    psychology, but the sorts of things women going through

7    abortions need in a short-term manner, in a short-term time

8    frame are perfectly addressed in a community counseling

9    setting.  That's fine for many women.

10             Moreover, we believe that the witness would offer

11   testimony as to spiritual impact of abortion.  So there is

12   necessarily a religious component to it and religious

13   individuals and groups would have an interest in that sort of

14   impact.

15             As for the interview at coffee shops, I don't know if

16   the witness should answer where she initially met them.  I

17   don't know if they were counseling sessions or what have you,

18   but the witness testified she regularly counsels these people.

19   She has an active practice in community counseling.  So if she

20   has published less than some other experts, so be it.  That can

21   go to weight, but she has an active practice doing this very

22   work.

23             *THE COURT:*  The motion is made pursuant to 702.

24   Mr. Scott is offering her opinion testimony as being within the

25   scope of 702 because it is specialized.  The witness has

Jane Brennan – Voir Dire

1    testified that she does community counseling, that she sees

2    each patient for approximately six sessions and that she has

3    been doing this for approximately six years.  She described her

4    background.  She does have an MS in counseling from the

5    University of Phoenix, although what type of counseling or what

6    that training has specifically relevant to her community

7    counseling is unclear.

8          She has also testified to a number of publications

9    that she has, although none of them are peer reviewed or

10   reviewed in any particular type of way.  She also testified

11   that she does review certain of the literature.  She did not

12   testify to what extent or what number of persons that she

13   counsels help her form the opinion that she has been asked to

14   express.

15         Under 702 opinion testimony is not admissible unless

16   the person is qualified as an expert by knowledge, skill,

17   experience, training or education.  And also the testimony has

18   to be based on sufficient facts or data.  The testimony has to

19   be the product of reliable principles or methods, and the

20   witness has applied the principles and methods reliably to the

21   facts of the case.

22         This particular -- actually as referred to in the

23   motion in limine briefing, this is a witness who Mr. Scott

24   believes would be qualified not strictly under the *Daubert*

25   analysis, but rather under subsequent opinions where someone

Jane Brennan – Voir Dire

1   may not necessarily be testifying in a strictly scientific area

2   of expertise.   Certainly the witness has some qualifications

3   based upon her having counseled people, but she hasn't

4   indicated how many of those formed relevant or provided

5   information that's relevant to her opinion.   Also, I don't

6   believe that you can become a witness -- I am in the course of

7   ruling.

8           MR. BREEN:   I apologize, Your Honor.   I wanted to make

9   sure your ruling was accurate because as I at least heard the

10  witness' testimony, she testified to having a master's in

11  community counseling and to seeing 50 patients a year in this

12  topic, but again, I apologize.

13          THE COURT:   Once again, you can make a record after,

14  but don't interrupt me when I am making a ruling.   You may be

15  perfectly accurate about that.

16          So the issue -- so in terms of having being familiar

17  with the literature, you can't become an expert just by

18  reading.   Moreover, it's pretty clear from her taking a look at

19  Exhibit J that she is not very familiar with the literature

20  because she, even after looking at it, could hardly remember

21  and remembered inaccurately the two references that she had

22  looked at before.   So therefore, the Court finds that she has

23  not been properly qualified as an expert under 702.

24          However, Ms. Brennan did testify that she does have

25  personal experience and mentioned the fact that she had I

Jane Brennan – Voir Dire

1   believe two abortions.  And as a result, while the objection is

2   sustained as to any opinions that she may have formed based

3   upon her counseling experience, she may, of course, testify as

4   to any opinions that she may have formed based upon her

5   personal experience.

6          MR. BREEN:  Thank you, Your Honor.

7          THE COURT:  None of that time beginning with the point

8   in time that Ms. Gayle conducted her voir dire counts against

9   your time, Mr. Breen, so you have about seven minutes left.

10         MR. BREEN:  Thank you, Your Honor.

11  BY MR. BREEN:

12  Q.  Ms. Brennan, I would like to direct your attention to the

13  activities at the Planned Parenthood Rocky Mountains, and you

14  had testified previously that you are there and that you

15  witness what Ken does.  Could you generally describe what Ken

16  Scott does when interacting with cars coming into or out of the

17  facility?

18  A.  He usually says something like, can I talk to you or can I

19  help you, and he extends his hand to gives them some literature

20  and says like we can help you or can we talk about this, things

21  like that.

22  Q.  And in your observation, what are the range of

23  possibilities that folks –– of reactions to Ken's attempts to

24  speak with folks?

25  A.  Some people completely ignore him.  Some people stop for a

Jane Brennan - Voir Dire

1   few seconds and some roll down their window.  Some stop

2   completely and engage in conversation with him.  Some turn

3   around.  I would say the whole range.

4   Q.  Okay.  When you see -- describe some of the more --

5   specifically some of the instances that happened at let's call

6   it the top of the range, so the turn-arounds and the folks that

7   stop and talk more frequently.  Maybe we should step back.  You

8   said you saw folks turning around.  Describe an average

9   instance of someone turning around.

10  A.  Well, the car is right at the entrance to the clinic in the

11  facility and they will stop, roll down their window and reach

12  out their hand for the information that Ken is extending.  And

13  meanwhile he is talking to them and they are listening.  They

14  will agree to talk further with him, so they will back their

15  car out of the entrance and park somewhere and meet with him.

16  Q.  And when you witness these occurrences, where is Ken

17  positioned physically as he is interfacing with cars going into

18  or out of the Planned Parenthood facility?

19  A.  Outside the driveway there is a yellow line that you cannot

20  cross.  He is always in the legally prescribed area.

21  Q.  If you would describe where Mr. Scott is in relation to

22  automobiles proceeding in and out of the facility.

23  A.  Right next to them.  The cars are going in.  They are

24  stopped at the driveway and he is standing right next to them

25  on the sidewalk of the driver's side.

Jane Brennan - Voir Dire

1  Q.  How do they come to stop?

2  A.  Because they see him and he is, you know, talking to them.

3  And he has some literature and he is saying, you know, would

4  you like to have this information, so they will stop.

5  Q.  But again, when they are say for lack of a better word

6  deciding to stop, where is Ken during that process of the car

7  slowing?

8  A.  On the sidewalk right outside the gate.

9  Q.  And where is Mr. Scott when that car is slowing down in

10  relation to -- physical relation to the car?

11  A.  Next to it, the driver's side.

12  Q.  Is he ever anywhere but next to it?

13  A.  No.

14  Q.  Okay.  In your recollection, do you recall being privy to

15  some of the exchanges of information between Mr. Scott and the

16  drivers of automobiles?

17  A.  Do I hear what he is saying to them?  Yes.

18  Q.  Would you -- how would you characterize those

19  conversations?

20  A.  As informational.

21  Q.  You yourself had testified that you had two prior

22  abortions.

23  A.  Yes.

24  Q.  In your experience, did you have any interaction with

25  anyone outside of whatever facility you obtained your

Jane Brennan – Voir Dire

1   abortions?

2          *MS. GAYLE:*  Objection, relevance.

3          *THE COURT:*  Overruled.

4   *A.*  No.

5   *BY MR. BREEN:*

6   *Q.*  How would you in your testimony or in your opinion as

7   someone who has had abortions, do you feel that the information

8   that Ken Scott is providing -- what do you think of what Ken

9   Scott is doing at that entranceway with regard to cars coming

10  into and out of the facility?

11         *MS. GAYLE:*  Objection.  It's seeking an opinion.

12         *THE COURT:*  Overruled.

13  *A.*  I feel it's very helpful.  I wish that someone would have

14  been there when I had went into the abortion clinics that I

15  went into and had given me the information.  At least I would

16  have had both sides of the issue and I would have been able to

17  make an informed choice.  I think he is providing a service, a

18  needed service.

19         *MR. BREEN:*  Thank you, Ms. Brennan.  No further

20  questions.

21         *THE COURT:*  You have one minute left.

22         *MR. BREEN:*  That's my last witness.

23         *THE COURT:*  Cross-examination?

24                         **CROSS-EXAMINATION**

25  *BY MS. GAYLE:*

Jane Brennan – Cross

1    *Q.* Ms. Brennan, you described yourself as a former militant

2    feminist?

3    *A.* Yes.

4    *Q.* And now you protest against abortions?

5    *A.* Yes.

6    *Q.* You were the Colorado coordinator for Silent No More?

7    *A.* Yes.

8    *Q.* That is an organization that's opposed to abortions?

9    *A.* Yes.

10   *Q.* You have organized protests against abortions for Silent No

11   More?

12   *A.* Yes.

13   *Q.* And you have protested with other organizations; is that

14   accurate?

15   *A.* Yes.

16   *Q.* And you go to PPRM three to four times a month?

17   *A.* Yes.

18   *Q.* You go there to pray about abortions?

19   *A.* Yes.

20   *Q.* And you consider Mr. Scott to be a fellow warrior; is that

21   accurate?

22   *A.* Yes.

23   *Q.* You consider him a fellow warrior in the fight against

24   abortion?

25   *A.* Yes.

Jane Brennan – Cross

1    *Q.*  You share the same views in this fight?

2    *A.*  As Mr. Scott?

3    *Q.*  As Mr. Scott.

4    *A.*  Yes.

5            *MS. GAYLE:*  No further questions.

6            *THE COURT:*  Any redirect?

7            *MR. BREEN:*  No, Your Honor.

8            *THE COURT:*  Thank you, Ms. Brennan.  You may be

9    excused.

10           We will go ahead and take our afternoon break now.

11   It's a little later than I normally take it.  For informational

12   purposes, does the United States intend to present any rebuttal

13   evidence?

14           *MR. FLEISHER:*  We do not, Your Honor.

15           *THE COURT:*  So the evidence is then closed.  What we

16   will do, then, why don't we plan on reconvening, we will take a

17   full 15 minutes and why don't we plan on reconvening then at

18   3:35.  And at that point in time we will begin arguments, all

19   right?

20           Anything we should take up before that point on behalf

21   of the United States?

22           *MR. FLEISHER:*  No, Your Honor.

23           *THE COURT:*  On behalf of Mr. Scott?

24           *MR. BREEN:*  No, Your Honor.

25           *THE COURT:*  The Court will be in recess.

Jane Brennan - Cross

1      (Recess at 3:18 p.m.)

2      (Reconvened at 3:38 p.m.)

3          THE COURT:  We are back on the record in the Scott

4   matter.  The evidence has concluded.  I will give each side 25

5   minutes cumulatively and that will give me enough time to rule,

6   assuming I am in a position to do so today.  I will first hear

7   from who filed the motion, the United States.  Go ahead.

8          MR. FLEISHER:  Thank you, Your Honor.

9          Your Honor, we are here today, of course, on the

10  United States' motion for preliminary injunctive relief against

11  the defendant, Ken Scott.  Of course, on a motion for

12  preliminary injunction there are four factors that the

13  proponent must meet:  The likelihood of success on the merits,

14  likelihood of irreparable harm without the preliminary relief,

15  the balancing of the equities favors the movement, and that

16  granting the relief is in the public interest.

17         I would just like to briefly address why a heightened

18  preliminary injunction standard as urged by defendant should

19  not apply in this case.  The government is not seeking to

20  affirmatively force the defendant to take any action.  Any

21  preliminary injunctive relief can be undone if a full trial on

22  the merits comes to a different conclusion.  And finally, an

23  injunction would not alter the last peaceable status quo

24  between the parties.

25         Regardless, however, even if a heightened standard is

Jane Brennan - Cross

 1 | applied, the United States today has met that standard.  The

 2 | evidence has shown that we can clearly prevail on all four

 3 | prongs of the PI standard, the preliminary injunction standard.

 4 | I would like to address each prong, the standard in turn.

 5 | First, the likelihood of success on the merits.

 6 |          The United States is likely to succeed in proving that

 7 | the defendant, Ken Scott, has violated the Freedom of Access to

 8 | Clinic Entrances Act on numerous occasions.  In fact, we have

 9 | proven that here today.  The evidence shows that Mr. Scott

10 | routinely makes it unreasonably difficult or hazardous for

11 | patients and employees to enter into or exit from the PPRM

12 | Healthcare Center.

13 |          Now, I want to be clear, we have talked about numerous

14 | examples of this behavior today, but the United States is only

15 | required to prove one instance of a FACE violation.  There is

16 | no pattern or practice requirement.  Furthermore, this case is

17 | not about threats and it's not about force.  It's about

18 | physical obstruction.  The evidence is clear that the defendant

19 | has engaged in physical obstruction.  You have seen the videos,

20 | Your Honor.  They show Mr. Scott walking into the middle of the

21 | healthcare center driveway.  He walks right into the path of

22 | cars.

23 |          THE COURT:  Do any of the video shows he walks into

24 | the path of cars?

25 |          MR. FLEISHER:  I would submit that they do, Your

Jane Brennan - Cross

1    Honor.

2         THE COURT:  He is clearly approaching a car.  And the

3    fact that he is approaching a car is true.  It may cause a car

4    to slow down because they may not know why is this guy

5    approaching me.  But can you show me a clip from the video that

6    shows him standing or walking in front of a car?

7         MR. FLEISHER:  What he does is he walks into the

8    middle of the driveway.

9         THE COURT:  Right.  But we are talking about if he

10   goes into the middle of the driveway, does that by itself mean

11   that he is walking in front of a car?

12        MR. FLEISHER:  It doesn't mean he is walking in front

13   of a car, but it means he is making it unreasonably difficult

14   or hazardous for those cars to enter or exit.

15        THE COURT:  Why if he isn't walking in front of a car

16   would it somehow impede the access to the facility?

17        MR. FLEISHER:  Well, if he is entering into the

18   driveway -- and we have heard testimony it's a very narrow

19   driveway.  A car is going to have to slow down.

20        THE COURT:  I have looked at it.  It's not a narrow

21   driveway.  In fact, we even had testimony that you can see

22   clearly on the videotape that it's not a narrow driveway.  As a

23   matter of fact, you probably could get three cars abreast to go

24   through that driveway at the same time.  It would be close to

25   one another, but you could probably do it.

Jane Brennan - Cross

1      Another thing that you can see on the video is that

2  who knows why, but it's apparent that cars coming from the

3  south, I don't know, maybe they aren't familiar with where the

4  entrance is, but they typically swing very wide going into the

5  facility, which I mention only because of the fact that it

6  seems like if anything, the driveway, you know, is fairly big,

7  not narrow.

8      MR. FLEISHER:  Well, I believe with all due respect

9  there has been some testimony about the width of the driveway

10  and that it is fairly narrow.  But regardless, again the fact

11  that the defendant walks into that driveway is making it

12  difficult and hazardous.

13      THE COURT:  Why is it hazardous?  What evidence has

14  there been of hazards?

15      MR. FLEISHER:  Your Honor, Danny Cram, the security

16  staff at PPRM, talked about the traffic safety hazards that are

17  caused by the defendant's obstructions.

18      THE COURT:  Which were what?

19      MR. FLEISHER:  They are general safety hazards because

20  of the activity in the driveway.  People are having trouble

21  seeing.  People are having trouble --

22      THE COURT:  Well, his testimony about seeing I think

23  related to people leaving the facility, right?  I mean, the

24  sight issue isn't one for cars going into the facility.

25      MR. FLEISHER:  That's correct, Your Honor.  But under

Jane Brennan - Cross

1    FACE people leaving the facility are covered as well.  The

2    statute defines physical obstruction as making it unreasonably

3    hazardous or difficult to enter into or exit from a

4    reproductive healthcare facility.

5            THE COURT:  Well, let's talk about people exiting from

6    the facility.  Because of the covering on the fence, isn't it

7    true that someone exiting the facility and also because of the

8    fact that it crosses the sidewalk, isn't it true that someone

9    exiting the facility even in the afternoon when no protesters

10   are present would probably have a tendency to slow down or be

11   cautious about entering onto Pontiac Street?

12           MR. FLEISHER:  I would hope they would, Your Honor.

13           THE COURT:  So what testimony was there about some

14   additional danger or hazard that has been caused by Mr. Scott

15   in terms of what he is doing when a vehicle is exiting?

16           MR. FLEISHER:  Well, there is testimony from several

17   employees, specifically Carol Armstrong and Leslie Durgin,

18   about how difficult it was and, in fact, how impossible it was

19   to get around Mr. Scott when he was in that driveway when they

20   were attempting to exit the facility.

21           THE COURT:  All right.  I think we are mixing apples

22   and oranges.  What about the difficulty in going around him or

23   perhaps even the inability to go around him created a hazard?

24   That's what I was talking about.  It was just on the hazard

25   issue.  I think there is a separate issue when it comes to

1    blocking, but in terms of hazard, what about people exiting?

2    What hazard has Mr. Scott created?

3           MR. FLEISHER:  Well, Ms. Durgin testified about the

4    danger in moving forward and trying to go around Mr. Scott

5    because there are other individuals sometimes on the side of

6    the driveway, in the driveway.  There are children in the

7    driveway.  It's a generally hazardous situation.

8           THE COURT:  She testified that she didn't feel it

9    would be a good thing to attempt to go around, that she thought

10   it was prudent to wait.  But in and of itself, did the incident

11   that involved her involve a hazard?

12          MR. FLEISHER:  I believe that based on her testimony

13   one could easily argue that it was unreasonably difficult or

14   hazardous which again is the language of the statute.

15          THE COURT:  Okay.  And what does unreasonably

16   difficult mean?

17          MR. FLEISHER:  It means difficult enough that someone,

18   for instance, Ms. Durgin or Ms. Armstrong did not attempt it

19   because it wouldn't have been reasonable.

20          THE COURT:  Okay.  Why did Congress use the word

21   unreasonably?

22          MR. FLEISHER:  I imagine Congress used the word

23   unreasonably so that it would be -- so that a simply nominally

24   difficult situation would be covered, but I would submit that

25   these situations are not such situations.

Jane Brennan – Cross

 1            THE COURT:  Well, if we want to talk about, you know,

 2     blocking, maybe that issue does get raised.  Let's assume that

 3     Mr. Scott is responsible within the terms of the statute for

 4     creating the blockage.  You know, you could argue it the other

 5     way.  You could argue Mr. Scott is not responsible if someone

 6     is voluntarily stopping, but let's move past that point.  Let's

 7     assume that Mr. Scott by virtue of his activities is

 8     responsible for another car stopping to talk to him and then

 9     another car comes along and either cannot get in or out.  Under

10     that circumstance does the term unreasonably have some

11     application that would cause me to need to decide how long the

12     blockage was unreasonable?

13            MR. FLEISHER:  Well, Your Honor, under the relevant

14     case law, acts of obstruction that last mere seconds are long

15     enough.

16            THE COURT:  What case law is that?

17            MR. FLEISHER:  I can point you to *New York v. Cain*.

18            THE COURT:  *New York v. Cain* doesn't stand for that at

19     all.  *New York v. Cain* cites *Spitzer*, the previous 2001 Second

20     Circuit opinion, but within the Second Circuit opinion I can't

21     find anything that would support that.  So it seems to me, feel

22     free to show me, I may have missed it, but it seems to me that

23     the *Spitzer v. Cain* reference to that seems like dicta and I

24     would also say that it doesn't seem to be a well-supported

25     citation, at least for just that proposition about the delay.

Jane Brennan - Cross

1          MR. FLEISHER:  Your Honor, I would also point to a *New*

2     *York v. Operation Rescue National,* 273 F.3d 184, a pin cite of

3     194 where the defendant's behavior is discussed.  And it's

4     discussed the protestors often walked across driveways so as to

5     meet oncoming cars, and then deliberately attempted to slow or

6     even stop the cars.  At 195 discussing:  She frequently

7     protests.  She has obstructed driveway access, using her body

8     to slow moving cars and pushing literature and pamphlets

9     through car windows.

10          THE COURT:  Would someone be liable under the FACE Act

11     if -- let's take one incident that's similar to here that

12     Mr. Scott approaches the car.  The car chooses to talk to him

13     and then the car drives on.  Is that a violation?

14          MR. FLEISHER:  Well, I would submit that -- we would

15     submit that as long as there is an initial obstruction, in

16     other words, Mr. Scott moving out in the driveway to make it so

17     that that car has to slow down, whether the car then -- whether

18     the driver then voluntarily talks to Mr. Scott or not is

19     irrelevant.  There was already an obstruction.  Furthermore, I

20     submit that on the facts of this case --

21          THE COURT:  Just so I am clear, so one theory of the

22     government is that Mr. Scott by virtue of where he is standing

23     has created an obstruction.

24          MR. FLEISHER:  That's correct, Your Honor.

25          THE COURT:  Now let's talk about just the car.  Let's

Jane Brennan – Cross

1  say that Mr. Scott moves towards the car.  The vehicle chooses

2  to stop and then the vehicle stops for a period of time and by

3  virtue of being stopped blocks the driveway, but nonetheless

4  comes in.  Does the position of the vehicle and the fact that

5  Mr. Scott is having a conversation with the driver, does the

6  vehicle constitute a violation?

7       MR. FLEISHER:  The vehicle in combination with

8  Mr. Scott does create a violation in that Mr. Scott is using

9  the vehicle, Mr. Scott intends the natural consequences of his

10  acts.  He knows that by stopping and talking to a vehicle and

11  stopping and talking to a driver of a vehicle, he is going to

12  make it difficult or hazardous for anyone else to get into or

13  out of that facility which is going to help him accomplish his

14  aims.

15       THE COURT:  Even if no one else comes along?

16       MR. FLEISHER:  Yes, even if no one else comes along.

17       THE COURT:  And who would the victim be?

18       MR. FLEISHER:  Well, I would submit that under the

19  statute there wouldn't be any private individual who could file

20  suit, but the United States could bring an action in that

21  instance to protect the rights of people to enter and exit that

22  facility.

23       THE COURT:  Because on the theory that if someone had

24  come along, that person would have been blocked?

25       MR. FLEISHER:  That's correct, Your Honor.  Your

Jane Brennan – Cross

1    Honor, to analogize, if Mr. Scott was to set himself up in the

2    center of the driveway and use a table to block access, whether

3    or not someone came along, that would be an obstruction.

4            THE COURT:  Okay.  Go ahead.

5            MR. FLEISHER:  Thank you, Your Honor.

6            I want to briefly discuss, Your Honor, the yellow line

7    because much has been made of the yellow line on the property.

8    And I am using the Elmo.  I am sorry, how does one focus with

9    this?  I apologize.

10           THE COURT:  I think there is a focus button on the

11   side of it, but Ms. Preuitt-Parks can help you.

12           MR. FLEISHER:  Thank you.  I am having trouble

13   focusing clearly, but Your Honor, again much has been made of

14   the yellow line.  You can see the yellow line right here.  Now,

15   the yellow line does separate public property from private

16   property, that's true.

17           THE COURT:  Mr. Fleisher, what exhibit are you

18   showing?

19           MR. FLEISHER:  I apologize, Your Honor, Exhibit No.

20   11.  That yellow line separates public property from private

21   property, but what it also does is run through that driveway.

22   So Mr. Scott can be still on the other side of the yellow line

23   thus being in the driveway causing an obstruction.

24   Furthermore, this is not a trespass claim, so the status of the

25   property is simply not relevant.

Jane Brennan - Cross

1          Your Honor, in terms of the obstruction, you have

2    heard, as we discussed, several employees talk about their

3    experiences being unable for some time to enter into or exit

4    from the driveway because of Mr. Scott's conduct.

5          THE COURT:  Well, right, but what's -- how long of a

6    time?

7          MR. FLEISHER:  I am sorry?

8          THE COURT:  How long of a time?

9          MR. FLEISHER:  I believe Ms. Armstrong -- I paused it,

10   Your Honor.  I don't have the exact testimony in front of me,

11   but I believe Ms. Durgin was stopped for at least 30 seconds,

12   if not more.  I think Ms. Armstrong testified she didn't know

13   exactly how long, but it certainly felt long.  Again, Your

14   Honor, we would submit that there is no -- that the timing

15   is -- that anything more than a momentary obstruction is -- a

16   momentary pause is enough to qualify.

17         THE COURT:  How do we balance out if the statute

18   contains under Subsection (d) under Rules of Construction, it

19   talks about not prohibiting any expressive conduct (including

20   peaceful picketing or other peaceful demonstration) protected

21   from legal prohibition by the First Amendment of the

22   Constitution.  We can argue what that means in terms of why

23   it's in there, but do you think that there needs to be some

24   balancing that would cause a court to have to look at how great

25   of a delay any type of blockage may have occurred, especially

Jane Brennan - Cross

1   if the blockage came as a result of a consequence of something

2   that Mr. Scott did?  In other words, if he is talking to

3   someone and the person chooses to stop and then the vehicle

4   constitutes the impediment to someone going in or out.

5        MR. FLEISHER:  Yes, Your Honor.  Of course, there

6   needs to be a balancing and we certainly don't seek to punish

7   any legitimate First Amendment expression, but --

8        THE COURT:  Well, you are not, but in the United

9   States' claims, the United States isn't claiming that he is

10  obviously making any threats or there is no intent to injure,

11  anything of that nature.

12       MR. FLEISHER:  Not at all, Your Honor.

13       THE COURT:  So what you consider to be a violation of

14  the Act is things that he may do or intend to do or attempt to

15  do in terms of blocking access.

16       MR. FLEISHER:  That's correct, or in terms again, I

17  just want to be clear that doesn't have to be a prohibitory

18  blockade when we talk about blocking access.  Again, it's

19  making it difficult or hazardous.

20        And furthermore, I would submit on the facts of this

21  case, I mean, we have seen videos where Mr. Scott has a car

22  stopped in the driveway and for several minutes Mr. Scott

23  doesn't move, the car doesn't move until someone, a security

24  officer comes out and asks them to move.  We heard Danny Cram

25  say that he has asked Mr. Scott many times.  He said you are

Jane Brennan - Cross

 1    welcome to have these conversations, but don't have them in the

 2    driveway.  You are blocking access.  And Mr. Scott refuses to

 3    move.  Mr. Scott could easily exercise his First Amendment

 4    rights right over on the side on the street.  He could easily

 5    invite those cars, if you want to talk to me, please come over

 6    here so we are not blocking others.  He doesn't do that.

 7            I would also submit, Your Honor, that on the facts we

 8    have heard here, it's clear that the vast majority of patients

 9    are not stopping voluntarily.  They are stopping because

10    Mr. Scott has made it difficult to get in and they feel the

11    need to stop so that they don't --

12            THE COURT:  What's your basis for saying that?  What

13    do you mean vast majority?

14            MR. FLEISHER:  We have heard from Danny Cram, the

15    security from PPRM, who says he has been out there for years.

16    He sees Mr. Scott's behavior almost daily.  Mr. Cram testified

17    in his experience most drivers don't want to stop.  Mr. Cram

18    testified that when he sees Mr. Scott with a car stopped in the

19    driveway, he goes out.  He says to Mr. Scott, you have got to

20    move.  You can talk to this person, but talk to him outside.

21            Mr. Scott doesn't do so.  And then he says to the

22    driver, if you want to talk to Mr. Scott, you can do that.

23    Please do it outside the driveway.  You can reverse.  You can

24    go into the street.  Otherwise, please proceed in.  And he said

25    in all his time, only once has a car pulled back into the

Jane Brennan - Cross

1    street to talk to Mr. Scott.  Every other car has proceeded

2    into the parking lot.  Clearly these cars do not want to --

3    these drivers do not wish to engage in conversation with

4    Mr. Scott.

5            Your Honor, I just want to address the fact that much

6    has been made of incident reports and calls to police.  And the

7    reason that PPRM staff are not filing incident reports

8    necessarily on every one of these incidents or calling the

9    police is because as they testified, this sort of thing happens

10   all the time.  It's simply routine.  We heard that as well from

11   defendants' witnesses.  This behavior where Mr. Scott is in the

12   driveway happens every day.

13           Furthermore, of course, the local police, the Denver

14   PD has local jurisdiction, so to the extent that someone

15   believes that there is a violation of federal law, they are not

16   going to call the local police.  That's the element of physical

17   obstruction, Your Honor.

18           I want to turn next to Mr. Scott's intent because, of

19   course, under the Act the United States has to show Mr. Scott's

20   intent.  Well, there is no question about his intent here.  He

21   is doing this intentionally.  He wants to interfere with cars

22   because he wants to interfere with individuals coming into and

23   out of this health center because he wants them to stop.  He

24   wants to interfere with them.

25           And even with that continuing obstruction as we

Jane Brennan - Cross

1    discussed when he is in the driveway talking to the driver in

2    one car, he intends the natural consequence of his acts.  He

3    knows if he is talking to one car and keeps talking to that car

4    and doesn't move, that driver, another patient or another

5    employee that comes up is not going to be able to get in and

6    out, so he is obstructing numerous people.

7           It's also clear on what Mr. Scott's motive is.  There

8    is a motive element to the statute.  There can't be any

9    question about that, of course.  Mr. Scott's pleadings make

10   that very clear.  His own witnesses have made that very clear.

11   He is motivated by his opposition to abortion.  He wants

12   patients to not get abortions.  He wants employees not to

13   provide abortions.  It's obviously also from the kind of

14   comments we have heard that Mr. Scott makes, it's clear that

15   Mr. Scott's mission is to prevent abortions.  There is no

16   question about that.

17          *THE COURT:*  Mr. Fleisher, you only have two minutes

18   left.  Could you address the issue of irreparable harm?

19          *MR. FLEISHER:*  Yes, Your Honor.

20          First of all, we submit that irreparable harm is

21   presumed because defendant violated the Freedom of Access to

22   Clinic Entrances Act.  That Act provides for injunctive relief;

23   therefore, irreparable harm is presumed.  But even if it's not,

24   we have demonstrated irreparable harm.  Mr. Scott is violating

25   the rights of patients to access healthcare and the rights of

Jane Brennan – Cross

1    employees to go unimpeded to and from their place of work.

2    Those are injuries that can't be compensated by monetary

3    damages.  They can't be compensated after the fact.  Only

4    injunctive relief is going to ensure that that healthcare

5    center remains accessible to patients and staff.

6         We have also heard testimony that Mr. Scott continues

7    to engage in the behavior we have talked about and that even

8    when he doesn't, Danny Cram told us that he directs others.  He

9    is a leader out there.  He is directing others to engage in

10   this behavior.  Mr. Scott is committed to this mission, so

11   without a preliminary injunction, this behavior is going to

12   continue.

13        THE COURT:  But there is some evidence, though, it was

14   pretty clear that since the summer he has altered his behavior

15   and hasn't done anything consistent with the information that's

16   contained in Exhibits 1 through 6.

17        MR. FLEISHER:  There was some evidence that that's

18   been the case for some period of time since the summer, but I

19   believe Mr. Cram testified that that's not been entirely the

20   case.  Also I believe Mr. Cram testified that even when

21   Mr. Scott is, say, across the street, he is directing others to

22   go into the driveway.  He is motioning to them.  He is calling

23   out to them.

24        With my limited amount of time left, Your Honor, is

25   there anything specific you would like me to address?

Jane Brennan – Cross

1          THE COURT:  No.  Thank you, Mr. Fleisher.

2          MR. FLEISHER:  May I offer a few concluding remarks?

3          THE COURT:  You may.

4          MR. FLEISHER:  Your Honor, Mr. Scott has a First

5     Amendment right to communicate his views, of course.  He simply

6     can't use that First Amendment to cloak his violation of

7     others' rights, and that's what we are here about, Mr. Scott's

8     violation of the rights of patients' unimpeded access to

9     healthcare and the rights of individuals to go to and from

10    their place of work without his interference.

11         We don't wish to prohibit Mr. Scott's speech.  The

12    only thing we are asking for here today is a buffer zone,

13    minimal buffer zone, 25 feet.  You have seen what that looks

14    like on this Exhibit 11 where these two individuals are.  We

15    have heard that there are plenty of other protesters who could

16    easily make their views known and even persuade people, as is

17    their goal, from more than 25 feet.  We are just asking for

18    that so that Mr. Scott cannot trample on the rights of others.

19         Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Fleisher.

21         On behalf of Mr. Scott?

22         MR. BREEN:  Thank you, Your Honor.  May it please the

23    Court.

24         Your Honor, coming into court today the Court had

25    access to several silent videos which the Court indicated it

212

Jane Brennan – Cross

1    reviewed carefully.  Now after the testimony today there is

2    context to the silent videos.  The context is shown by the

3    numerous interactions on the public right-of-way, information

4    exchanges that are changing minds, information exchanges that

5    resulted in depending upon the testimony either 50 or 70 people

6    changing their minds in the last year.

7        *THE COURT:*  But the United States isn't basing their

8    claims on the content communicated.  The theory of the United

9    States seems to be twofold:  One, that he moves his body into a

10   position that has the effect of obstructing or impeding; and

11   two, that when he engages someone, both he and/or the vehicle

12   cause the blockage.  So it doesn't seem to depend upon any

13   context evidence that you presented.

14       *MR. BREEN:*  Your Honor, the reason the context is

15   important is because of what Your Honor had talked about

16   earlier about the balancing of the First Amendment interests

17   and the interests of the statute, the interests that Congress

18   indicated with this statute.  And so that is very important in

19   terms of drawing a line as to what is permissible conduct and

20   not permissible.

21       But going to the two points that Your Honor had

22   mentioned, yet the videos themselves even silently show that

23   Mr. Scott did not step in front of a car.  The Court challenged

24   opposing counsel to find an instance, and I still haven't seen

25   one yet and I don't believe they will find one because there

Jane Brennan - Cross

1    isn't one in these videos.  And also the testimony undisputed

2    of our witnesses is that Mr. Scott does not walk in front of

3    moving cars.  He is a sensible man.

4         As for whether Mr. Scott when speaking to the driver

5    of a car that has willingly pulled over, willingly rolled down

6    its window, willingly taken information or exchanged ideas with

7    Mr. Scott, exchanging information, ideas, et cetera, with

8    Mr. Scott is obstructing, we would respectfully submit that was

9    not what this Act was intended to reach.

10        And, Your Honor, I believe the legislative history of

11   the Act from the House Report, I believe it's 103.  I have got

12   House Report No. 103-306, Page 12, it states under Section 2 of

13   the section-by-section analysis:  Analyzing Subsection

14   248(a)(1) and quote: The acts of physical obstruction covered

15   would include blockades and invasions rendering passage to or

16   from a clinic or other facility impossible or unreasonably

17   difficult, as required by the definition of this term in

18   Subsection 248(f). Many types of vandalism and disruption could

19   achieve this end, including but not limited to, pouring glue

20   into the locks of clinic doors, chaining people to clinic

21   entrances or equipment, strewing nails on clinic driveways or

22   public access roads, and blocking driveway entrances with

23   immobilized cars. The imprisonment of patients and providers in

24   a facility could also constitute prohibited "physical

25   obstruction" under this subsection.

Jane Brennan – Cross

1          Continuing after a paragraph it says:  In addition, in

2     order to narrowly tailor this legislation to those activities

3     found by the Committee to warrant new federal remedies, the Act

4     requires that the offender be motivated by the involvement of

5     the victim or others in obtaining or providing reproductive

6     health services. Thus the Act covers attacks, threats and

7     blockades used directly against a person who is obtaining or

8     providing reproductive health services. The Act also covers

9     attacks, threats, and blockades against a particular victim

10    that are meant to intimidate other persons or classes of

11    persons who may be obtaining or providing reproductive health

12    services, or that are taken because others have obtained or

13    provided reproductive health services.

14          Your Honor, there are a couple parts to this.  One of

15    them is the United States had talked about this as if it were

16    still a crime even without a victim.  And with all due respect

17    to them, they are conflating two parts of this statute.

18    Section 1 reads, as noted in the legislative history, that the

19    Act covers attacks, threats or blockades used directly against

20    the person obtaining or providing reproductive health services,

21    but as a second part, it covers those attacks, threats and

22    blockades against a particular victim that are meant to

23    intimidate.

24          And Your Honor ––

25          *THE COURT:*  I think that's why certain justices on the

Jane Brennan - Cross

 1    Supreme Court don't think too much of legislative history

 2    because it's a lot better to take a look at the statute, so

 3    what we have in the statute is in Subsection (e), we have a

 4    definition of physical obstruction.  That would seem to

 5    indicate that the statute is certainly not limited to

 6    blockades.

 7          MR. BREEN:  Your Honor, they mention the nails being

 8    strewn across the clinic driveway, so that is not technically a

 9    blockade.  That is not placing a large automobile --

10          THE COURT:  Courts have held that if you have

11    protesters who are laying down across the entranceway forcing

12    people to step across, I mean, stepping across isn't -- you

13    know, you could argue, well, it doesn't delay you too much.

14    You have to be a little careful.  You probably have to slow

15    down, but that's unreasonable.

16          MR. BREEN:  But again, Your Honor, even with a holding

17    of that type, it would not apply to the set of facts here today

18    because of the fact there is no evidence that Mr. Scott is

19    moving his body in any way in front of those who are entering

20    or leaving the clinic.

21          THE COURT:  Well, but what about the fact that

22    Mr. Scott -- the videos show this -- he engages a car.  Car

23    stops.  Other cars, sometimes one, sometimes the video show

24    more than one stack up, and he doesn't seem to be doing

25    anything.  We can't hear anything and there has been no

Jane Brennan – Cross

1  testimony about how he may react when that happens, but there

2  doesn't seem to be any effort on Mr. Scott's part to do

3  anything about that.  He just lets it occur.  So why isn't he,

4  as Mr. Fleisher said, responsible for the reasonable

5  consequences of his actions?

6  　　　　MR. BREEN:  Well, first off, Your Honor, in terms of

7  the specific instances noted here when reviewing the videos,

8  the delays are brief, if at all.  Oftentimes cars can drive

9  around.  As well oftentimes --

10  　　　　THE COURT:  Right, but like I said, the delay may not

11  necessarily be the touchstone because, of course, in the

12  situation where you have people lying across the sidewalk,

13  there is not much of a delay there, but yet courts have held

14  that to be an unreasonable obstruction.  So what about this

15  incident, which is a different type of impediment, but why

16  would it be appropriate to put the stop watch to the incidents

17  here?

18  　　　　MR. BREEN:  Well, Your Honor, partially, and one of

19  the answers that we had to this stems from the *United States v.*

20  *Pine* decision which was recently reached on the 13th of

21  January.  Does Your Honor have that decision?  We cited that to

22  Your Honor discussing this issue of what is the intent of an

23  individual who is discussing these issues of public importance

24  when that person is in a car on a public sidewalk.  The intent

25  of the individual who was reaching out the literature is to

Jane Brennan – Cross

1   offer information, to offer assistance.

2           We had repeated testimony about what actually occurs

3   in these interchanges.  That's what I meant, Your Honor, when

4   we talked about context beforehand.  Well, obviously when

5   Mr. Scott is sitting there on that five-minute-long video we

6   sat through, they are not talking about the Broncos, but at the

7   same time you have actual testimony as to what they are talking

8   about, the literature being exchanged.

9           It's about issues of great public importance as

10  recognized repeatedly by the Supreme Court.  Abortion is

11  certainly an issue of such magnitude.  And really the conduct

12  is pure speech and as well if you are talking about 30 seconds

13  or one minute, you are looking at the same length of time that

14  one might be stopped at a traffic light.  You are looking at

15  the same length of time that when a fireman or fire woman is

16  walking down with the boot asking for donations, someone is

17  digging in to get those donations, you might, if you are in the

18  car behind them, be delayed an extra 30 seconds.

19          THE COURT:  Let's assume that what Mr. Scott did was

20  he walked right in front of a car and keeps it from going in,

21  and let's say that he does that and he times it and it lasts 30

22  seconds.  Would that be okay?

23          MR. BREEN:  Your Honor, I am glad I do not have to

24  defend that sort of an instance, but that would be certainly

25  more egregious conduct because it would match within what we

Jane Brennan – Cross

1    are talking about, as Your Honor had mentioned, laying down

2    across the roadway.  And certainly this is a public sidewalk

3    and if it had been testified to, Colorado law is that cars

4    yield to pedestrians.  Pedestrians could walk across that

5    sidewalk and you might be delayed as you are waiting trying to

6    come into the facility.

7        THE COURT:  But if a natural consequence of

8    Mr. Scott's engaging a driver in the driveway, and there has

9    been testimony about why that's advantageous for him to be able

10   to get his message out to people, but if a natural consequence

11   of that is that some, apparently not that many, but some cars

12   may stop and the driver voluntarily talked to Mr. Scott, but if

13   that's a natural consequence and that seems to be what he is

14   intending to do, he is intending to engage the person in the

15   driveway, then why hasn't he caused a blockage just in the same

16   way that he might cause a blockage if he walked in front of a

17   car?

18       MR. BREEN:  Well, Your Honor, part of that is that

19   Mr. Scott doesn't choose whether that car is going to pull into

20   the driveway.  He is not the one stopping --

21       THE COURT:  He chooses where to engage the car.  And

22   in natural consequences that, you know, he hopes that the car

23   will stop where he approaches the car and that at least in, you

24   know, we have had some evidence in the video show that some

25   cars at least do that.

Jane Brennan - Cross                                    219

 1          MR. BREEN:  Well, again, and I understand that the

 2     cars are stopping in various places.  I am sure if Mr. Scott

 3     had his druthers, he would have it come over to the side and he

 4     would talk to them for a while.

 5          THE COURT:  But there is no evidence that.  There is

 6     no evidence that that's his druthers.

 7          MR. BREEN:  Fair enough.  I am sorry for my

 8     colloquialism.

 9          THE COURT:  But there is no evidence that's his

10     intent.  As a matter of fact, there is evidence to the

11     contrary; namely, that when he has been asked by one of the

12     security guards to have people pull over to the street, that he

13     doesn't follow that recommendation.

14          MR. BREEN:  Well, and again, Your Honor, that, as I at

15     least recall the testimony, that may have been a stray comment

16     in one single instance, but the overwhelming weight of the

17     testimony is that Mr. Scott is attempting to offer assistance

18     at a moment where Mr. Scott believes this individual may or may

19     not be, may be attempting to end the life of a child inside of

20     the facility, so it's certainly an issue where that is of great

21     importance.

22          But I might refer the Court to *Spitzer v. Cain*, 418

23     F.Supp.2d 457, out of the Southern District of New York where

24     the Court at Page 474 noted that:  These contacts belie the

25     defendants' claims that they maintain a distance of several

Jane Brennan - Cross

1   feet from their targets, and they demonstrate how the

2   defendants' practices of following at close proximity greatly

3   increase the likelihood of unwanted physical contact. But while

4   such contact may be inappropriate, it is not illegal under FACE

5   if it is not motivated by an intent to restrict freedom of

6   movement or place another in reasonable apprehension of bodily

7   harm. The plaintiffs have not shown that each instance where a

8   defendant bumps into a patient or escort is motivated by this

9   intent.

10          And that makes -- two points there, Your Honor.  One

11  is that while this is incidental, the fact that someone may be

12  stopped for 30 seconds because Mr. Scott was discussing an

13  issue of great public importance to the individual in the car,

14  but then No. 2, it is plaintiff's burden to prove that intent,

15  not the defense to rebut it without some further evidence.

16          Again, I think the overwhelming weight of the

17  testimony is that Mr. Scott is attempting to assist these folks

18  and numerous -- and with success.  He is not doing it in a way

19  that is not fruitful.  The man has been doing it since 1995 at

20  least according to the testimony.  He would have to be awfully

21  patient if he weren't getting any success with it, which again

22  we have testimony between 50 and 70 in the last year of people

23  changing their minds about this particular -- their particular

24  decision.

25          As well, and Your Honor, I don't mean to be flippant,

Jane Brennan - Cross

 1   but *Roe v. Wade* defended a right to choose an abortion and

 2   choice presupposes two options.  What Mr. Scott is providing is

 3   of great public interest in terms of providing an actual

 4   choice.

 5          Again, that video that this Court was subjected to,

 6   over five minutes of Mr. Scott discussing with the individual

 7   in the car I would say at great length and certainly the person

 8   who has the car can pull away if they didn't want the

 9   information or didn't need the information or didn't feel it

10   was worthwhile.  That is the case here.

11          But again, I might -- I also just as a housekeeping

12   matter, Your Honor, there was no testimony at all about any of

13   the incidents alleged on August 15 of 2009 nor was there any

14   video evidence introduced at this hearing, and I might also

15   point out that there was little testimony and I believe no

16   video of the September 30th, 2009 alleged incident.

17          THE COURT:  I think the only testimony was pursuant to

18   questions that you asked.

19          MR. BREEN:  Right, but again no video.

20          Now, I do want to get to the issue raised in the *Pine*

21   decision.  We really have been tracking that in our own

22   argument and defense because the circumstances in the two cases

23   are very similar.  *Pine* did not have the benefit of a video,

24   but here we do where we see brief obstructions if at all under

25   the other side's definition, but then also that these, as soon

Jane Brennan – Cross

1    as something happens, just like in the *Pine* case, the Planned

2    Parenthood staff employee moves the car right along and the car

3    drives along.

4         In fact, that was -- I don't remember the exact

5    witness, but who testified about seeing the car being escorted

6    into the clinic, that was something that really would be almost

7    an anti-choice because you are cutting off the conversation

8    about whether that individual wants to choose to have an

9    abortion or not to exercise their constitutional rights.

10        *THE COURT:*  Well, I think you are straying into an

11   area that isn't really raised by your motion if your complaint

12   is something that employees of the facility are doing.

13        *MR. BREEN:*  We do want to make a point, and we

14   asserted this repeatedly, that the particular employees who are

15   claiming to have been obstructed and interfered with under this

16   statute are not employees who are providing reproductive health

17   services.  Again, this is what we were talking about in terms

18   of conflating two parts of the statute in Section (a)(1).

19        There is that first that you intentionally interfere

20   with any person because that person is or has been, skipping

21   the middle, obtaining or providing reproductive health services

22   versus the second part of Section (1) where one by force or by

23   physical obstruction intentionally interferes with any person

24   in order to intimidate such person or any other person or any

25   class of persons from obtaining and providing.

Jane Brennan - Cross

1          Again, that intimidation factor is not present in this

2    case nor is it alleged or testified to that anyone under the

3    auspices of the statute felt intimidated as that term is

4    defined in the statute, which means to place a person in

5    reasonable apprehension of bodily harm to himself or another.

6          THE COURT:  Yeah, they disclaimed that.

7          MR. BREEN:  And so that general and more the

8    victimless crime, if you will, is not at issue here.  The other

9    side has got to prove specifically that the individuals who are

10   being alleged to have been interfered with are -- they were

11   interfered with because that person is or has been obtaining or

12   providing reproductive health services.

13         Your Honor, we have I believe discussed this in our

14   opening statement.

15         THE COURT:  You have about one minute.  I will let you

16   wrap up.

17         MR. BREEN:  Thank you, Your Honor.  Again, here the

18   other side has waited two years --

19         THE COURT:  Actually, I take that back.  You have five

20   minutes left.

21         MR. BREEN:  Okay.  In terms of this balance of

22   equities and public interest we have been talking about,

23   obviously we have been repeating this is a message of public

24   importance.  And Your Honor saw two individuals before the

25   Court that had actually changed their minds based on

Jane Brennan – Cross

1   Mr. Scott's advocacy.  But even looking at the harm to the

2   other side, the harm to the public, the United States waited

3   two years after some of these instances, almost two years prior

4   to bringing any sort of action to remedy them.

5        Moreover, there were no police reports, no internal

6   reports presented here today.  So when you look at how much

7   harm is being done here, it appears, at least according to

8   those who are intimately involved, very little.  They didn't do

9   anything to respond to these.  And the testimony from most

10  folks were that they didn't even remember what happened on the

11  days because it was so average and normal, nothing to write

12  home about.

13       Moreover, I want to talk about the 25 feet.  We have

14  had repeated witnesses speak about how Mr. Scott is less

15  effective being 25 feet away.  And we would note the relief

16  sought in the United States' motion for preliminary injunction

17  was 25 feet from the property altogether, not just from the

18  entrance.  Today they talked about being from the entrance, but

19  at least in the -- I believe in the wherefore clause, there was

20  a request for 25 feet from the property generally.

21       THE COURT:  Well, if they said -- if they limited it

22  today, that's what they are bound by.

23       MR. BREEN:  Your Honor, we have had the unrebutted

24  testimony from our witnesses that he is less effective from

25  25 feet away across that street.  Moreover, though, Mr. Cram

Jane Brennan - Cross

1    had noted that no one had come over to Ken for literature.  And

2    he has been offered as an individual who is out there regularly

3    by the other side and he himself noted that no literature is

4    being passed when Ken is across the street.

5          So from that perspective this is a very heavy burden

6    that we are placing on Mr. Scott.  As I pointed out in opening,

7    this is a prior restraint on free speech and as well the

8    deprivation of free speech for any moment of these precious

9    First Amendment rights according to *Elrod v. Burns* is

10   irreparable injury to the one whom speech is being restricted.

11         The heightened scrutiny was mentioned, Your Honor.

12   This alters the status quo.  To say that somehow the last

13   peaceable status was Ken Scott 25 feet away makes no sense.

14   This man, at least according to the testimony of the other

15   side, has been doing this since at least 1995, and he has been

16   doing it the same way as far as the testimony coming from 2008

17   at this facility.  The first instance alleged here wasn't until

18   2009 August, so certainly the last peaceable uncontested status

19   was Ken Scott standing there on the edge of the driveway doing

20   the things that he does.

21         *THE COURT:*  Well, let's say that someone is doing some

22   action that later becomes the subject of an injunction.  Do you

23   measure the status quo from the point in time that the person

24   commits -- starts doing the acts which are later complained

25   about?

Jane Brennan - Cross

1            MR. BREEN:  Well, Your Honor, if the status quo --

2            THE COURT:  If that would be true, doesn't that

3    swallow up the rule?  I mean, wouldn't everything be a

4    mandatory injunction?

5            MR. BREEN:  Well, Your Honor, particularly here where

6    there is a continuing course of conduct that had been -- that

7    had been consistent from time immemorial, you are now asking

8    for a change in that conduct.  And I don't have right in front

9    of me the statute of limitations on a FACE claim, but the first

10   instance of where the other side is alleging that an individual

11   at the clinic was obstructed was August 15 of 2009.  If that's

12   the first instance, then at all the times prior Mr. Scott was

13   engaging his activity and not obstructing, at least according

14   to the United States' interpretation of the Act.

15           So it's not swallowing up the rule here.  It's just

16   saying we have got a practice here that is long, long

17   established that is seeking to be changed by this injunction.

18   It's certainly not a harmless injunction when you have got 50

19   to 70 people changing their minds every year.

20           And Ms. Brennan very powerfully at the end noted that

21   she wished she had that information, that it is useful

22   information.  So that is the real practical harm here, that you

23   may be removing choice from certain individuals because they

24   will not have the options that they might have otherwise had

25   with Ken Scott standing where he normally stands, doing what he

Jane Brennan - Cross

1   normally does.

2            *THE COURT:*  Now you have one minute left, Mr. Breen.

3            *MR. BREEN:*  Thank you, Your Honor.

4            Co-counsel wanted me to mention *Snyder v. Phelps* which

5   is certainly a case on everybody's mind because of the recency,

6   the harm, the great emotions there.  This case also is a place

7   where we have speech that is of great public importance, is

8   very controversial, and therefore should require special

9   protection under *Snyder v. Phelps*.  And we urge the Court to

10  balance the equities here and balance the statute with the

11  First Amendment to avoid any sort of First Amendment issues

12  where two individuals exchanging information willingly on a

13  right-of-way would be restricted or otherwise impeded.

14           With that, Your Honor, thank you.

15           *THE COURT:*  What I am going to do is I will take a

16  recess for maybe about 10 minutes just so I can look over my

17  notes.  I will come back out and at that time rule on the

18  motion for preliminary injunction.

19           Court will be in recess.

20      (Recess at 4:30 p.m.)

21      (Reconvened at 4:50 p.m.)

22           *THE COURT:*  The motion that is before the Court is the

23  motion of the United States of America for preliminary

24  injunctive relief.  This is Docket No. 3.  The Court has heard

25  the testimony from witnesses on both sides of this matter and

Jane Brennan - Cross

1    will now make the following conclusions of law, but I will

2    start off with findings of fact.

3        The testimony has shown that Mr. Scott is a person who

4    engages in protests outside of the only public entrance to a

5    facility can which among other types of services related to

6    reproduction also offers abortion services.  That facility is

7    called Planned Parenthood of the Rocky Mountains.  It's located

8    in Denver on Pontiac Street .  The entrance to the facility is

9    a public entrance that is open to people who drive in and out

10   of the parking lot.  On the other side is a driveway which

11   could allow approximately three cars to go in at one time if

12   they were close to one another.  Of course, it appears to be

13   designed just to have one car go in, one car go out at any

14   given time.

15       There is a yellow line that is painted that's parallel with

16   the length of the sidewalk and that particular yellow line is

17   the demarcation between the private property of PPRM and the

18   public sidewalk.  Mr. Scott typically and in the instances that

19   have been identified in the complaint and in the instances that

20   have been the subject of evidence today positions himself on

21   the north side of the driveway on the public side of the yellow

22   line.  And in fact, there is no evidence that he goes over onto

23   the Planned Parenthood side of that yellow line, but he

24   positions himself on the north side and that gives him an

25   opportunity to engage the drivers of vehicles that are either

Jane Brennan – Cross

1    going into the facility or leaving the facility.

2         For vehicles that are entering the facility, Mr. Scott,

3    either holding a sign, the subject of the sign the testimony

4    was may either have some words on it or the sign may have a

5    photograph on it, both the words or the photograph relating to

6    his message concerning abortion, approaches a vehicle.  He may

7    also have literature in his hand and attempts to engage the

8    driver of the vehicle.

9         As I will discuss in more detail when I review each of the

10   videos that have been admitted, Mr. Scott does not move in

11   front of any of the vehicles.  Instead, he approaches the

12   driver's side and moves deliberately towards those vehicles on

13   the driver's side.  The effect of him doing so is that certain

14   cars, although the testimony indicates not most cars, but some

15   cars will slow down or a smaller subset will slow down, stop,

16   and then Mr. Scott attempts to engage the driver of the vehicle

17   in a conversation regarding his anti-abortion message.

18        For those drivers who choose to talk to Mr. Scott, the

19   conversation that he has with them may last for a relatively

20   short period of time or it may last for several minutes.  One

21   of the videos shows a conversation that took place for over

22   four minutes, and during that time that he is engaging a

23   vehicle in the driveway the effect is to block at least a

24   portion of the driveway to the facility.

25        Mr. Cram testified today.  He is a security guard and he

Jane Brennan - Cross

1    said that one thing that he monitors at least to some extent is

2    how long a particular vehicle may be stopped while Mr. Scott is

3    communicating with the driver and if that car is stopped for a

4    longer period of time, on some occasions Mr. Cram will go ask

5    the driver to move forward or to exit the facility, pull over

6    to the side of the street and have his conversation with

7    Mr. Scott.  Mr. Cram also testified that he occasionally asks

8    Mr. Scott to have conversations with the drivers of persons

9    entering the facility over on the side of the road, but that

10   Mr. Scott has not followed that particular recommendation.

11       The United States has introduced six videos of incidents.

12   Each of the six incidents that is the subject of the videos is

13   mentioned in the United States' complaint, and let me talk

14   about what findings I make after reviewing each of those

15   videos.  And what I will do is I will begin in chronological

16   order.

17       So the first one that I will talk about is marked as

18   Government Exhibit No. 6 and it involves an incident that took

19   place on December 16, 2009.  And what that particular videotape

20   shows is that a vehicle approached to enter the driveway.

21   Mr. Scott moved forward to engage the driver.  That particular

22   car, as cars for some reason tend to do, made a very wide turn

23   into the driveway of the facility.  So when the car stopped to

24   talk to Mr. Scott, the car was more in the middle of the

25   driveway.  Mr. Scott engaged in a apparent conversation with

Jane Brennan - Cross

1    the driver of that vehicle.  That conversation lasted for over

2    four minutes.

3         Towards the end of that conversation with the driver of the

4    vehicle a car approaches from inside the facility and attempts

5    to leave.  And, in fact, Ms. Armstrong indicated that she was

6    that person.  And the car then needs to wait for a period of

7    approximately 20 seconds before the car that Mr. Scott is

8    engaging in conversation with drives forward.  And, in fact,

9    what happens is that eventually she -- once the car moves

10   forward, then Ms. Armstrong is able to drive past.  What the

11   tape shows is that after the vehicle was entering goes into the

12   facility, Mr. Scott was talking to the person, actually backs

13   away from the driveway and then Ms. Armstrong's vehicle exits

14   the facility.

15        The next incident is December 23rd, 2009, and this is

16   Exhibit 5 of the government's exhibits.  This is an incident

17   that Mr. Cram testified that he witnessed.  In this particular

18   videotape, it shows that the conditions on that day were snowy

19   and based upon the behavior of the car also icy.  So what it

20   shows is that a vehicle approaches from the south.  It goes

21   into a skid.  It's skidding along past the driveway and heading

22   towards the area where the defendant and another individual

23   happen to be standing.  And, in fact, because of the vehicle

24   skidding, the other individual actually moves closer towards

25   the driveway in what happens to be an attempt to make sure he

Jane Brennan - Cross

1    doesn't get hit.

2        Nothing in the videotape would show that the path that that

3    vehicle took was in any way influenced by where Mr. Scott was

4    standing.  It appears as if, like other cars, it may not have

5    seen the entrance or misgauged the road conditions, but in any

6    event, the path that it traveled because of the skidding

7    doesn't appear to be related in any way to where Mr. Scott or

8    the other individual for that matter are standing.

9        Once the car comes to a stop, this is now somewhat past the

10   driveway, Mr. Scott goes into the street and attempts to engage

11   the occupant or occupants, can't tell how many people are in

12   the car, whether anyone is in the passenger's side, but he

13   approaches the passenger side of the vehicle in an apparent

14   attempt to engage the occupants.

15       The vehicle backs up while Mr. Scott is trying to do that,

16   and then the vehicle moves forward and goes into the facility.

17   The videotape does not show any evidence that the vehicle

18   deviated in its path in any way to avoid Mr. Scott and does not

19   show Mr. Scott being in the way of the vehicle at any point in

20   time in terms of its travels.

21       The next incident is January 16, 2010, and this is

22   Government Exhibit No. 4.  In that particular incident there

23   are three other people, apparently protesters.  They are

24   standing really more at the dividing line between the street

25   and the sidewalk right in front of the driveway.  A vehicle

Jane Brennan - Cross

1    then approaches from the south.  It's hard to tell whether the

2    vehicle is braking because of those three individuals, not

3    Mr. Scott, or whether the vehicle is braking because it's about

4    ready to cross the sidewalk and go into the entrance, but in

5    any event, it does not appear that Mr. Scott based upon where

6    he is at the time is causing the vehicle to either slow or

7    change its direction in any way.

8        However, as the vehicle starts to make the turn into PPRM,

9    the three individuals who were in front of the driveway move

10   off to the south so that they get out of the way, and at that

11   point in time Mr. Scott approaches the vehicle and attempts to

12   engage the driver of that vehicle.  However, the vehicle does

13   not stop and proceeds on into the facility.

14       The next incident is February 4th of 2010 and this is

15   Exhibit 3 of the United States.  This is a situation where a

16   vehicle is seeking to leave PPRM's facility.  Because Mr. Scott

17   apparently wishes to try to engage the driver of the vehicle,

18   as the car is approaching, he crosses to get into the middle --

19   he is on the north side -- he crosses to get into the middle of

20   the driveway area.

21       From the videotape that act of crossing to the middle does

22   not cause the vehicle to deviate from its path or slow down in

23   any way.  However, the car does stop in the driveway and at

24   that point in time Mr. Scott engages the driver of the vehicle.

25   And because of that fact the vehicle does come to a stop.

234

Jane Brennan – Cross

1   While Mr. Scott is talking to that particular vehicle, another

2   vehicle seeking to exit the facility pulls up behind the other

3   vehicle.

4       Ms. Durgin testified that she was, in fact, the driver of

5   that second vehicle.  And what the videotape shows is that

6   Ms. Durgin was held up for approximately 28 seconds by my count

7   while she was waiting for the conversation between Mr. Scott

8   and the other vehicle to end such that the other vehicle then

9   leaves, at which point Ms. Durgin's vehicle exits the facility.

10      As Ms. Durgin's vehicle leaves, Mr. Scott's position is not

11  blocking the exit from the facility.  He does attempt to engage

12  the driver and crouches down apparently to establish some type

13  of eye contact with the driver, but at that point in time

14  Ms. Durgin's vehicle is moving quickly.  She doesn't stop.  She

15  just quickly drives off and turns to the south on Pontiac

16  Street.

17      The next incident is one that takes place on December 2nd,

18  2010.  In this particular incident a vehicle approaches the

19  facility.  Mr. Scott is carrying a large sign.  Once the

20  vehicle turns into the driveway, the vehicle stops and

21  Mr. Scott initiates a conversation with the driver.  Mr. Scott

22  does not move in front of that vehicle.  As Mr. Scott is having

23  that conversation with that first vehicle, another car

24  approaches and is attempting to turn into PPRM.

25      Because of the position of the car that's stopped talking

Jane Brennan - Cross

1    to Mr. Scott, that second vehicle is waiting to get by and by

2    my count is delayed by about 30 seconds.  Towards the end of

3    that 30-second period a third car is also trying to get into

4    the facility and it also is having to wait, although once the

5    first car proceeds into the parking lot, then the second car

6    quickly enters, not being blocked, and then the third car

7    quickly enters as well.  And once again, Mr. Scott's position

8    in the driveway is such that it is not -- his position is not

9    blocking those two cars' ability to enter the lot.

10       Then the final incident is one that is the videotape marked

11   as Exhibit No. 1.  And in this particular incident Mr. Scott

12   approaches a car that is turning into the driveway.  He is

13   carrying a sign.  The vehicle stops.  Mr. Scott has a

14   conversation with the driver.  And during the time that he is

15   having that conversation with the driver of that vehicle,

16   another vehicle is attempting to enter into the facility and is

17   unable to do so.  That particular vehicle is delayed for

18   approximately a minute before the first vehicle clears, and as

19   a result the second vehicle is able to -- actually, this is a

20   little bit different.  After a minute this particular vehicle,

21   the second vehicle, reverses, repositions itself and then goes

22   around the stopped vehicle.

23       When it goes around, nothing about Mr. Scott's position

24   impedes the car's ability to go around because Mr. Scott is

25   over on the driver's side, but obviously the car in that

Jane Brennan – Cross

1    incident or the second vehicle in that particular incident

2    needed to reverse, of course, from a different angle in order

3    to get around the first vehicle that Mr. Scott was talking to.

4        The Court will now review what the standards are for a

5    preliminary injunction.  And the standards come from a case of

6    the 10th Circuit from 2009 called *Roda Drilling Company v.*

7    *Siegal*, 552 F.3d 1203 at 1208.  And in order to obtain a

8    preliminary injunction, the moving party bears the burden of

9    establishing that four factors weigh in its favor:

10       No. 1, a likelihood of success on the merits;

11       No. 2, a likelihood that the movant will suffer irreparable

12   harm in the absence of preliminary relief;

13       No. 3, that the balance of equities tips in the movant's

14   favor;

15       And No. 4, that the injunction is in the public interest.

16       Before I go through each of those different factors, let's

17   talk about the issue of whether this is a disfavored

18   injunction.  And the claim of Mr. Scott is that this would

19   alter the status quo and therefore this constitutes the

20   disfavored category of a mandatory injunction.

21       For purposes of determining what the status quo is, the

22   Court looks to the last uncontested status between the parties

23   which preceded the controversy until the outcome of the final

24   hearing.  However, the status quo is not necessarily defined by

25   what was the condition immediately prior to the lawsuit.

Jane Brennan – Cross

1   Instead, as the 10th Circuit noted in *Dominion Video Satellite*

2   *Inc*, a case from 2001, in determining the status quo for

3   preliminary injunctions, this court looks to the reality of the

4   existing status and relationship between the parties and not

5   solely to the parties' legal rights.

6        On this particular record it's somewhat unclear how long

7   Mr. Scott has been doing this outside of PPRM at its Pontiac

8   Street facility.  Regardless of when he started, it's unclear

9   exactly what he was doing, whether his behavior is different.

10  There is some testimony that his behavior is a little bit

11  different now, but it seems to have come about for some

12  litigation related reason, and in any event, that change of

13  conduct only took place beginning in the summer of 2011.

14       And as a result, the Court cannot conclude that this is

15  some type of a mandatory injunction, so as a result, the Court

16  finds that the four factors would apply as they would in the

17  case of a normal preliminary injunction.

18       Given that, I will now review each of the different

19  factors, and I will start with likelihood of success on the

20  merits.  The statute, and this is 18 U.S.C. 248(a)(1) reads:

21  Whoever by force or threat of force or by physical obstruction,

22  intentionally injures, intimidates or interferes with or

23  attempts to injure, intimidate or interfere with any person

24  because that person is or has been, or in order to intimidate

25  such person or any other person or any class of persons from,

Jane Brennan – Cross

1    obtaining or providing reproductive health services.

2        The statute contains certain definitions.  The term

3    "interfere with" is defined as to restrict a person's freedom

4    of movement.  And the term "physical obstruction" means

5    rendering impassable ingress to or egress from a facility that

6    provides reproductive health services or to or from a place of

7    religious worship, or rendering passage to or from such a

8    facility or place of religious worship unreasonably difficult

9    or hazardous.

10       There is no disagreement that PPRM is a facility within the

11   meaning of the Act the Court so finds.  And I construe the

12   statute to mean that in order for the United States to

13   demonstrate the likelihood of success on the merits, the United

14   States must prove the following elements:

15       No. 1, by force or threat of force or by physical

16   obstruction;

17       No. 2, intentionally injured, intimidated or interfered

18   with or attempted to injure, intimidate or interfere with any

19   person;

20       No. 3, because that person is or has been obtaining or

21   providing reproductive health services or in order to

22   intimidate such person or any other person or any class of

23   persons from obtaining or providing reproductive health

24   services.

25       And that's from the 11th Circuit's has opinion from 2001

Jane Brennan - Cross

1    from *Roe v. Aware Woman Center for Choice, Inc*.

2        Here, of course, the claim is not that Mr. Scott threatened

3    anyone or injured anyone.  It's rather that he obstructed

4    people by virtue of two claims by the government; No. 1, by

5    virtue of how he positioned himself in the driveway when cars

6    were either approaching or when cars were leaving the facility;

7    and No. 2, by virtue of the fact that when engaging a vehicle

8    that chose to stop and the driver talked to him, the car that

9    stopped and talked to him created an obstruction that

10   interfered with the ability of people to either go in or out of

11   the facility.

12       The Court does find that for purposes of this hearing that

13   the government has shown a likelihood of success in showing

14   that the defendant had the necessary intent.  In other words,

15   Mr. Scott intended to engage persons either leaving the

16   facility or entering the facility.  And by virtue of him

17   attempting to talk to them and knowing that the natural

18   consequence of a person stopping the vehicle was that the

19   vehicle itself would be positioned in a way that would narrow

20   the driveway, that he did, in fact -- that the government

21   showed a likelihood of success in showing that he acted with

22   the necessary intent.

23       And the Court consistent with the way that it ruled on the

24   motion to dismiss that Mr. Scott filed also finds that the

25   persons that were affected by that -- I use the term blocking,

Jane Brennan – Cross

1   but the cars being in the way, were persons that were obtaining

2   or providing reproductive health services.

3        The issue then becomes whether or not Mr. Scott by virtue

4   of either his body position or by virtue of the position of the

5   cars that he was talking to and which stopped to talk to him

6   constitutes a physical obstruction.  And there has to be some

7   type of physical obstruction under the Act.

8        And once again, in reviewing this particular element of a

9   claim, it's appropriate to go back to the statute and look at

10  that definition of physical obstruction.  And that part of it

11  that I think is most relevant here -- well, actually let's take

12  a look at the whole thing.  Physical obstruction means

13  rendering impassable ingress to or egress from.  The Court

14  doesn't find the government has shown any likelihood of success

15  in showing that.

16       It's true that when Mr. Scott was engaging one of the

17  vehicles and that vehicle stopped, there were on some occasions

18  cars that were behind either seeking to enter or exit who had

19  to stop and wait.  However, I don't believe that the term

20  impassable used in the first part of the definition of physical

21  obstruction refers to that situation because it was only

22  temporary.  It wasn't as if Mr. Scott did something that had

23  the effect of closing off the entrance, completely blocking it,

24  anything of that nature.

25       What's more pertinent for purposes of the facts before the

Jane Brennan – Cross

 1    Court is the last part of the clause defining physical

 2    obstruction which reads or rendering passage to or from such a

 3    facility unreasonably difficult or dangerous.  There was some

 4    testimony from people who were in the second cars on what type

 5    of effect having Mr. Scott talk to a car that stopped had on

 6    them.  There was the testimony of Mr. Cram about -- no, there

 7    was actually the testimony of Mr. Wagner about the

 8    September 30th, 2009 incident, not one that the government

 9    apparently is -- has narrowed its case down to, although it is

10    an incident that's referred to in the complaint.

11        And Mr. Wagner said on cross-examination that he was

12    delayed and he was concerned and frightened.  However, there is

13    no explanation for why Mr. Wagner was concerned, no explanation

14    for why Mr. Wagner was frightened and really no basis on which

15    the Court could draw any conclusion that the delay in and of

16    itself would cause anyone to be frightened, especially given

17    the fact that Mr. Wagner is a very experienced law enforcement

18    person.  And the only thing that he testified about was that he

19    was delayed and that when the car in front of him moved, that

20    he was able to leave.  And he also testified that he did not

21    see Mr. Scott do any blocking in that particular case.  He also

22    admitted that Mr. Scott did not step out in front of his car.

23    He made no police report regarding that particular incident.

24        We also heard the testimony from Ms. Armstrong regarding

25    the December 16, 2009 incident.  She testified that Mr. Scott

Jane Brennan - Cross                                            242

 1   didn't say anything to her.  She could not get past.  She

 2   couldn't go around because of the fact this other car was

 3   stopped.

 4       Ms. Durgin testified regarding the February 4th, 2010

 5   incident that she decided once she was unable to exit because

 6   of this other car that had stopped in the driveway while

 7   Mr. Scott was talking to the driver that she considered it to

 8   be unsafe to go around the vehicle.  She did testify that it's

 9   hard to see around the gates.

10       But once again, that testimony doesn't explain why any

11   other driver wouldn't have to slow down and would probably stop

12   in order to safely either cross the sidewalk regardless of

13   whether someone is in the sidewalk area or simply stop or at

14   least almost come to a stop just to be able to look both ways

15   on the street, particularly given the fact that the fence is

16   closed off so you can't see through the fence.

17       Ms. Durgin did testify that she was apprehensive and

18   irritated and she testified that she was not sure what the

19   defendant would do.  I don't construe anything that Ms. Durgin

20   said to in any way suggest that there was something dangerous

21   about Mr. Scott's behavior, especially given the fact that

22   Ms. Durgin testified that she was seeing Mr. Scott virtually

23   every day so she would have a context and, in fact, did testify

24   about the fact that she sees him all the time.  She didn't

25   testify about anything specific that would suggest that there

Jane Brennan – Cross

1   was a particular danger or hazard to her.

2       The issue in terms of physical obstruction what it boils

3   down to is whether -- well, first of all, let me make the

4   following conclusion of law and that is that Mr. Scott's body

5   position did not constitute a physical obstruction; and as a

6   result, the government has shown no likelihood of success on

7   the merits with that particular theory.

8       So then the better theory is that Mr. Scott by virtue of

9   engaging certain drivers in a conversation and having certain

10  drivers stop their vehicles in the driveway, that those

11  vehicles that he is talking to constitute the blockage and has

12  the effect of a physical obstruction within the meaning of the

13  Act.

14      In that regard, what we have is, as I have said before, we

15  have a situation where there is evidence that I think three,

16  maybe four drivers were delayed, and the length of the delay

17  varied from between 20, seconds to up to a minute.  So the

18  question becomes whether -- and the Court will also find that

19  the fact that they are delayed or even the actions at least as

20  shown in one of the videotapes of a driver having to reposition

21  the car and go around in and of itself does not show any

22  evidence of there being a hazard.  There is no evidence in

23  those incidents of any type of a traffic accident, although

24  Mr. Cram thought that he saw some near accidents but was

25  unspecific about when those occurred and frankly was unspecific

Jane Brennan – Cross

1    about whether the conduct was a result of Mr. Scott's conduct.

2    So there is nothing about the getting around or the waiting

3    that constitutes any type of hazard.

4        So the issue then boils down to whether the delay itself,

5    which is a delay that is causing a blockage of the facility,

6    whether that delay constitutes a physical obstruction rendering

7    passage to or from such facility unreasonably difficult or

8    hazardous.  It's not hazardous, so is it unreasonably difficult

9    by virtue of the blockage?

10       Well, obviously during that period of delay, well, in some

11   instances a car can maybe go around.  Nonetheless, it does

12   constitute a blockage.  But then what do we mean or what did

13   Congress mean by the word unreasonable?  The government's

14   theory is that any type of delay would constitute a violation

15   of the Act, but I don't think that that can be true because

16   otherwise we wouldn't be doing the balancing between First

17   Amendment rights and the rights of persons who are seeking

18   reproductive health services.  Instead, there would be

19   something almost similar to strict liability if there was even

20   a momentary delay.

21       Also I think we have to look at the character of the delay,

22   too.  So, for instance, as I referred to, other courts have

23   held that if, for instance, protesters are lying on the ground

24   in the path of persons who are seeking access to a facility,

25   that the act of having to step over them to get inside can be

Jane Brennan - Cross

1    unreasonable.

2        Here we have a situation where people are essentially stuck

3    in their car and having to wait for a period of time to get

4    into the facility.  I think there could be situations where if

5    the delay that took place was a lengthy delay, that certainly

6    the government would be able to show a likelihood of success on

7    the merits because that delay could reasonably have the effect

8    of deterring people from obtaining the services and it would

9    certainly constitute -- and it's right under the definition,

10   really -- it would interfere with their freedom of movement

11   inside the facility.

12       But part of the context here is the fact that Mr. Scott is

13   engaging with a small subset of persons who choose to stop and

14   talk to him.  And even though as I found in terms of his

15   intent, I think that Mr. Scott is responsible for the natural

16   consequence of his actions.  Nonetheless, this is to me a lot

17   different than judging reasonability from the situation where,

18   for instance, a person may stand in front of a vehicle or do

19   other types of purposeful activities to obstruct entrance or

20   delay entrance into a facility.

21       Instead, as we have talked about, Mr. Scott in the course

22   of engaging people entering or exiting the facility on occasion

23   creates this blockage because someone chooses to talk to him.

24   But given the evidence that was presented today of the length

25   of delay between 20 and 60 seconds and given the fact that the

Jane Brennan - Cross

1    delay in this case is as a result of Mr. Scott engaging in what

2    the government concedes is an exercise of his protected First

3    Amendment rights, the Court finds that the government has

4    failed to demonstrate likelihood of success on the merits in

5    terms of showing that element that requires proof of a physical

6    obstruction.  And therefore, because the government has failed

7    to show that, the government has failed to show likelihood of

8    success on the merits, period.

9        The other factors that are mentioned in the preliminary

10   injunction standards are balance of the equities.  Once you --

11   and frankly in terms of the equities here, it's hard to say

12   that it favors one side or the other.  Certainly the fact that

13   there have been no violations apparently that the government

14   has cited for a long period of time doesn't demonstrate that

15   the equities are in favor of the United States.

16       However, on the other hand, there seems to be some evidence

17   that Mr. Scott is refraining from his activity because of the

18   legal matter, so it's somewhat unclear about to what extent

19   Mr. Scott may resume the activity.  But even if we assume that

20   Mr. Scott may resume the activity, if the government hasn't

21   shown a likelihood of success on the merits and if the Court

22   denies the injunction, then that doesn't really help the United

23   States' argument in any event.

24       Similar to in terms of the public interest, certainly there

25   is a public interest in enforcing the Act.  The Act protects

Jane Brennan - Cross

1   people's right to access reproductive healthcare, no doubt

2   about that fact.  But on the other hand, the statute explicitly

3   acknowledges a balancing of First Amendment rights.  And if the

4   government has failed to show likelihood of success on the

5   merits, then the public interest in enforcing the Act also does

6   not weigh in favor of entering an injunction.

7       And finally, in terms of the irreparable harm, once again,

8   the government -- I shouldn't say once again, but that delay

9   once again as demonstrated by the evidence between 20 seconds

10  and a minute has not been shown to cause or have likelihood of

11  causing any type of irreparable injury.  Certainly there has

12  been some testimony that it was annoying, but there is no

13  testimony -- and those are from people who are staff, but, of

14  course, the staff have to put up with this, as they testified,

15  virtually every day.

16      And, in fact, they have a policy of non-engagement, and

17  that non-engagement policy kind of recognizes the fact that

18  they are frequently subjected to all sorts of things which may

19  not necessarily be pleasant things or good things, but for

20  purposes of what we are dealing with today in determining

21  whether there has been a violation of the Act and whether there

22  would be some type of irreparable harm, there has been no

23  showing that delay of any staff person will cause irreparable

24  injury.

25      Moreover, there has been no showing of any irreparable harm

Jane Brennan - Cross

1    to any patients from that delay.  Once again, there certainly

2    could be a situation where if a defendant was significantly

3    delaying the ability of someone to come, a patient to either

4    come into a facility or out of a facility, that there could be

5    irreparable harm because that person's access to reproductive

6    health services could be significantly impaired by virtue of

7    that long delay.  On this record, however, without any evidence

8    from any person who is seeking services who was delayed, the

9    Court can't find that there has been any irreparable harm.

10       So once I balance out my findings in regard to each of the

11   four factors, the Court finds that none of them weigh in favor

12   of granting the injunction; and as a result, the United States'

13   motion for a preliminary injunction will be denied.

14       Mr. Fleisher, anything else on behalf of the United States?

15           *MR. FLEISHER:*  No, thank you, Your Honor.

16           *THE COURT:*  On behalf of Mr. Scott, anything further?

17           *MR. BREEN:*  No, Your Honor.

18           *THE COURT:*  Then the Court will be in recess.  Thank

19   you.

20       (Recess at 5:45 p.m.)

21

22

23

24

25

Jane Brennan – Cross

1                               INDEX

2    OPENING STATEMENTS

3        By Ms. Gayle                                        6

4        By Mr. Breen                                       10

5    WITNESSES

6        Michael Wagner

7            Direct Examination By Mr. Fleisher            17

8            Cross-examination By Ms. Messall              42

9        Kara Armstrong

10           Direct Examination By Ms. Gayle              61

11           Cross-examination By Ms. Messall             68

12           Redirect Examination By Ms. Gayle            73

13       Danny Cram

14           Direct Examination By Mr. Fleisher           74

15           Cross-examination By Ms. Messall             88

16       Leslie Durgin

17           Direct Examination By Ms. Gayle              94

18           Cross-examination By Ms. Messall            100

19       Binette Diallo

20           Direct Examination By Mr. Breen             110

21       Oretha Zaybay

22           Direct Examination By Mr. Breen             115

23       Clifton Powell

24           Direct Examination By Mr. Breen             119

25           Cross-examination By Mr. Fleisher           131

Jane Brennan - Cross

1                    **INDEX (continued)**

2   **WITNESSES**

3      Joshua Aughenbaugh

4           Direct Examination By Mr. Breen              132

5           Cross-examination By Ms. Gayle              138

6           Redirect Examination By Mr. Breen           141

7      Jackie Cromer

8           Direct Examination By Mr. Breen              143

9           Cross-examination By Ms. Gayle              150

10          Redirect Examination By Mr. Breen           153

11     Leo Mantei

12          Direct Examination By Mr. Breen              154

13          Cross-examination By Mr. Fleisher           160

14          Redirect Examination By Mr. Breen           162

15     Lisa Cress

16          Direct Examination By Mr. Breen              163

17     Paula Lynn Reid

18          Direct Examination By Mr. Breen              171

19     Jane Brennan

20          Direct Examination By Mr. Breen              174

21          Cross-examination By Ms. Gayle              192

22

23

24

25

Jane Brennan – Cross

1                          **INDEX (continued)**

2                               EXHIBITS

3   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4   1-6                        36

5   11                         25

6   12                        106

7   13                        109

8                        REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.  Dated

11   at Denver, Colorado, this 8th day of February, 2012.

12

13                               S/Janet M. Coppock____

14

15

16

17

18

19

20

21

22

23

24

25